**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ELNOR WHITEHEAD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:08-cv-00192 |
| v. ) | |
| ) | |
| THE PULLMAN GROUP, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**THE PULLMAN GROUP, LLC'S MOTION TO VACATE ARBITRATION AWARD**

## 1. INTRODUCTION

The arbitration award is erroneous and must be vacated because the arbitrators did not consider critical evidence based on a misapplication of the Dead Man's Rule.

## 2. FACTS

The arbitration award states:

"By agreement of the parties and order of the Tribunal, in the interests of efficiency and expediting the process, both sides were permitted at the hearing to present evidence in either written form, or by oral testimony, given either in person or by telephone. At the beginning of the hearing, the Tribunal informed counsel how New York's Dead Man's Statute, NY CPLR 4519, would be applied. To save time, no restriction would be placed on presenting the testimony of witnesses, 'some of which had already been reduced to writing, **but in the decision process the Tribunal would give no weight to testimony by any witness who was 'interested in the event' with respect to any transaction with either decedent Gene McFadden or decedent John Whitehead.** All understood that this would preclude **any weight** to be given to the anticipated testimony by David Pullman, Claimant's sole stockholder, about his conversations with Gene and John, both before and after the contract was entered into. Based on the evidence presented and the arguments and submissions of counsel, and after due deliberation, the Tribunal finds and concludes that Pullman has failed to prove that it performed its obligations under the contract so that its claims must be dismissed with prejudice..."

Declaration of Anthony Kornarens ("Kornarens Decl."), Exh. A, Arbitration Award, pp. 2-3.

As the basis of this conclusion, the Award states:

"But even assuming that the due diligence was completed, Pullman had an additional

1

> obligation, clearly implied by the Agreement, and that was to notify Gene and John of the fact that it had completed its due diligence in a commercially reasonable manner.
> . . .
> In the context of the Agreement and the circumstances of this case, we find and conclude that the Agreement imposed on Pullman an implied obligation to notify Gene and John that Pullman's due diligence had been completed and what its results were. Only then could the price of the catalog be determined, and only then would the 'First Right of Refusal' and other rights purported to be reserved for Pullman in the Agreement, including specific performance and the 'break up fee' set forth in Paragraph 7, come into existence." Kornarens Decl., Exhibit A, pp. 3-4.

The Award thus makes clear that the Arbitrators "implied" a contractual obligation that Pullman notify the Sellers "that Pullman's due diligence had been completed and what its results were" and *also* refused to hear the undisputed (and, indeed, admitted) evidence that Pullman *did* notify the Sellers "that Pullman's due diligence had been completed and what its results were." *Id.* The Award also makes clear that the Arbitrators failed to consider the unrefuted testimony of Pullman **and** *the representatives of the Estates* that the Sellers had repudiated their obligations under the agreement within a few weeks of signing it (and well within the 180 day contract period to conduct due diligence [Kornarens Decl., Exh. A, Arbitration Award at 3]); thereby excusing Pullman from any further obligation to perform under New York law. Nonetheless, the Arbitrators held against Pullman due to a "failure of proof."

Of course, the so-called "failure of proof" by Pullman was the direct result of the Arbitrators' refusal to consider Pullman's testimony that "he had orally informed Gene and John that he had completed due diligence..." and the Arbitrators' failure to consider all of the parties' admissions that the Sellers had repudiated their obligations under the agreement within a few weeks of signing it.

The Award concludes:

"Until Pullman notified Gene and John that its due diligence was complete, the price formulae could not be applied, so the contract was, therefore, left without a price term for the transaction. Although David Pullman's testimony asserted that he had orally informed Gene and John that he had completed due diligence, Pullman presented no writing to that effect, and since David Pullman, as Claimant's sole stockholder, is a person "interested in the event", the tribunal, under the Dead Man's Statute, must disregard his testimony about those conversations. As a result, Pullman has not met its burden of proving either that it notified Gene and John that it had completed its due diligence in a commercially reasonable manner or that the price of the catalog was ready to be calculated. Indeed, the first time the alleged price of the catalog under the

Agreement ($1.9 million) was identified by evidence the Tribunal could rely on was in the course of this arbitration in 2014. Accordingly, Pullman's claim for breach of contract and specific performance of the Agreement to purchase is dismissed with prejudice. Kornarens Decl., Exh. A, Arbitration Award, p. 4."

The arbitrators misapplied the Dead Man's Rule and refused to consider this and other crucial evidence:

"Pullman argued that Gene and John had committed an anticipatory breach of the contract by refusing to proceed with the sale in 2002. The only evidence in support that the Tribunal can consider is the allegation in the Estates' Answer and Counterclaim that Gene and John did not "desire to consummate the transaction" (Ans., Par. 27). But such a "desire" is far from the total repudiation or "definite and final communication evincing an intention to forego performance under the contract" that is required under New York law to constitute an anticipatory breach. (See *D'Ahreau v. Smith,* 220 AD2d 616 at 617 [2nd Dept. 1997])". Kornarens Decl., Exh. A, Arbitration Award, p. 5.

Even as to the pleading that the Arbitrators mistakenly believed they were limited to considering, the Award omits a key portion of the admission contained in the Estates' Answer and Counterclaim that this "desire" **was communicated to Pullman by McFadden and Whitehead**, thereby showing that the arbitrators refused to consider the uncontroverted evidence of these communications.

Thus, the Estates' pleadings state that McFadden and Whitehead "**notified Pullman** that they did not desire to consummate the proposed transaction." Kornarens Decl., Exhibit B, Estates' Answer and Counterclaim, Par. 27 (Boldface added). For whatever reason, the Award omits the admission that McFadden and Whitehead "**notified Pullman"** that they did not desire to proceed. In addition to admitting that McFadden and Whitehead committed an anticipatory repudiation, this affirmative allegation opened the door under the Dead Man's rule to Pullman's communications with McFadden and Whitehead.

As well, the Award omits the testimony of the representatives of the Estate that McFadden and Whitehead – within only a few weeks of signing the Agreement – and well within the due diligence period – had decided they wanted nothing to with Pullman and were unwilling to communicate with David Pullman. This testimony which the Arbitrators declined to consider conclusively affirms that there

3

was an anticipatory repudiation by McFadden and Whitehead, well within the 180 day due diligence period, thereby excusing the additional term the arbitrators implied into the Agreement.

These admissions should have been considered under the Dead Man's Rule. Not only were they material, they also confirm that an anticipatory repudiation of the Agreement was communicated to Pullman under New York law; thereby excusing any further performance by Pullman under the Agreement, including the due diligence requirement that Arbitrators "implied" and then found was not met because they would not consider Pullman's testimony under the Dead Man's Rule.

3.    **AN ARBITRATION AWARD MUST BE VACATED WHERE, AS HERE, THE ARBITRATORS FAILED TO CONSIDER ALL EVIDENCE MATERIAL TO THE CONTROVERSY**.

As the Award correctly states at page two, the Parties stipulated that New York law applies to these proceedings.

New York CPLR Section 7511 (entitled "Vacating or modifying award") states:

**(a) When application made.** An application to vacate or modify an award may be made by a party within ninety days after its delivery to him.

**(b) Grounds for vacating.**
1. The award shall be vacated on the application of a party who either participated in the arbitration or was served with a notice of intention to arbitrate if the court finds that the rights of that party were prejudiced by:

(i) corruption, fraud or misconduct in procuring the award; or
(ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or
(iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or
(iv) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.

The Federal Arbitration Act is applicable to this case since it involves interstate commerce. The FAA has a provision identical to the New York statute.  (FAA, Section 10(a) stating as grounds for vacating an arbitration award, "[w]here the arbitrators are guilty of . . . refusing to hear evidence pertinent and material to the controversy.").

4

*Lewis v. County of Suffolk*, 70 A.D.2d 107 (N.Y. App 1979) explains that refusal by an arbitrator to hear pertinent material evidence may constitute misconduct under CPLR 7511. That case is directly on point.

> Refusal by an arbitrator to hear pertinent material evidence may constitute misconduct under CPLR 7511 (subd [b], par 1, cl [i]) for which the award should be vacated. (Gervant v New England Fire Ins. Co., 306 NY 393; Matter of Professional Staff Congress/City Univ. of N.Y. v Board of Higher Educ. of City of N.Y., 39 NY2d 319; 23 Carmody-Wait 2d, NY Prac, § 141:117).
>
> As stated in Weinstein-Korn-Miller (vol 8, par 7511.15, pp 75-206 -- 75-207): "Courts have frequently used the term 'misconduct' loosely to denote any irregularity whether intentional or unintentional.". . .
>
> The opinion accompanying the award clearly showed that evidence of the negotiators' alleged stated intents as to the 1977 portions of the increases set forth in the 1976 agreement was a very important factor in the arbitration award. In fact, the arbitrator held it against the county for not offering such evidence. Under such circumstances we believe that if the alleged statement were in fact made, there would indeed be "misconduct", albeit unintentional, sufficient to vacate the award under CPLR 7511 (subd [b], par 1, cl [I]).
>
> There is a distinction between an arbitrator's mistake of fact or law, in general (see Matter of Schine Enterprises [Real Estate Portfolio of N.Y.], 26 NY2d 799) and a statement made by the arbitrator which is a direct cause of the parties' not offering competent and material evidence. **The latter constitutes an exclusion of evidence which, although more subtle, is just as prejudicially effective as a specific ruling made by an arbitrator that evidence, formally proffered, is to be excluded.**

*See also Professional Staff Congress/City University of New York v. Board of Higher Education* (N.Y. 1976) 39 N.Y.2d 319, 323 ("An arbitrator's award, however, may be vacated for prejudicial misconduct by the arbitrator (CPLR 7511, subd [b], par 1, [i]). One form of misconduct is the refusal to hear pertinent and material evidence *(e.g., Gervant v New England Fire Ins. Co.,* 306 NY 393, 400; *Matter of Katz [Uvegi]*, 18 Misc 2d 576, 583 [Pette, J.], affd 11AD2d 773; see *Matter of Raisler Corp.* [New York City Housing Auth.], 32 NY2d *274,* 282-283, supra, and sources cited)."

Many New York cases have applied this rule in vacating arbitration awards based on arbitral failure to consider probative evidence.

For example, in *Matter of State of New York Off. of Mental Health v. New York State Correctional Officers & Police Benevolent Assn.,Inc.*, 46 A.D.3d 1269 (N.Y. App. Div. 3d Dep't 2007), an employee was arrested on charges of allegedly assaulting a patient at one of the state agency's facilities. Following a jury trial, the employee was convicted of assault in the third degree and official misconduct. The arbitrator preliminarily ruled that he would not hear evidence as to the outcome of the criminal trial. He instead reviewed transcripts from the trial and heard testimony from witnesses. On appeal, the court found that the arbitrator exceeded his power and committed misconduct by excluding pertinent and material evidence, which resulted in an irrational factual conclusion under CPLR 751l(b) (l). Additionally, the arbitrator acted irrationally and committed arbitral misconduct by not admitting proof of the employee's criminal convictions which directly related to the charged misconduct and conclusively resolved the question of whether the employee committed that misconduct. The petition to vacate the arbitration award was granted. The Court reasoned that once a dispute has been properly submitted to arbitration, a court has the authority to vacate the award if a provision of CPLR 7511(b) applies (see *Matter of New York City Tr. Auth. v Transport Workers' Union of Am., Local 100, AFL-CI0,* 6 NY3d 332, 336, 845 NE2d 1243, 812 NYS2d 413 [2005]). The Court held the arbitrator exceeded his power and committed misconduct by excluding pertinent and material evidence which resulted in an irrational factual conclusion. The same is true in this case.

In *Intercontinental Packaging Co. v. China Nat'l Cereals,Oils & Foodstuff Import & Export Corp.*, 172 A.D.2d 224 (N.Y. App.Div. 1st Dep't 1991), the purchaser and the seller made an agreement, which provided that the purchaser had to make timely claims for defective goods. The parties later agreed that disputes would be submitted to arbitration under New York law. The Court found "that the award must be set aside for misconduct by the arbitrator pursuant to CPLR 7511(b)(1)(i). Although the claimed 'misconduct' herein (refusal to admit into evidence or consider the April 5, 1986 agreement) was perfectly understandable, given the then extant determination by the IAS

court that the April 5, 1986 agreement had been superseded, nevertheless the arbitrator's refusal to consider what was later determined to have been pertinent and material evidence, was prejudicial to China National, and justifies vacatur of the award." The same applies here. Even if "understandable," the Arbitrators' refusal to consider pertinent and material evidence justifies vacatur of the award.

In *In re Rosenberg*, 180 Misc. 500 (N.Y. Sup. Ct. 1943), Petitioner charged respondent with assault. Two of the three arbitrators found in favor of petitioner. The court granted respondent's cross-motion to vacate the award, concluding there was no basis for the damages awarded because there was no medical testimony to support the award, in a case where such proof is necessary. The minority arbitrator demanded said medical proof after the witnesses testified. The majority arbitrators failed to require such proof. Thus the award was vacated. The court was of "the opinion that under all the circumstances, this 'refusal to hear evidence pertinent and material to the controversy,' evidence that was necessary as a foundation for the award, constituted serious prejudice to the respondent and justifies setting aside the award. If the arbitrators refuse to hear evidence pertinent and material to the matter in controversy, it is unquestionably such misconduct as will vitiate an award in a court of equity." Thus, *Rosenberg* confirms the rule applies where the arbitrators have not been presented with or heard evidence necessary to a proper determination of the matter.

In *Gervant v. New England Fire Ins. Co.*, 306 N.Y. 393 (N.Y. 1954), an appraisal award based on the actual cash value of the premises was made by the umpire and the insurer's appraiser by determining the replacement cost less depreciation only. On review, the court found that the method to determine the actual cash value used by the umpire and the insurer's appraiser was incorrect as a matter of law and they should have considered every fact and circumstance which would logically tend to form a correct estimate of the loss. The court stated that their denial to receive all pertinent evidence offered was misconduct in the legal sense and was sufficient to set aside the award in equity. Reasoning that "the trier of fact should listen to all pertinent evidence on the subject" the Court stated "(t)he right

7

of a party to have appraisers receive all pertinent evidence offered is a fundamental procedural right to which plaintiff was entitled, and its denial by the umpire and the company's appointed appraiser has been characterized as 'misconduct, in the legal sense' which is sufficient... to set aside an award in equity."

Thus, under New York law, a mistake in the law by the arbitrators that results in not all material evidence being considered requires the award be set aside.

Likewise, in *Van Cortlandt v. Underhill* (N.Y. 1819) 17 Johns. 405, the lessors and lessees agreed to a long term lease in which the lessees would improve real property and the lessors would repurchase the buildings at the end of the lease. The parties agreed that each party would have an appraiser and that if the two a p p r a i s e r s d i d not agree on a price, they would pick a third appraiser. The two appraisers did not agree and a third appraiser established an $18,000 price for the improvements. The trial court entered a judgment in favor of the lessees for that amount, but the court reversed, finding that the appraisers acted as arbitrators and that erred in failing to consider evidence proffered by the lessors of the cost of the improvements. The Court found that the cost of the improvements was admissible and pertinent evidence as to the value of the improvements as contemplated by the parties. The Court reasoned: "**If the arbitrators refuse to hear evidence pertinent and material to the controversy, it is unquestionably such conduct as will vitiate an award in a court of equity**. Partiality and corruption, either of the arbitrators, or the suppression and concealment of material facts, by either of the parties, if it can reasonably be supposed that the knowledge of such facts by the arbitrators would have produced a different result, are causes for setting aside an award" (emphasis added).

Here, the Award specifically states that the Arbitrators refused to hear evidence pertinent and material to the controversy and it also states that evidence, had it been admitted, would have produced a different result.

Similarly, *Halstead v. Seaman* (N.Y. 1880) 82 N.Y. 27, 30-31, involved a creditor- debtor

8

dispute in which the arbitrators refused to allow the creditor to present witnesses and refused to receive any evidence other than the statements of the parties. The arbitrators found in favor of the debtor, and the creditor subsequently appealed. The court reversed and ordered a new trial because the refusal of the arbitrators to examine the creditor's witnesses was misconduct, although the arbitrators thought that evidence was sufficient without the examination of the witnesses. "The refusal of an arbitrator to examine witnesses is sufficient misconduct on his part to induce the court to set aside his award, even though he thinks he has sufficient evidence without them."

These standards are met in this case.

**4.    THE ARBITRATORS IMPROPERLY DECLINED TO CONSIDER MATERIAL AND PROBATIVE EVIDENCE.**

**A.    Introduction And Summary Of Argument**

As discussed in Part 2, the Arbitrators found that Pullman did not provide sufficient evidence to prove it complied with the contractual obligation "implied" by the Arbitrators that Pullman notify the Sellers "that Pullman's due diligence had been completed and what its results were." Kornarens Decl., Exh. A, Award, p. 4. The Arbitrators could reach this result only because they held the implied "obligation" could be met one way – through a written communication sent by Pullman to the Sellers notifying the Sellers "that Pullman's due diligence had been completed and what its results were." *Id.*

The Award makes clear that the Arbitrators failed to consider the extensive evidence offered by Pullman that he met this "implied" obligation by communicating verbally with McFadden and Whitehead, and this failure to consider material evidence was based on a misunderstanding about the operation of the Dead Man's Rule. Thus, the Award expressly confirms that the Arbitrators declined to consider David Pullman's uncontroverted evidence that he notified the Sellers that Pullman's due diligence had been completed and what its results were.

The Arbitrators *also* refused to hear the undisputed (and, indeed, admitted) evidence that Pullman *did* notify the Sellers "that Pullman's due diligence had been completed and what its results were." Nonetheless, the Arbitrators held against Pullman due to a "failure of proof."

The Arbitrators also held that Pullman did not provide adequate evidence that McFadden and Whitehead committed an anticipatory repudiation of the Agreement. This, too, was based on the Arbitrators' failure to consider evidence relevant to the controversy, based on a mistaken application of the Dead Man's rule. See Discussion *supra*.

**B.     How The Dead Man's Rule Is Supposed To Work And How It Is <u>Not</u> Supposed To Work.**

The purpose of the Dead Man's Rule is to discourage fraudulent claims against Estates where "death has sealed the lips" of a party "to a *personal* transaction." *Miller v. Lu-Whitney,* 61 A.D. 1043, 1044-1045 (italics added). The idea is that the decedent is no longer alive to controvert the personal claim. Ibid.  The Rule does not apply here, where the transaction was a *commercial* rather than a personal transaction. Indeed, one of the three Sellers identified in the Agreement is the partnership of "McFadden & Whitehead."  Kornarens Decl., Exh. C, Signed Agreement Dated May 10, 2002.  As to this entity, Pullman did not "derive its claim or sustain its liability through the deceased."  As such, the claim extended beyond simply the Estates of McFadden and Whitehead. The evidence was not subject to the Dead Man's Rule to begin with since the transaction was commercial (not personal) and one of the sellers was a partnership.  Moreover, as discussed at Parts C - E *infra*, there were many exceptions to the rule that were applicable here and which rendered all of Pullman's evidence admissible.

The Sellers cited to no case that permits application of the rule where, as here, the Arbitrators found a binding and enforceable agreement was entered into, and – after the fact – "implied" a notice provision that is not expressly in the Agreement, and held that "implied" term could be met only by a writing, since the Sellers had died after signing and repudiating the Agreement. At the same time, the Arbitrators also misapplied the Dead Man's Rule to disregard the Estate's *affirmative* admissions in the arbitration that the Sellers had repudiated the Agreement shortly after signing it, thereby excusing Pullman's obligation to meet the "implied" obligation.

In short, the Arbitrators' misapplication of the Dead Man's Rule made it impossible for Pullman

to enforce what the Arbitrators determined was a valid agreement – even though the Estates admitted the Sellers had repudiated that agreement shortly after signing it in 2002. *In re Estate of Wood*, 52 N.Y.2d 139, 145, 436 N.Y.S.2d 850, 418 N.E.2d 365 (1981) (Waiver rule under New York Dead Man's Rule "prevents the unfair use of the statute as a sword rather than a shield.")

**C.      Exceptions To The Dead Man's Rule.**

Recognized exceptions to the Dead Man's Rule that apply here include:

(i) the Estates opened the door by stating that there is no evidence they can consider that Pullman ever communicated the results of its due diligence to McFadden and Whitehead;

(ii) the Estates waived the Dead Man's Rule because both representatives of the Estates testified in their own behalf concerning a personal transaction of his adversary with McFadden and Whitehead;

(iii) the Estates waived the Dead Man's Rule because both representatives of the Estates elicited testimony from an interested party on the personal transaction in issue;

(iv) the Dead Man's Rule does not apply where, among other things, "the executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf..."; and

(v) some of the evidence that the Arbitrators declined to consider was not within the scope of the Dead Man's rule to begin with.

*See*  http://quizlet.com/24829628/dead-man-statute-flash-cards/  ("The New York Dead Man's statute is similar to the rule in most other states .... Door openers. The estate representatives and those claiming under the decedent may waive the protection of the statute. Common provisions for waiver include: (1) If the protected party calls the interested person to testify about the transaction, the interested person may explain all matters about which he is examined. (2) Where the testimony of the deceased given at a former trial or at a deposition is read in evidence, the interested person may explain all matters about which he is examined. (3) Where there is a failure to make timely and proper objection. Objection is to the incompetency of the witness, not to the incompetency of the testimony."

The Arbitrators' announcement *at the beginning* of the hearing – before hearing *any* evidence offered by the Estates – that they would not consider communications that Mr. Pullman had with McFadden and Whitehead demonstrates that the Arbitrators did not adequately assess these

exceptions.  Kornarens Decl., Exh. A, p.1.  (*See* CPLR §4519; *Phillips v. Joseph Kantor & Co.* 31 N.Y.2d 307, 313 (1972) (recognizing the inability to predict with certainty whether evidence otherwise excludable under the Dead Man's Statute might nonetheless be admissible at trial by virtue of a waiver of the statute and that such a waiver could be effectuated intentionally or by inadvertence, such as by "opening the door" to the admission of evidence otherwise excludable under the statute, the New York Court of Appeals holds that the Dead Man's Rule can be waived only at trial.).

> **D.  The Arbitrators Misapplied The Dead Man's Rule In Not Considering Uncontroverted Evidence That Pullman Met The Notice Obligation Which The Arbitrators Implied From The Contract.**

It is perhaps best to start with the obvious: the Arbitrators created an almost insurmountable hurdle by implying a notice obligation and then invoking the Dead Man's Rule and refusing to hear uncontroverted evidence that Pullman in fact met that obligation. Under the Arbitrators' unstated rationale, the only way Pullman could have met this "obligation" was to send written notice, in case both Sellers unexpectedly died before the arbitration.  This approach raises serious due process concerns: the Arbitrators – after the hearing and without any notice to Pullman– "implied" a contractual obligation that the Estates never claimed existed, and simultaneously invoked the Dead Man's Rule to decline to consider the copious evidence that this "implied" obligation was met.

As next shown, this misapplied the Dead Man's Rule for numerous reasons.

> ### *i.  The Estates Opened the Door (An Exception to the Dead Man's Rule) by Stating That There Is No Evidence They Can Consider That Pullman Ever Communicated the Results of its Due Diligence to McFadden and Whitehead.*

Both by giving declarations and by making representations regarding the state of McFadden and Whitehead's knowledge and the Contract, the Estates have waived any protection that the Dead Man's statute otherwise arguably might have afforded. *In Re Nealon,* 104 A.D.3d 1088 (3d Dept 2013). ("[T]he Dead Man's Statute....will not preclude any testimony elicited by the representative of the estate, nor does it preclude testimony of transactions between decedent and a non-interested third party (see *Durazinski v Chandler*, 41 AD3d 918, 920 [2007]).

Indeed, (1) the Estates (including in the brief and their Opening Statements) argued that The Pullman Group did not perform by failing to communicate; (2) the Estates offered testimony (for example, Barbara McFadden's testimony) where they admit that McFadden and Whitehead did not want to perform the contract (including telling her not to allow Mr. Pullman to talk to them and Mr. Pullman's attempt to talk to McFadden when he was sick); (3) the testimony of Kenneth Whitehead confirming the heirs' declarations. Likewise, David Pullman testified that after the Contract was made, McFadden and Whitehead provided no further documents to The Pullman Group, LLC, even though the Contract required them to do so.  Kornarens Decl., Exh. I, Declaration of David Pullman, ¶¶48-49; Kornarens Decl., Exh. C,  Signed Agreement Dated May 10, 2002, ¶3.

This testimony corroborated Pullman's testimony about his communications with McFadden and Whitehead and their anticipatory repudiation of the Agreement. The Arbitrators erred in failing to consider this corroborating testimony.  (http://judgebonniesudderth.wordpress.com/2012/04/11/the-dead-mans-rule/) ("It is not necessary that the corroborating witness provide direct testimony about the decedent's oral statement, so the corroborating witness need not actually have heard the words spoken.  All that is required is that the corroborating witness provide testimony that tends to prove the truthfulness of the testimony that would otherwise be barred.  For example, proof that a decedent subsequently acted in conformity with the decedent's alleged oral statement would suffice as corroboration and render an executor's testimony as to the statement admissible.")

Moreover, Respondents opened the door by claiming that David Pullman "abandoned" the Contract and by examining Mr. Pullman at the arbitration regarding these issues.  This waived any protection that the Dead Man's Rule conferred and resulted in the Arbitrators erring in failing to consider evidence of David Pullman's communications with the Sellers, including the following:

● The Pullman Group, LLC repeatedly reminded McFadden and Whitehead of what it was learning through its due diligence activities and its rights (Kornarens Decl., Exh. I, Pullman Decl., ¶57;

footnote 1/);

● The Pullman Group, LLC through David Pullman told McFadden and Whitehead what it had learned through its due diligence activities and communicated the amount of the purchase price to each of them (Kornarens Decl., Exh. I, Pullman Decl., ¶57);

●This was confirmed in the testimony given by Mr. Pullman at the arbitration.  Kornarens Decl., Exh. J, Pullman Testimony, R.T. 225:7-226:3.

● The Pullman Group, LLC in May-June 2006 brought the tax liens to the attention of McFadden and Whitehead and tried to communicate with McFadden and Whitehead regarding questions concerning the Catalog (Kornarens Decl., Exh. I, Pullman Decl., ¶44);

● Both McFadden and Whitehead told Pullman they would not go forward with the Contract and declined to cooperate in due diligence (Kornarens Decl., Exh. I, Pullman Decl., ¶¶47, 52. );

● The Pullman Group, LLC repeatedly urged McFadden and Whitehead to perform under the Contract both by phone and in writing (Kornarens Decl., Exh. I, Pullman Decl., ¶¶ 51, 52, 57);

● This was even after McFadden and Whitehead admittedly "notified Pullman that they did not desire to consummate the proposed transaction"(Kornarens Decl., Exh. B, the Estates' Answer, ¶ 27; Kornarens Decl., Exh. I, Pullman Decl., ¶53);

● When it became clear well before year-end 2002 that McFadden and Whitehead were not going to consummate the sale of the Works to The Pullman Group, LLC, David Pullman repeatedly reminded them and, after their deaths, their representatives and heirs, that McFadden and Whitehead were in breach of the Contract and that The Pullman Group, LLC was prepared to seek to enforce its rights under the Contract at any time in litigation.  At this time The Pullman Group had completed its due diligence to the extent it could, given McFadden and Whitehead's lack of cooperation, and was prepared to consummate the sale (Kornarens Decl., Exh. I, Pullman Decl., ¶55);

● As the Estates' representatives confirmed, approximately every six months until McFadden and Whitehead's respective deaths, David Pullman was calling McFadden and Whitehead separately. He stated to McFadden and Whitehead that The Pullman Group, LLC can enforce its rights, but prefers to complete the purchase cooperatively.  McFadden and Whitehead still would not cooperate in completing the transaction (Kornarens Decl., Exh. I, Pullman Decl., ¶59).

Moreover, the Arbitrators considered the evidence offered by the Estate that Pullman did not communicate with McFadden and Whitehead. (See Kornarens Decl., Exh. F, Barbara McFadden

---

1Due to medical issues, Mr. Pullman could not personally attend the arbitration. Pursuant to the Arbitrators' Order, he testified by Declaration and by telephone. On direct exam, Mr. Pullman testified, among other things, that he performed due diligence and determined that he wished to proceed with the contract (Kornarens Decl., Exh. J, Pullman Testimony, R.T. 219:17-220:24) and communicated that fact by telephone separately to both McFadden and Whitehead (R.T. 219:21-220:17, 221:4-9).

Testimony) or that he had misrepresented the terms of the transaction to the Sellers. (See Kornarens Decl., Exh. G, Kenneth Whitehead testimony). Indeed, the Arbitrators relied on these positions in holding that Pullman had not met its burden to prove it communicated the purchase price or the results of its due diligence until the year 2014. (Kornarens Decl., Exh. A, Arbitration Award, p. 4).

Yet – at the same time – the Arbitrators declined to consider Pullman's evidence that conclusively established this point, and which contradicted the very assertions made the Estates in this arbitration. That evidence was admissible based on basic principles of waiver.

### ii. The Estates Waived The Dead Man's Rule Because Both Representatives Of The Estates Testified In Their Own Behalf Concerning a Personal Transaction of His Adversary with McFadden and Whitehead.

The Dead Man's statute's protections may be waived where the representative of the estate "testifies in his [or her] own behalf concerning a personal transaction of his adversary with the deceased." (*Estate of Wood,* 52 N.Y.2d at 145; see also *Matter of Breistol*, 64 AD3d 1122, 1123-24 [2009]); *Durazinski*, 41 AD3d at 920. ) Here, the Estates elicited testimony from two representatives, Babara McFadden and Kenneth Whitehead, whose testimony was integral to Pullman's communications with the Sellers and their repudiation of the Agreement.

### iii. The Estates Waived The Dead Man's Rule Because Both Representatives Of The Estates Elicited Testimony from Interested Parties to the Transaction in Issue.

The Dead Man's statute's protections may be waived where the representative "elicit[s] testimony from an interested party on the personal transaction in issue." *In re Estate of Wood*, 52 N.Y.2d at 145. "By the terms of the statute, the representative of a decedent's estate waives the protection of the statute if he testifies in his own behalf concerning a personal transaction of his adversary with the deceased. Once having introduced testimony concerning that transaction into evidence, he cannot thereafter prevent his adversary from testifying to the details of the same transaction, for to do so would give the estate an unfair advantage not intended by the statute." (Ibid).

Put simply, *CPLR* 4519 does not bar an interested party from testifying where the estate opens

the door by introducing evidence regarding the relevant transaction, *Wood*, 52 N.Y.2d at 145; *Nay v. Curley*, 113 N.Y. 575, 578-79, 21 N.E. 698 (1889).

Likewise, the statute's protections are waived by the executor or representative questioning its adversary with respect to the transaction. *Wood*, 52 N.Y.2d at 145 ("Also, the executor cannot avoid a waiver by eliciting testimony from an interested party on the personal transaction in issue. It was long ago settled that when the executor questions his adversary as to all or part of a personal transaction with the decedent, he has 'opened the door' as to that transaction and otherwise incompetent testimony is admissible to fully explain the personal transaction in issue. (See, e.g., *Cole v Sweet*, 187 N.Y. 488; *Nay v Curley*, 113 N.Y. 575.) The purpose of this rule is to place the parties, insofar as is practical in light of the policy embodied in the statute, in relatively equivalent positions vis-à-vis the same transaction. This prevents the unfair use of the statute as a sword rather than a shield."); see *Matter of Breistol*, 64 AD3d 1122, 1123-1124 [2009]); http://judgebonniesudderth.wordpress.com/2012/04/11/the-dead-mans-rule/ ("The applicability of the Dead Man's Rule can be waived by calling the adverse party to the stand and eliciting testimony about statements which would otherwise be barred under the rule.")  Even at trial the party claiming protection of the Act must take a "backseat."

A representative of the decedent's estate waives protection of the Act by cross-examining an adverse party as to matters occurring during the decedent's lifetime and the adverse party becomes competent to testify as a result thereof. (Ruf, Jr., A *Primer On the Applicability of the Dead Man's Act to Litigation Matters*).  The Estates did just that here by questioning David Pullman about his communications with McFadden and with Whitehead.  *See* Kornarens Decl., Exh. J, Pullman Testimony, R.T. 271:11-272:4, 273:10-274:7; *See also* Kornarens Decl., Exh. K, Selsky Testimony, R.T. 156:8-12, 161:3-5, 165:13-166:2.

Here, the Sellers waived The Dead Man's Rule for at least three reasons: (1) they elicited testimony from Pullman about his interactions with McFadden and Whitehead; (2) they argued that Pullman failed to communicate with McFadden and Whitehead including regarding the due diligence

and the results of the due diligence, thereby opening the door to Pullman's testimony on the point; and (3) they brought affirmative claims against Pullman that were predicated on the Agreement not being in force, a point which Pullman refuted by stating he performed due diligence under the Agreement and communicated those results to the Sellers.

Specifically, the Estates called the two representatives (Babara McFadden and Kenneth Whitehead) who testified that Pullman had failed to communicate with McFadden and Whitehead about the agreement. *See* Kornarens Decl., Exh. F, Barbara McFadden Testimony; Kornarens Decl., Exh. G, Kenneth Whitehead Testimony.    This waived any protection under the Dead Man's Rule and opened the door to evidence of what Pullman communicated with McFadden and Whitehead.

### iv. 4519 of C.P.L.R. States That The Dead Man's Rule Exclusion Does Not Apply Where, As Here, "The Executor, Administrator, Survivor, Committee or Person So Deriving Title or Interest Is Examined In His Own Behalf . . ."

There is also a critical exception in §4519 of *C.P.L.R.* that makes admissible the five separate declarations of the Whitehead heirs stating that the agreement was in effect and binding. Kornarens Decl., Exh. H, Whitehead heirs' declarations.   Specifically, the statute states that the Dead Man's Rule does not apply where, among other things, "the  executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf . . ."

Here, the executor of the Whitehead Estate (Kenneth Whitehead) and four other heirs to John Whitehead signed declarations on their own behalf which contain information regarding the two key issues on which the Arbitrators erroneously ruled against Pullman.  Kornarens Decl., Exh. H.

For example, Executor Kenneth Whitehead states under penalty of perjury:

"[B]oth my father and Gene McFadden told me they had entered in an agreement with The Pullman Group, LLC (Pullman) and showed me a copy of the executed Agreement by David Pullman, my father and Gene McFadden in the year 2002.... The agreement among other things granted Pullman the exclusive right to purchase the musical assets, songs, compositions, record royalties, royalties or payments of any kind, writer's share, co-publishing, publisher's share and any in all the songs written in whole or part and or performed by my father John Whitehead and

or Gene McFadden." Kornarens Decl., Exh. H, Whitehead heirs' declarations. 2/

This evidence should have been considered. Courts have typically permitted a witness to testify about the contracts of others with a decedent where the witness has no interests adversely affected by the claim. *Pavlinko Estate,* 399 Pa. 536, 160 A.2d 554 (1960) (where claimants sought compensation for services rendered to decedent as memorialized in a contract that was transcribed by their daughter--the scrivener, the daughter was competent to testify despite the dead man's rule because she personally had no interest adverse to the decedent's estate.); see *Visscher v. O'Brien,* 274 Pa. Super. 375, 383, 418 A.2d 454, 458 (1980).

Moreover, as discussed above, both personal representatives of the Estates testified at the arbitration regarding the two key issues on which the Arbitrators erroneously ruled against Pullman. The Arbitrators also erred in failing to consider this testimony.

Much of Pullman's evidence regarding the admissions made by Mr. McFadden and Mr. Whitehead should have been considered for the simple reason that the statute does not apply where, as here, the evidence has been given by the heirs of the deceased. *Brezinski v. Brezinski*, 84 A.D.2d 464, 468 (1982) (testimony of defendants who were called by plaintiff not barred by Dead Man's Statute since their interests were adverse to plaintiff and not adverse to the interests of the deceased).

> ### v.   The Estates Waived The Dead Man's Rule By Making Pullman's Alleged Lack Of Communication The Centerpiece of Their Defense.

The Dead Man's Rule is supposed to be a shield, not a sword. *Wood*, 52 N.Y.2d at 145. A party cannot make the substance of communications with the decedents an issue and at the same time invoke the rule to exclude evidence of those communications. ("The purpose of [the waiver] rule is to place the parties, insofar as is practical in light of the policy embodied in the statute, in relatively

---

2This was also sworn to by the Sellers' heirs and estate beneficiaries, who testified *against* their interests regarding conversations with the decedents. Kornarens Decl. Exh. H, Declarations of Kenneth Whitehead, Dawn Whitehead Mosley, John C. Mosley Whitehead II; Caiya Whitehead; Leslie Battle. Again, the Arbitrators failed to consider this evidence.

equivalent positions vis-à-vis the same transaction. This prevents the unfair use of the statute as a sword rather than a shield.")  However, that is exactly what the Estates did here.

In addition to all of the testimony the Estates elicited as to communications, the Estates also argued throughout their pleadings and their opening statements that Pullman did not communicate with the Sellers and that he abandoned the agreement. Indeed, this was a centerpiece of the Estate's defense in this case and formed the basis of the Award.

Here, there are numerous waivers.  For example, the Estates opened the door (an exception to the Dead Man's rule) by stating that there is no evidence they can consider that Pullman ever communicated the results of its due diligence to McFadden and Whitehead.

In their Opening Statements, the Estates argued:

**Ms. Ladov:** (1) p. 42, lines 14-24 ("You will also hear that Pullman disappeared for five years, as he can produce no record, no record of any correspondence with Gene and John. And when he learned the estates were about to sell their catalog for considerably more money than what he purportedly offered Gene and John, i.e. the multiples of six, he had his attorney write a letter to the widows asserting the claims."), (2) p. 43, lines 4-11 ("Pullman claims he has performed his due diligence to ascertain the value of the catalog. If the due diligence was ever performed, if [Pullman's attorney] Mr. Besser did what he said he did, it was slipshod at best and was never forwarded to Gene and John or their windowed [sic]"), (3)  pp. 45-46, lines 22-2 ("The laches argument that counterclaimant is making is not a laches argument vis-à-vis the statute of limitations. It is a laches argument that from 2002-2007 Mr. Pullman goes silent.")

Kornarens Decl., Exh. E, the Estates' Opening Statements, pp. 42:14-24, 43:4-11, 45:22 - 46:2.

**Mr. Jackson:** p. 50, lines 7-16 ("We approached this as shocked as everyone else was that David Pullman actually had a deal that locked us in and we could do nothing more when he came before us talking about securitizing and helping the estate. All of a sudden he said no, there is no securitization, there is an actual deal that I had.")

Kornarens Decl., Exh. E, the Estates' Opening Statements, p. 50:7-16.

The Arbitration Brief submitted by the Estates also contains numerous examples of this.  *See* Kornarens Decl., Par. 15-16, Exh. D, the Estates' Arbitration Brief, pp. 1-2, 4, 8-9,  12, 15.  The Arbitrators should have considered Pullman's evidence for this reason as well.

*vi.   The Evidence That The Arbitrators Declined To Consider Was Not Within The Scope Of The Dead Man's Rule To Begin With.*

The evidence that the Arbitrators declined to consider was not within the scope of the Dead Man's rule to begin with.  Specifically, that rule applies to "personal transactions." CPLR §4519. As discussed above, the transaction here was commercial.  Moreover, one of the sellers was a partnership. Further, the evidence should have been considered in connection with the Estates' affirmative claims against Pullman, which necessarily were predicated on there not being a binding contract between Pullman, on the one hand, and McFadden and Whitehead, and their partnership, on the other.

**E.      The Arbitrators Misapplied The Dead Man's Rule In Not Considering Uncontroverted Evidence And The Estates' Affirmative Evidence That The Sellers Committed An Anticipatory Repudiation Of The Contract.**

The award states that the arbitrators could not consider the copious evidence McFadden and Whitehead presented that they repudiated the agreement, since that evidence is not in writing. Kornarens Decl., Exh. A, Arbitration Award, pp. 2, 4, 5.

This, in conjunction with the Award's misapplication of the Dead Man's Rule, makes clear that the Arbitrators did not consider any of copious evidence of anticipatory repudiation offered by Pullman besides the Estate's pleading admission that McFadden and Whitehead "**notified Pullman** that they did not desire to consummate the proposed transaction." Kornarens Decl., Exh. B, Estates' Answer, ¶27. (Boldface added). And, even as to that admission, the Arbitrators disregarded the portion that refers to what McFadden and Whitehead "notified Pullman" and further disregarded testimony from executrix Barbara McFadden admitting that her husband told her in 2002 "that he had notified Pullman that he did not desire to consummate the proposed transaction with Pullman." *See*  Kornarens Decl., Exh. F, Barbara McFadden Testimony,.R.T. 367:15-368:12.

Critically, *on the examination of her counsel,* Mrs. McFadden admitted that Gene and John had decided within 3 to 4 weeks of signing the agreement that they "did not want anything to do with

[Pullman]." Kornarens Decl., Exh. F, Barbara McFadden Testimony, R.T. pp. 329-330, lines 19-11.3/

     This is also corroborated by David Pullman's testimony at arbitration that McFadden and Whitehead told him in the "spring - summer" of 2002 that they were not willing to perform the agreement. (Kornarens Decl., Exh. J, Pullman Testimony, R.T. 227:15 - 228:4).

     The Estates opened the door to Pullman's testimony about anticipatory repudiation by directly questioning David Pullman about his communications with McFadden and with Whitehead on the topic. For example::

> Q. Mr. Pullman, I want to go back to your statement on direct examination that you heard from McFadden and Whitehead sometime in 2002 that they did not want to go forward with the deal; is that right?
> A. Yes.  In the month right after we executed the transaction in 2002 they told me that.
> Kornarens Decl., Exh. J, Pullman Testimony, R.T. 288:15-289:11. 4/

     This, alone, establishes an anticipatory repudiation under New York law and opened the door to Mr. Pullman's testimony on direct on this topic (see cases cited at Part D, this section, supra.)

---

3"The two of them, Gene and John, came into our house and said that they were getting ready to make the biggest deal of a lifetime, that someone named David Pullman wanted to purchase their catalog for $10 million. And they were all excited about it, and I guess you could say they would tell anybody that would listen about this deal they were going to make with David Pullman. As time went on, I'll say within three weeks, **maybe three to four weeks**, Gene and John no longer wanted any part of David Pullman. I don't know all the exacts of what went down with them, but they said -- now they were saying that David Pullman was trying to steal their catalog from them and that they didn't want anything to do with him. That was basically it." (Emphasis added)

4"Q.  So would it be a fair statement that it was sometime in June or July of 2002? A. That's possible. I don't have the exact – (unintelligible). That was arranged, yes. Q.  You're breaking up. Mr. Pullman, you then told us that  you would reach out to McFadden and Whitehead on a periodic basis; is that correct? A. Correct. Q. How did you reach out to them, sir? A. Telephone." This was elaborated on at R.T. 292:10-24: "Q. Now, you said that you tried to work things out amicably in 2003, correct? A. Correct. Q. How many times did you try to contact McFadden and Whitehead in 2003? A. Well, there is a difference between us actually speaking to them and trying to work it out, each of them separately, and the amount of phone calls it took to actually get them on the phone.  Those are two different issues. So probably we got them on the phone, I'd say, one out of six to one out of ten times we'd call them.  It was a six-month interval, but it would take six to ten calls to actually get them on the phone, to pick up." Kornarens Decl., Exh. J, Pullman Testimony, R.T. 292:10-24.

Under New York law, anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty. See *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 667, 705 N.E.2d 656 (1998); John D. Calamari and Joseph M. Perillo, The Law of Contracts § 12-3 (3d ed.1987). "A repudiation can be either 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach' *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998) (quoting Restatement [Second] of Contracts, § 250; see, 1 Farnsworth, Contracts § 8.21; Official Comment 1 to U.C.C. § 2-610); *D'Ahreau v. Smith*, 240 A.D.2d 616, 617 (2d Dept 1997) (the concept of anticipatory repudiation may be applicable where there is a "definite and final communication evincing an intention to forego performance under the contract. . . .")5/

When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) continue to treat the contract as valid and await the designated time for performance before bringing suit. *Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 259 A.D.2d 932, 686 N.Y.S.2d

---

5Repudiation occurs when a party manifests an intent not to perform, either by words or by deeds (*200 East 87th Street Assocs. v. MTS, Inc.,* 793 F.Supp. 1237, 1253 (S.D.N.Y.), aff'd mem., 978 F.2d 706 (2d Cir. 1992); *Key Bank of New York, N.A. v. K.H. Assocs.*, 210 A.D.2d 769, 620 N.Y.S.2d 537, 537 (3d Dep't 1994); see also *Restatement (Second) of Contracts* § 250 (1981) (obligor repudiates contract when it states its intent to totally breach, or when it commits an affirmative act which renders it unable to perform absent such a breach), or when one party "insist[s] upon terms that are not contained in a contract," *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990) (quoting *REA Express, Inc. v. Interway Corp.*, 538 F.2d 953, 955 (2d Cir. 1976)), or otherwise advances an untenable interpretation of the contract. *SPI Communications, Inc. v. WTZA-TV Assoc. Limited Partnership*, 229 A.D.2d 644, 644 N.Y.S.2d 788, 790 (3rd Dep't 1996)

911, 913 (3d Dep't 1999); *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d

262, 629 N.Y.S.2d 382, 384 (1st Dep't 1995); see also *Apex Pool Equipment Corp. v. Lee*, 419

F.2d 556, 562 (2d Cir.1969); *Bua v. Purcell & Ingrao*, P.C., 99 A.D.3d 843, 845 [2d Dept 2012]

(buyer's "attempted termination" was an anticipatory repudiation of the contract).

     As well, the Estates elicited the following testimony from Barbara McFadden:

Page 332, Line 3-23: "I'm not sure. I remember hearing Gene and John, they weren't talking directly to me, they were speaking among each other, and I remember them saying that David keeps setting up meetings for them, to meet with them at this place or that place, but he wouldn't show up. Q. David wouldn't show up? A. David wouldn't show up. So I think the last meeting they were supposed to have had was supposed to be a restaurant in Philadelphia, and they waited and waited for him. He didn't show up. At that point Gene told me, "If David Pullman calls here, I'm not home." So I said okay. But that particular night David Pullman didn't call. I would say within the next couple of days, when I was at home, David Pullman called. Gene wasn't at home. I told him he wasn't there, that he could leave a message for him. His message was, "Just tell him David Pullman called." Kornarens Decl., Exh. F, Barbara McFadden Testimony, R.T. Page 332, Lines 3-23.  6/

     Likewise, the Arbitrators did not consider that the Sellers were aware of the contract and

knowingly breached the contract in 2005 during the AREC Transaction.   Kornarens Decl., Exh. I,

Pullman Decl., Ex M-1.   Likewise, the Arbitrators did not consider the admission at page 15 of the

Estates' Arbitration Brief that "Gene and John acted in clear fashion.   They wanted nothing to do with

Pullman." Kornarens Decl., Exh. B, the Estates' Arbitration Brief, p. 15.

     All of this is evidence independent of anything David Pullman said about his communications with

McFadden and Whitehead or it opened the door to these issues.

---

6Kornarens Decl., Exh. F, Barbara McFadden Testimony, Page 333, line 7-10: "When Gene was ill, when -- during his last days, I'll say, during his last couple of weeks, David Pullman called to speak with Gene." *Id.* at  pp. 333-334, line 22-13: "David called and he asked me -- mind you, he hadn't called in a very, very long time. He called and asked if he could speak to Gene. I told him that he couldn't, that Gene was very ill, that he was at the end stages of his illness and that he could no longer speak or anything. He was just there. So David asked me if I can hold the phone up to his ear so that he could speak to him. I told him, "No, I'm not doing that." I said, "If there is anything you need to know, David, it's not going to happen now because Gene is no longer talking, he's no longer coherent," and I said, "Is there anything else?" He said no and I hung up the phone. I didn't hear from David Pullman anymore after that until '07."

## 5.    CONCLUSION

The arbitration award is erroneous and must be vacated because the arbitrators refused to consider material evidence.  The Award expressly states that the Arbitrators gave **"no weight"** to crucial evidence from David Pullman and the respective executors,  representatives, and heirs to the McFadden and Whitehead Estates.  Under *Lewis* and a wealth of New York case law, the arbitrators' ruling was "just as prejudicially effective as a specific ruling made by an arbitrator that evidence, formally proffered, is to be excluded," *Lewis v. County of Suffolk*, 70 A.D.2d 107 (N.Y. App 1979).

Here, the arbitrators seemed to have decided that the only way Pullman could prevail is if it communicated the contract price *in writing* to McFadden and Whitehead, even though (1) this is not an express term of the contract; (2)  McFadden and Whitehead admittedly repudiated the contract before they died; (3) Pullman communicated the price verbally;  (4) Pullman had no way of knowing both  McFadden and Whitehead would die unexpectedly; (5) Pullman presented many declarations from heirs regarding the contract and the McFadden and Whitehead's estates refusal to perform under it; and (6) Pullman *did* communicate the written contract price to their estates (again, after they repudiated).  In other words, evidence that Pullman communicated the contract price orally to McFadden and Whitehead and that the Sellers committed an anticipatory repudiation was erroneously not considered.

**For the reasons set forth herein, the arbitration award must be vacated and sent back to the AAA tribunal with instructions to include all pertinent, material evidence in the record.**

Dated: DECEMBER 10, 2014

Dated: November ᵂ, 2014

Respectfully submitted,

Armen Mahasserian
Counsel for Defendant,
The Pullman Group, LLC

Douglas L. Dolfman
Associate Co-Counsel for Defendants,
The Pullman Group, LLC

24

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

I am over the age of eighteen (18) and not a party to the within action.

On December 12, 2014 I served the foregoing document described as: **MOTION TO VACATE ARBITRATION AWARD** on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

**SEE ATTACHED SERVICE LIST**

[XX]   VIA EMAIL:  I caused the above described document to be electronically transferred in "pdf" format to the email addressee(s) listed and no errors were reported.

Executed on December 12, 2014 at Los Angeles, California

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

| Armen Manasserian | /s/ Armen Manasserian |
|---|---|
| TYPE OR PRINT NAME | SIGNATURE |

**<u>Service List</u>**

**TIMOTHY J. HOLMAN**
SMITH KANE LLC
112 MOORES RD STE 300
MALVERN, PA 19355
Tel: 610-518-4909
Email: tholman@smithkanelaw.com
*Attorney for the Estate of John C. Whitehead*

**OREN J. WARSHAVSKY**
GIBBONS DEL DEO DOLAN GRIFFINGER & VECCHIONE P.C.
ONE PENNSYLVANIA PLAZA - 37TH FL
NEW YORK, NY 10119
212-649-4700
owarshavsky@gibbonslaw.com
*Attorney for the Estate of John C. Whitehead*

**James L. Jackson**
**JAMES L. JACKSON**
170 JOHN STREET, APT 3E
NEW YORK, NY 10038
973-652-7261
mrmusicpublisher@gmail.com
*Representing the Estate of John C. Whitehead*