**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **BARBARA MCFADDEN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Civil Action No. 2:08-cv-00193** |
| v. | ) | |
| | ) | |
| **THE PULLMAN GROUP, LLC,** | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF ANTHONY KORNARENS

I, Anthony Kornarens, declare as follows:

1.  I am an attorney at law, licensed to practice before the courts of the State of California. If called as a witness, I could and would competently testify to the matters stated herein.

2.  I represented Defendants The Pullman Group, LLC and David Pullman (collectively "Pullman") in the American Arbitration Association ("AAA") arbitration proceeding entitled *The Pullman Group, LLC, and David Pullman v. The Estates of Gene McFadden and John C. Whitehead*, AAA No. 13-20-0800-1087, the hearing for which took place on Tuesday, July 29, 2014.

3.  On Friday, September 19, 2014, I received a copy of the Arbitration Award in the above-captioned arbitration proceeding.

4.  Attached hereto as Exhibit "A" is a true and correct copy of the Arbitration Award in the above-captioned proceeding.

5.  The Arbitration Award states, in part:

    "By agreement of the parties and order of the Tribunal, in the interests of efficiency and expediting the process, both sides were permitted at the hearing to present evidence in either written form, or by oral testimony, given either in person or by telephone. At the

beginning of the hearing, the Tribunal informed counsel how New York's Dead Man's Statute, NY CPLR 4519, would be applied. To save time, no restriction would be placed on presenting the testimony of witnesses, 'some of which had already been reduced to writing, **but in the decision process the Tribunal would give no weight to testimony by any witness who was 'interested in the event' with respect to any transaction with either decedent Gene McFadden or decedent John Whitehead.** All understood that this would preclude **any weight** to be given to the anticipated testimony by David Pullman, Claimant's sole stockholder, about his conversations with Gene and John, both before and after the contract was entered into. Based on the evidence presented and the arguments and submissions of counsel, and alter due deliberation, the Tribunal finds and concludes that Pullman has failed to prove that it performed its obligations under the contract so that its claims must be dismissed with prejudice..." Exhibit A, pp. 2-3 (emphasis added).

6.    The Arbitration Award further states:

"But even assuming that the due diligence was completed, Pullman had an additional obligation, clearly implied by the Agreement, and that was to notify Gene and John of the fact that it had completed its due diligence in a commercially reasonable manner.

. . .

In the context of the Agreement and the circumstances of this case, we find and conclude that the Agreement imposed on Pullman an implied obligation to    notify Gene and John that Pullman's due diligence had been completed and what    its results were. Only then could the price of the catalog be determined, and    only then would the 'First Right of Refusal' and other rights purported to be reserved for Pullman in the Agreement, including specific performance and the 'break up fee' set forth in Paragraph 7, come into existence." Exhibit A, pp. 3-4.

7.    The Award concludes:

"Until Pullman notified Gene and John that its due diligence was complete, the price formulae could not be applied, so the contract was, therefore, left without a price term for the transaction. Although David Pullman's testimony asserted that he had orally informed Gene and John that he had completed due diligence, Pullman presented no writing to that effect, and since David Pullman, as Claimant's sole stockholder, is a person "interested in the event", the tribunal, under the Dead Man's Statute, must disregard his testimony about those conversations. As a result, Pullman has not met its burden of proving either that it notified Gene and John that it had completed its due diligence in a commercially reasonable manner or that the price of the catalog was ready to be calculated. Indeed, the first time the alleged price of the catalog under the Agreement ($1.9 million) was identified by evidence the Tribunal could rely on was in the course of this arbitration in 2014. Accordingly, Pullman's claim for breach of contract and specific performance of the Agreement to purchase is dismissed with prejudice." Exhibit A, p. 4.

8.   In the Arbitration Award, the AAA tribunal "implied" a contractual obligation that Pullman notify the Sellers " that Pullman's due diligence had been completed and what its results were." Exhibit A, pp. 3-4.

9.   The AAA tribunal refused to hear evidence that Pullman notified the Sellers that Pullman's due diligence had been completed and what its results were.

10.  The AAA tribunal refused to consider testimony of Pullman and the representatives of the Estates that the Sellers had repudiated their obligations under the agreement within weeks of signing the agreement.

11.  The Arbitration Award omits the testimony of the representatives of the Estate that McFadden and Whitehead – within weeks of signing the Agreement – were unwilling to communicate with David Pullman.

12.  Attached hereto as Exhibit "B" is a true and correct copy of the McFadden and Whitehead Estates' Answer and Counterclaim in the above-captioned arbitration proceeding.

13.  In Paragraph 27 of the Answer and Counterclaim, the Estates state that McFadden and Whitehead "notified Pullman that they did not desire to consummate the proposed transaction." Exhibit B, Paragraph 27.

14.  Attached hereto as Exhibit "C" is a true and correct copy of the signed Purchase Agreement, dated May 10, 2002, between, on one hand, The Pullman Group, LLC and David Pullman, and on the other hand, Gene McFadden, John Whitehead, and the partnership of McFadden & Whitehead.

15.  Attached hereto as Exhibit "D" is a true and correct copy of the Estates' Arbitration Memorandum.

3

16.  Pertinent excerpts from the Estates' Arbitration Memorandum include:

   a. "A review of the evidence must lead the finders of fact to the inexorable conclusion that Pullman did not perform any of his obligations as required of him under the 'Agreement' and by his conduct, or lack thereof, he abandoned it." Exhibit D, pp. 1-2.

   b. "It was only 5½ years after creation of the purported "Agreement,' when 4.4 million dollars was on the table, and coincidentally, after Gene and John's death, did David Pullman surface, with his alleged "Agreement' in hand. Exhibit D, p. 4.

   c. "Ostensibly, Pullman promised to engage in due diligence and this is the consideration he gave to McFadden and Whitehead. Notwithstanding the fact that Pullman's own expert states that the cost of same was 'cheap,' it was never produced to Gene and John or exchanged with Geene and John." Exhibit D, p. 8.

   d. "In this civil action, Pullman failed to assert his rights pursuant to the purported 'Agreement' for over a decade. As discussed above, Pullman had certain obligations that he needed to fulfill. He never fulfilled his obligation and never surfaced until after Gene and John died." Exhibit D, p. 9.

   e. "Pullman was supposed to perform his due diligence. He never did. He was supposed to present price terms to Gene and John. He never did. The right of first refusal must be supported by consideration. There was none." Exhibit D, p. 12.

   f. "At no time over the last twelve years, since the execution of the purported 'Agreement', was Gene or Barbara McFadden, as his Executrix, or John or any representative on his behalf, ever presented with one scintilla of evidence of due diligence on the part of David Pullman." Exhibit D, p. 12.

   g. "Gene and John acted in clear fashion. They wanted nothing to do with Pullman." Exhibit D, p. 15.

17.  Attached hereto as Exhibit "E" are true and correct copies of excerpts from the Estates'

   Opening Statements during the Arbitration proceeding, including the following

   comments by the attorneys representing the Estates:

   a. **Sayde J. Ladov, Esq.:**

      i.    "You will also hear that Pullman disappeared for five years, as he can produce no record, no record of any correspondence with Gene and John. And when he learned the estates were about to sell their catalog for considerably more money than what he purportedly offered Gene and John, i.e. the multiples of six, he had his attorney write a letter to the widows asserting the claims." Exhibit E, R.T. 42:14-24.

4

ii.    "Pullman claims he has performed his due diligence to ascertain the value of the catalog. If the due diligence was ever performed, if [Pullman's attorney] Mr. Besser did what he said he did, it was slipshod at best and was never forwarded to Gene and John or their windowed [sic]." Exhibit E, R.T. 43:4-11.

iii.    "The laches argument that counterclaimant is making is not a laches argument vis-à-vis the statute of limitations. It is a laches argument that from 2002-2007 Mr. Pullman goes silent." Exhibit E, R.T. 45:22 - 46:2.

**b. James Jackson:**

i.    "We approached this as shocked as everyone else was that David Pullman actually had a deal that locked us in and we could do nothing more when he came before us talking about securitizing and helping the estate. All of a sudden he said no, there is no securitization, there is an actual deal that I had." Exhibit E, R.T. 50:7-16.

18.    Attached hereto as Exhibit "F" are true and correct copies of excerpts from the

testimony of Estate Representative Barbara McFadden during the Arbitration

proceeding.

19.    Pertinent excerpts from the testimony of Barbara McFadden include:

a.    "Q. That's fine. And in Exhibit C30 -- this is the answer and counterclaim that's pending against Mr. Pullman and his corporation -- it says, "Pullman irrevocably waived whatever rights he may have had to enforce the 2002 and" -- "the 2002 Pullman memorandum in 2002 and 2003 after McFadden and Whitehead notified Pullman that they did not desire to consummate the proposed transaction.". . .
Q. Do you see that language now?
A. I see the language.
Q. Did your husband tell you in 2002 that he had notified Pullman that he did not desire to consummate the proposed transaction with Pullman?
A. Yes, he did."

Exhibit F, .R.T. 367:15-368:12.

b.    "The two of them, Gene and John, came into our house and said that they were getting ready to make the biggest deal of a lifetime, that someone named David Pullman wanted to purchase their catalog for $10 million. And they were all excited about it, and I guess you could say they would tell anybody that would listen about this deal they were going to make with David Pullman. As time went on, I'll say within three weeks, **maybe three to four weeks**, Gene and John no longer wanted any part of David Pullman. I don't know all the exacts of what went down with them,

5

but they said -- now they were saying that David Pullman was trying to steal their catalog from them and that they didn't want anything to do with him. That was basically it."

Exhibit F, R.T. pp. 329:19 - 330:11.

c. "I'm not sure. I remember hearing Gene and John, they weren't talking directly to me, they were speaking among each other, and I remember them saying that David keeps setting up meetings for them, to meet with them at this place or that place, but he wouldn't show up.
Q. David wouldn't show up?
A. David wouldn't show up. So I think the last meeting they were supposed to have had was supposed to be a restaurant in Philadelphia, and they waited and waited for him. He didn't show up. At that point Gene told me, 'If David Pullman calls here, I'm not home.' So I said okay. But that particular night David Pullman didn't call. I would say within the next couple of days, when I was at home, David Pullman called. Gene wasn't at home. I told him he wasn't there, that he could leave a message for him. His message was, 'Just tell him David Pullman called.'"

Exhibit F, R.T. 332:3-23.

d. "When Gene was ill, when -- during his last days, I'll say, during his last couple of weeks, David Pullman called to speak with Gene."

Exhibit F, R.T. 333:7-10.

"David called and he asked me -- mind you, he hadn't called in a very, very long time. He called and asked if he could speak to Gene. I told him that he couldn't, that Gene was very ill, that he was at the end stages of his illness and that he could no longer speak or anything. He was just there. So David asked me if I can hold the phone up to his ear so that he could speak to him. I told him, 'No, I'm not doing that.' I said, 'If there is anything you need to know, David, it's not going to happen now because Gene is no longer talking, he's no longer coherent,' and I said, 'Is there anything else?' He said no and I hung up the phone. I didn't hear from David Pullman anymore after that until '07."

Exhibit F, R.T. 333:22 - 334:13.

20.    Attached hereto as Exhibit "G" is a true and correct copy of excerpts from the testimony

of Estate Representative Kenneth Whitehead during the Arbitration proceeding.

21.    The Estates elicited the following testimony from Kenneth Whitehead:

"Q. Regarding initial contact between Mr. Pullman, were you made aware by Mr. Pullman or anyone else that your dad had entered into an agreement to sell the catalog to Mr. Pullman in May of 2002?

6

A. Not until later. Not in our first round of conversations.
Q. Was it Mr. Pullman who told you that there was an agreement?
A. I don't -- I believe I heard about Mr. Pullman's agreement through Artists Rights, saying that Mr. Pullman contacted them and maybe have -- got word to them that he was informed that they were moving, trying to move the catalog or sell it."

Exhibit G, Kenneth Whitehead Testimony, R.T., pp. 388-389 lines 22-18; *see also* p. 393, lines 2-15; p. 397, lines 17-21.

22.    Attached hereto as Exhibit "H" are true and correct copies of five separate declarations

filed by five different heirs of John Whitehead, stating under penalty of perjury that the

agreement between Pullman and McFadden and Whitehead was in effect and binding:

a.  Declaration of Kenneth Whitehead, executed December 18, 2007;

b.  Declaration of Caiya Whitehead, executed December 5, 2007;

c.  Declaration of Dawn Whitehead Mosley, executed December 18, 2007;

d.  Declaration of John C. Mosley a/k/a John C. Mosley Whitehead II, executed

    December 17, 2007;

e.  Declaration of Leslie A. Battle, mother and legal guardian of minor Jaron Cavadus

    Battle, beneficiary and son and heir of his father John Cavadus Whitehead Sr.,

    executed December 29, 2007.

23.    Kenneth Whitehead's Declaration states, in pertinent part:

"I further declare that both my father John Cavadus Whitehead, Sr. And Gene McFadden told me they had entered in an agreement with The Pullman Group, LLC (Pullman) and showed me a copy of the executed agreement by David Pullman, my father John Whitehead, and Gene McFadden in the year 2002 with all their respective signatures on it ('The Agreement'). I am familiar with both my father's signature John C. Whitehead and his long time songwriting and recording partner Gene McFadden and recognized and can verify the signatures on the executed Pullman Agreement was theirs. The agreement among other things granted Pullman the exclusive right to purchase the musical assets, songs, compositions, record royalties, royalties or payments of any kind, writer's share, co-publishing, publisher's share and any reversionary interest, renewal rights, and extension rights in all the songs written in whole or part and or performed by my father John Whitehead and or Gene McFadden (the 'Assets').

7



The Pullman Group, LLC was also granted the first right [of] refusal and matching rights in any economic transaction or sale of the Assets and royalties from Warner Chappell, Broadcast Music, Inc. (BMI), and Philadelphia International Records.

I understand that my father's musical Assets and Gene McFadden were about to be sold, as recently as this past Wednesday October 31, 2007 and such sale would be subject to the executed agreement by father John Whitehead and Gene McFadden, **and the estate rights of both John Whitehead and Gene McFadden are of course also subject to The Pullman Group, LLC['s] agreement with the decedents. Any rights both estates and their respective heirs have are subject to The Pullman Group, LLC's right the assets pass through the estate with those rights. Any sale would be a breach of the Pullman Group, LLC's rights, and The Pullman Group, LLC[] is now entitled to purchase all the Assets."**

Exhibit H (emphasis added).

24.    Due to medical issues, Mr. Pullman could not personally attend the arbitration. Pursuant

to the Arbitrators' Order, he testified by Declaration and by telephone.

**25.    Attached hereto as Exhibit "I" is a true and correct copy of the Declaration of**

**David Pullman in Support of Motion for Summary Adjudication in the**

**Arbitration.**

26.    The Pullman Group, LLC repeatedly reminded McFadden and Whitehead of what it was

learning through its due diligence activities and its rights.  Exhibit I, Pullman Decl., ¶57.

27.    The Pullman Group, LLC through David Pullman told McFadden and Whitehead what

it had learned through its due diligence activities and communicated the amount of the

purchase price to each of them.  Exhibhit I, Pullman Decl., ¶57).

28.    The Pullman Group, LLC in May-June 2006 brought the tax liens on McFadden and

Whitehead's royalties to the attention of McFadden and Whitehead and tried to

communicate with McFadden and Whitehead regarding questions concerning the

Catalog.  Exhibit I, Pullman Decl., Pullman Decl., ¶44.

8



29.  Both McFadden and Whitehead told Pullman they would not go forward with the

     Contract and declined to cooperate in due diligence. Exhibit I, Pullman Decl., Pullman

     Decl., ¶47.

30.  Specifically, Paragraph 52 of Mr. Pullman's Declaration states:

     "Not long after signing the Contract, both Mr. McFadden and Mr. Whitehead
     stated to me via telephone that they do not intend to further perform under the
     Contract. Specifically, well before year-end 2002, Gene McFadden and John
     Whitehead notified me that they would not proceed with the sale of the
     Works to Pullman. I told each of them I considered this to be a breach of the
     Contract and I asked them to reconsider. As discussed above, both Gene
     McFadden and John Whitehead told me they would not go forward with the
     Contract. Each of them said to me that they knew they had signed the
     Contract and understood it was legally binding and enforceable. Nonetheless,
     they said they would not proceed unless legally forced to do so."

     Exhibit I, Pullman Decl., Pullman Decl., ¶52.

31.  Mr. Pullman's Declaration also states The Pullman Group, LLC repeatedly urged

     McFadden and Whitehead to perform under the Contract both by phone and in writing.

     Exhibit I, Pullman Decl., ¶¶ 51, 52, 57.

32.  Mr. Pullman's Declaration also states this was even after McFadden and Whitehead

     admittedly "notified Pullman that they did not desire to consummate the proposed

     transaction." Exhibhit B, the Estates' Answer, ¶ 27; Exhibit I, Pullman Decl., ¶53.

33.  Mr. Pullman also testified that well before year-end 2002, after McFadden and

     Whitehead notified Pullman that they did not desire to consummate the proposed

     transaction, Pullman repeatedly reminded McFadden and Whitehead and, after their

     deaths, their representatives and heirs, that McFadden and Whitehead were in breach of

     the Contract and that The Pullman Group, LLC was prepared to seek to enforce its

     rights under the Contract at any time in litigation. At this time The Pullman Group had

     completed its due diligence to the extent it could, given McFadden and Whitehead's

9

lack of cooperation, and was prepared to consummate the sale. Exhibit I, Pullman Decl., ¶55.

34.    Mr. Pullman further testified that, as the Estates' representatives confirmed, approximately every six months until McFadden and Whitehead's respective deaths, David Pullman called McFadden and Whitehead separately, and stated to McFadden and Whitehead that The Pullman Group, LLC can enforce its rights, but prefers to complete the purchase cooperatively. McFadden and Whitehead still would not cooperate in completing the transaction. Exhibit I, Pullman Decl., ¶59.

35.    Attached hereto as Exhibit "J" are true and correct copies of excerpts from the testimony of David Pullman during the Arbitration proceeding.

36.    On direct examination, Mr. Pullman testified, among other things, that he performed due diligence and determined that Pullman wished to proceed with the contract and that he communicated that fact by telephone separately to both McFadden and Whitehead. Exhibit J, Pullman Testimony, R.T. 219:17-220:24; 221:4-9.

37.    The following testimony was elicited from Mr. Pullman:

> Q. When you spoke to Mr. McFadden and Mr. Whitehead separately by phone in 2002, did you tell them what purchase price you had calculated for the writer's royalties using the formula set forth in the agreement?
> A. Yes.
> Q. Did either of them articulate any objection -- well, strike that. Did you tell them also what figure you had determined was the price for the publisher's share of the royalties, if and when those royalties came back, using the formula set forth in the contract?
> A. Yes, as -- yes.
> Q. Okay. Did either Mr. McFadden or Mr. Whitehead articulate any objection to those figures? In other words, did they share with you any objections or concerns about the Pullman - Direct amounts?
> A. No.
>
> Exhibit J, Pullman Testimony, R.T. 225:7 - 226:3.

10



38.     The following testimony was elicited from Mr. Pullman:

"Q. Did McFadden and Whitehead notify you in 2002 that they did not desire
to consummate the proposed transaction?
A. Yes.
Q.   Okay.  And to the best of your recollection, what did they say to you or
how did they notify you of that?
A. Telephone, the last conversation I had with them on that topic in -- would
have been in the summer 2002, spring-summer. They were not going to go
forward with the transaction, they were going to breach the agreement.  And I
said I can enforce it, and  they said, 'We know that.'"

Exhibit J, Pullman Testimony, R.T. 227:15 - 228:4.

39.     The following testimony was elicited from Mr. Pullman on cross-examination:

"Q. Yet, you agree that you brought the tax liens to the attention of
McFadden and Whitehead?
A. Of course, because they had to be dealt with, as opposed to the -- our
calculations and our due diligence of going through the statements.  That's all
our work product.  But as far as the IRS, that's something in terms of how to
be paid.
Q. Mr. Pullman, is it your contention that McFadden and Whitehead were
not aware of their own tax issues?
A. What they knew or didn't know, I can't say to what their state of mind was,
but I do know that we brought it up and we were waiting to get information
from them in terms of  what they were doing in terms of dealing with it, and
they never came back to us with that."

Exhibit J, Pullman Testimony, R.T. 271:11-272:4.

40.     The following testimony was elicited from Mr. Pullman on cross-examination:

"Q. Well, I keep coming back to the tax issue, Mr. Pullman, because so
much has been made of it.  Were you aware that prior to Mr. Whitehead's
untimely death he was a guest of the Metropolitan Correctional Center for
tax
problems?
. . .
Q.   Mr. Pullman, were aware of it then when you -- when the 2002
agreement was executed?
A.   He actually told us about it, and it came up when we were looking,
prior to that,  to a securitization and said we could not in the years prior to
that because he had a criminal record and we couldn't issue security with
someone with that, but it didn't have anything to do with what his current tax

11

situation was."

Exhibit J, Pullman Testimony, R.T. 273:10-274:7.

. . .

"Q. Mr. Pullman, I want to go back to your statement on direct examination
that you heard from McFadden and Whitehead sometime in 2002 that they did
not want to go forward with the deal; is that right?
A. Yes. In the month right after we executed the transaction in 2002 they told
me that.
Q. So would it be a fair statement that it was sometime in June or July of
2002?
A. That's possible. I don't have the exact – (unintelligible). That was arranged,
yes.
Q. You're breaking up. Mr. Pullman, you then told us that you would reach
out to McFadden and Whitehead on a periodic basis; is that correct?
A. Correct.
Q. How did you reach out to them, sir?
A. Telephone."

Exhibit J, Pullman Testimony, R.T. 288:15-289:11.

. . .

"Q. Now, you said that you tried to work things out amicably in 2003, correct?
A. Correct.
Q. How many times did you try to contact McFadden and Whitehead in 2003?
A. Well, there is a difference between us actually speaking to them and trying
to work it out, each of them separately, and the amount of phone calls it took
to actually get them on the phone. Those are two different issues. So
probably we got them on the phone, I'd say, one out of six to one out of ten
times we'd call them. It was a six-month interval, but it would take six to ten
calls to actually get them on the phone, to pick up."

Exhibit J, Pullman Testimony, R.T. 292:10-24.

41.     Attached hereto as Exhibit "K" are true and correct copies of expert witness Ira

        Selsky's testimony during the Arbitration proceeding.

42.     Pertinent excerpts from Mr. Selsky's testimony include:

        "Q. Between 2002 and October of 2007, do you know what efforts, if any -- of your

                                                    12

own knowledge, what efforts, if any, were made by Mr. Pullman to purchase the catalog?

A. I was told by Mr. -- I don't know anything personally. I was told by Mr. Pullman that he regularly called McFadden and Whitehead and told them, 'I understand you guys are maybe not so sure about going through the deal, I really want to make this deal with you,' and then I -- so he did, according to him, ask to have the deal go forward. Then I believe I saw a -- something from Besser in 2004 or 2005 in which he put some people on notice, I guess the estate on notice."

Kornarens Decl., Exh. K, Selsky Testimony, R.T. 165:13-166:2; *see also* R.T. 156:8-

12, 161:3-5.


I declare under penalty of perjury under the laws of the United States that the foregoing is true

and correct. Executed on *March 7*, 2014 at Los Angeles, CA.

ANTHONY KORNARENS

13

Exhibit  A

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration Between

THE PULLMAN GROUP, LLC,
    Claimant and Counterclaim Respondent, and                AAA No. 13-20-0800-1087

DAVID PULLMAN,
    Additional Counterclaim Respondent

    And

THE ESTATES OF GENE McFADDEN AND
    JOHN C. WHITEHEAD,

    Respondents and Counterclaimants.

## FINAL AWARD

This arbitration was commenced in 2008 by Claimant, The Pullman Group, LLC ("Pullman"), against the Estates of Gene McFadden ("Gene") and John C. Whitehead ("John") (collectively "the Estates"), based on the arbitration clause contained in an agreement between Pullman and Gene and John dated May 2, 2002 (the "Agreement" or "Agmt."). Pullman's Demand for Arbitration, dated May 2, 2008, asserted claims for declaratory relief and breach of contract. It sought specific performance of the Agreement. The Estates' Answer and Counterclaim, dated June 2, 2008, denied Pullman's allegations and counterclaimed for declaratory relief that the Agreement was void, and also sought damages for intentional interference with contractual relations.

## BACKGROUND

Pullman brought this arbitration to enforce rights it claims to have under the 2002 contract that it entered into with the songwriting team of Gene and John. Under the contract, in consideration of Pullman's engaging in due diligence, Pullman was to acquire the option to purchase Gene's and John's rights in their catalog of songs. It was to have 180 days in which to

1

conduct the due diligence.  "[A]s a result of its due diligence" (Agmt. Par. 9) Pullman could give Gene and John written notice of its election not to proceed with the purchase of the catalog, but even then Pullman was to have a "First Right of Refusal" with respect to any third party's offer to purchase the catalog.

Before this arbitration began, both Gene and John had died, and their respective estates are Respondents in this proceeding.  Following the organization meeting for the arbitration there was a long delay while Respondents worked out problems with the administration of their respective estates.  At the re-organization conference held in January 2014, a schedule for concluding the arbitration was established.  As directed by the contract, the arbitration of this dispute was held in New York County, State of New York in accordance with the rules of the American Arbitration Association ("AAA").  The parties stipulated that New York law was to apply.  The evidentiary hearing was held on July 29, 2014, with final arguments delivered by telephone conference call on August 6, 2014.  Post-hearing written memoranda were deemed to be unnecessary.

By agreement of the parties and order of the Tribunal, in the interests of efficiency and expediting the process, both sides were permitted at the hearing to present evidence in either written form, or by oral testimony, given either in person or by telephone.  At the beginning of the hearing, the Tribunal informed counsel how New York's Dead Man's Statute, NYCPLR 4519, would be applied.  To save time, no restriction would be placed on presenting the testimony of witnesses, some of which had already been reduced to writing, but in the decision process the Tribunal would give no weight to testimony by any witness who was "interested in the event" with respect to any transaction with either decedent Gene McFadden or decedent John Whitehead. All understood that this would preclude any weight to be given to the anticipated testimony by David Pullman, Claimant's sole stockholder, about his conversations with Gene and John, both before and after the contract was entered into.

2

Based on the evidence presented and the arguments and submissions of counsel, and after due deliberation, the Tribunal finds and concludes that Pullman has failed to prove that it performed its obligations under the contract so that its claims must be dismissed with prejudice, thereby making moot the Estates' counterclaim for declaratory relief. The Tribunal has also concluded that the Estates' counterclaim for intentional interference with contractual relations must be dismissed with prejudice.

## DISCUSSION

### Breach of Contract Claim

We agree with Pullman that the Agreement was a contract, and not an agreement to agree as contended by the Estates. By stipulation, the signatures on the document must be deemed those of Gene and John, respectively. Pullman's obligation under the contract – indeed, the only consideration given – was to do its due diligence in the succeeding 180 days. Pullman argues that what constituted due diligence in this context was left to Pullman to determine, and it presented evidence to establish due diligence work by attorney Besser, and by Pullman's organization. Pullman contends, therefore, that it had completed its due diligence. The Tribunal makes no determination of this contention. But even assuming that the due diligence was completed, Pullman had an additional obligation, clearly implied by the Agreement, and that was to notify Gene and John of the fact that it had completed its due diligence in a commercially reasonable manner.

The significance of due diligence in this transaction is underscored by two key provisions that were contingent upon Pullman's completion of its due diligence – the price and the first-refusal right. As to price, all the alternative formulas for determining the price were, under Paragraph 2-a, "[s]ubject to . . . our [Pullman's] completion of due diligence . . ." Similarly, the "First Right of Refusal" was to come into existence only "after due diligence is complete" (Agmt.

3

Par. 7). Completion of due diligence was, therefore, a significant event in the Agreement, and only Pullman knew when, or if, its diligence was completed and what actual price it would produce using the formulae in the Agreement. In the context of the Agreement and the circumstances of this case, we find and conclude that the Agreement imposed on Pullman an implied obligation to notify Gene and John that Pullman's due diligence had been completed and what its results were. Only then could the price of the catalog be determined, and only then would the "First Right of Refusal" and other rights purported to be reserved for Pullman in the Agreement, including specific performance and the "break up fee" set forth in Paragraph 7, come into existence.

Until Pullman notified Gene and John that its due diligence was complete, the price formulae could not be applied, so the contract was, therefore, left without a price term for the transaction. Although David Pullman's testimony asserted that he had orally informed Gene and John that he had completed due diligence, Pullman presented no writing to that effect, and since David Pullman, as Claimant's sole stockholder, is a person "interested in the event", the Tribunal, under the Dead Man's Statute, must disregard his testimony about those conversations.

As a result, Pullman has not met its burden of proving either that it notified Gene and John that it had completed its due diligence in a commercially reasonable manner or that the price of the catalog was ready to be calculated. Indeed, the first time the alleged price of the catalog under the Agreement ($1.9 million) was identified by evidence the Tribunal could rely on was in the course of this arbitration in 2014. Accordingly, Pullman's claim for breach of contract and specific performance of the Agreement to purchase is dismissed with prejudice.

**First Refusal Claim**

Because the "First Right of Refusal" was not to arise until "after due diligence is complete", and since completion also required notice of completion by Pullman to Gene and

John, which notice was never provided by Pullman, the claim for a continuing right of first refusal must also fail.

Pullman's first refusal claim must fail for an additional reason. As indicated above, under Paragraph 7 that right would not arise until due diligence was completed and notice of completion given to Gene and John. In addition to the implied-notice requirement, the first refusal right was to arise only "[i]f for any reason . . . Pullman elects not to purchase [the catalog]". That election was to be made in writing after completion of due diligence, per Paragraph 9. David Pullman testified at the hearing that Pullman never made that election. Consequently, for this additional reason, the "First Right of Refusal" did not arise even if notice of completion had been given.

Pullman argued that Gene and John had committed an anticipatory breach of the contract by refusing to proceed with the sale in 2002. The only evidence in support that the Tribunal can consider is the allegation in the Estates' Answer and Counterclaim that Gene and John did not "desire to consummate the transaction" (Ans., Par. 27). But such a "desire" is far from the total repudiation or "definite and final communication evincing an intention to forego performance under the contract" that is required under New York law to constitute an anticipatory breach (See *D'Ahreau v. Smith*, 220 AD2d 616 at 617 [2nd Dept. 1997]).

**Counterclaim**

The Estates asserted a counterclaim against Pullman and David Pullman individually based on their alleged intentional interference with the Estates' contractual relations. In 2007, the Estates were negotiating and about to sign an agreement with Warner Chappell Music, Inc. to sell the catalog for $4.4 million. When David Pullman learned of the deal, he had counsel write a letter to the Estates claiming that Pullman had a right of first refusal. There is no indication that a copy was sent to Warner Chappell. Because Warner Chappell shortly thereafter withdrew its

purchase offer, the Estates have claimed that Pullman and David Pullman tortiously interfered with their proposed contractual relationships.

The counterclaim cannot succeed. Pullman's and David Pullman's conduct do not rise to the level required by New York law to impose liability for tortious interference. Pullman had an agreement that arguably granted it the claimed right of first refusal; it therefore had a legitimate economic basis for sending the letter. And there is no indication that Pullman engaged in any culpable conduct, or acted with the sole purpose of harming the Estates (See *Smith v. Meridian Technologies, Inc.* 86 AD3d557, 560; *Thome v. Alexander & Louis Calder Foundation,* 76 AD3d 88,108.)

Therefore, the Estates' counterclaim for intentional interference with contractual relations is dismissed with prejudice.

**Attorney's Fees and Costs**

Under the arbitration clause of the contract, Paragraph 11, "[t]he losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such arbitration proceeding." Under this Tribunal's decision Pullman's claims for declaratory relief and for breach of contract are dismissed, which also renders the Estates' counterclaim for declaratory judgment moot. The Estates' counterclaim for tortious interference is also dismissed. Thus, neither party can be designated as "the prevailing party" or "the losing party". Accordingly, attorney's fees are awarded to neither party, and each shall bear its own attorney's fees and costs as incurred.

**AWARD**

1. The claims of Claimant Pullman Group LLC are denied and dismissed with prejudice.

2. The counterclaim of Respondents The Estates of Gene McFadden and John C. Whiteheadfor intentional interference with contractual relations is dismissed with prejudice.

3. The counterclaim of Respondents The Estates of Gene McFadden and John C. Whitehead for declaratory relief is dismissed as moot.

4. Each party shall bear its own attorney's fees and costs.

5. The administrative fees of the AAA totaling $23,700.00 shall be borne $11,850.00 (fifty percent) by Pullman, and $11,850.00 (fifty percent) by the Estates, jointly and severally. The compensation and expenses of the Tribunal totaling $101,886.52 shall be borne$50,943.26 (fifty percent) by Pullman, and $50,943.26 (fifty percent) by the Estates, jointly and severally  Therefore, the Estates have to pay Pullman an amount of $2,970.49

6. This Final Award disposes of all the claims, counterclaims, and defenses raised in this arbitration. All claims or counterclaims not expressly granted herein are hereby denied with prejudice.

7. This Final Award may be executed in separate counterparts.

7

*September 16, 2014*

Date

*James B. Kobak*

James B. Kobak, Jr.

I, **James B. Kobak**, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the **Final Award**.

State of ___New York___ ⎫

County of ___New York___ ⎬   SS:

⎭

On this 16th day of September, 2014, before me personally came and appeared **JAMES B. KOBAK, JR.**, to me known and known to me to be the individual described in and who executed this **FINAL AWARD** and acknowledged to me that he executed the same.

*September 16, 2014*

Date

*Kathleen Augello*

Notary Public

KATHLEEN AUGELLO
Notary Public, State of New York
No. 01AU5055477
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires February 12, 20__

8

Date 9/17/14

George C. Pratt

I, **George C. Pratt**, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the **Final Award**.

State of ~~Uniondale~~ Verginia

County of ~~New York~~ Richmond          SS:

On this 17 day of September, 2014, before me personally came and appeared **GEORGE C. PRATT**, to me known and known to me to be the individual described in and who executed this FINAL AWARD and acknowledged to me that he executed the same.

9/17/14
Date

Notary Public

SANDRA DONLEY
COMMONWEALTH OF
Expires
06-30-17
ID#
7543582
VIRGINIA
NOTARY PUBLIC

9

_9-16-14_
Date

_Richard D. Rosenbloom_
Richard D. Rosenbloom

I, **Richard D. Rosenbloom**, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is the **Final Award**.

State of ___Rochester___

County of ___New York___

SS:

On this _16 th_ day of September, 2014, before me personally came and appeared RICHARD D. ROSENBLOOM, to me known and known to me to be the individual described in and who executed this **FINAL AWARD** and acknowledged to me that he executed the same.

_9-16-14_
Date

_Allyn Van Dusen_
Notary Public

ALLYN VAN DUSEN
Notary Public, State of New York
No. 01VA4865414
Qualified in Monroe County
Commission Expires July 7, 2018

10

Exhibit    B

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| THE PULLMAN GROUP LLC<br><br>　　　　　　　Plaintiff/Claimant,<br><br>v.<br><br>ELNOR WHITEHEAD, as the Executrix of the<br>Estate of John C. Whitehead; and BARBARA<br>MCFADDEN, as Executrix of the Estate of Gene<br>McFadden,<br><br>　　　　　　　Defendants/Respondents | Case No.: Case number: 13 148 Y 01087 08 |
| ELNOR WHITEHEAD, as the Executrix of the<br>Estate of John C. Whitehead; and BARBARA<br>MCFADDEN, as Executrix of the Estate of Gene<br>McFadden,<br><br>　　　　　　　Counterclaim-<br>　　　　　　　Plaintiffs/Claimants<br><br>v.<br><br>THE PULLMAN GROUP LLC and DAVID<br>PULLMAN<br><br>　　　　　　　Counterclaim-<br>　　　　　　　Defendants/Respondents | |

## ANSWER AND COUNTERCLAIM

Defendants/Respondents and Counterclaim Plaintiffs/Claimants ELNOR WHITEHEAD,

as the Executrix of the Estate of John C. Whitehead; and BARBARA MCFADDEN, as

Executrix of the Estate of Gene McFadden , through their undersigned attorneys, Troutman

#1046539 v1
105801-53303

Sanders LLP, hereby complain of claimant/counterclaim defendants THE PULLMAN GROUP LLC; and DAVID PULLMAN as follows:

### ANSWER TO PULLMAN'S COMPLAINT

*1.*      Respondents deny Pullman's complaint and right to relief.

### COUNTERCLAIMS

### Parties

*2.*      BARBARA MCFADDEN, as Executrix of the Estate of Gene McFadden ("Ms. McFadden") is the duly court appointed Executrix of the Estate of Gene McFadden and is a resident of the State of Pennsylvania.

*3.*      ELNOR WHITEHEAD, as the Executrix of the Estate of John C. Whitehead ("Ms. Whitehead"), is the duly court appointed Executrix of the Estate of John C. Whitehead and is a resident of the State of Delaware.   Hereinafter, Ms. McFadden & Ms. Whitehead will be collectively referred to as "Respondents" unless otherwise indicated.

*4.*      Respondents are informed and believe, and thereon allege, that defendant THE PULLMAN GROUP LLC ("TPG") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in the State of New York.  Respondents are further informed and believe, and thereon allege, that TPG has had its good standing corporate status suspended by the State of Delaware.

*5.*      Respondents are informed and believe, and thereon allege, that defendant DAVID PULLMAN ("Pullman") is an individual residing in the State of California.  Respondents are

informed and believe, and thereon allege, that Pullman is the sole proprietor of TPG and that since TPG is not a corporation in good standing with the State of Delaware, all of the obligations and responsibilities of TPG have become the obligations and responsibilities of Pullman. Hereinafter, TPG and Pullman will be collectively referred to as "Pullman" unless otherwise indicated.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.    The Songwriters:

6.      Gene McFadden & John Whitehead (individually and collectively "McFadden & Whitehead") are the famous Philadelphia songwriting, production, and performing duo who were prominent at Philadelphia International Records ("PIR") during the 1970's. They are most known for their seminal single "Ain't No Stoppin' Us Now," which was a number one R&B chart-topper in 1979 and peaked at number 13 on the Billboard Hot 100 Singles Chart that same year. In the early 1970's, McFadden & Whitehead commenced their relationship with Philadelphia's legendary Gamble & Huff, who discovered the duo's writing talents. Gamble & Huff employed McFadden & Whitehead as songwriters for PIR. In addition to their seminal hit "Ain't No Stoppin Us Now", McFadden & Whitehead also wrote and/or produced such classics as "Backstabbers" for the O'Jays, "Bad Luck" and "Wake Up Everybody" for Harold Melvin & the Blue Notes, and "Let's Groove," "Soul City Walk," "Strategy," and "Don't Let Love Get You Down" for Archie Bell & the Drells. They also worked with Carolyn Crawford and did outside projects during the '70s and '80s with Melba Moore, Gloria Gaynor, Freddie Jackson, Willie Collins, and Beau Williams.

### B.    The Estates:

7.      In 2004, John Whitehead passed away and Elnor Whitehead was appointed by the Philadelphia Orphans Court as Executrix of the Estate of John C. Whitehead (the "Whitehead Estate").  Accordingly, the only person legally entitled to bind the Whitehead Estate is Ms. Whitehead.

8.      In 2006, Gene McFadden passed away and Barbara McFadden was appointed by the Philadelphia Orphans Court as Executrix of the Estate of Gene McFadden (the "McFadden Estate").  Accordingly, the only person legally entitled to bind the McFadden Estate is Ms. McFadden.

C.      **The Alleged Pullman Contract:**

9.      Unbeknownst to either Respondents, in or about May, 2002, Pullman alleges to have entered into a written contract (the "2002 Pullman Memorandum") with both decedents, McFadden & Whitehead, whereby the two men purportedly agreed to sell to Pullman their respective songwriter and publishing royalty interests.  At no time prior to January 2008, were either Respondents (or for that matter McFadden or Whitehead) provided with a copy of the fully executed 2002 Pullman Memorandum.

10.     Respondents contend that the purported 2002 Pullman Memorandum was merely an agreement to commence negotiations and that under the terms of the 2002 Pullman Memorandum, Pullman had a duty to commence and complete a due diligence examination. Respondents further contend that: (a) no due diligence examination was ever performed by Pullman or by any other person or party on Pullman's behalf (or if performed it was never completed); and (b) that any sale of songwriter or publishing royalty interests by McFadden & Whitehead would be subject to the completion by Pullman of his due diligence examination.

*11.*     Respondents further contend on information and belief that shortly after McFadden & Whitehead executed the 2002 Pullman Memorandum, Pullman abandoned whatever rights he may have had under the 2002 Pullman Memorandum.

*12.*     Respondents further contend on information and belief that it was not until Pullman learned of the Warner Chappell Agreement discussed below, some 5 ½ years after Pullman abandoned whatever rights he may have had under the 2002 Pullman Memorandum, and several years after both McFadden & Whitehead -- key and fundamental witnesses to the alleged negotiations surrounding the 2002 Pullman Memorandum - died that Pullman tried to resurrect an agreement which he had clearly abandoned.

*13.*     At no time since May, 2002 has either Respondent been provided with any document setting forth any negotiation of the purchase price, any "due diligence" performed by Pullman or any additional writing that memorializes the transfer of any songwriter or publishing royalty share.  Further, at no time prior or subsequent to the passing of either McFadden (2006) or Whitehead (2004) did Pullman contact either Respondent to provide them with any documentation as to his rights, if any, with respect to McFadden & Whitehead's songwriter royalty interests.

**C.     The Sale to Warner Chappell:**

*14.*     In 2005, Ms. Whitehead and Gene McFadden engaged Artists Rights Enforcement Corp. ("AREC") to investigate any and all royalties and other fees that may be due them with respect to their respective songwriter  publishing, artist and producer royalty interests.  In late 2007 Warner Chappell Music, Inc. ("WC") made an offer to purchase from both Estates, their respective songwriter interests in all musical compositions currently published and administered

by WC. After much negotiation, the parties consummated sale agreements wherein WC agreed to acquire McFadden & Whitehead's songwriter share of royalties for the total purchase price of $4,400,000.00. Accordingly, written Purchase Agreements ("Purchase Agreements") were drafted and negotiated by the parties. The Purchase Agreements with WC had been signed by Respondents and had been returned to WC for counter signature at the time that Pullman asserted his claim.

### C.    The Tax Liens:

*15.*    Currently, each Estate has outstanding state and federal tax liens against all or a portion of their songwriter royalties. The McFadden Estate currently has liens in excess of $300,000.00. The Whitehead Estate currently has tax liens in excess of $6,000,000.00. In order to satisfy the tax liens, each estate has or is in the process of filing with the IRS and state taxing authorities applications to obtain an "Offer and Compromise", which when accepted and paid, would eliminate any and all outstanding tax liens. As part and parcel of the sale to WC, monies were to be advanced and/or paid by WC to enable each Estate to pay the required monies to satisfy the respective tax liens.

### D.    Pullman's Interference With The WC Sale:

*16.*    In October 2007, each Estate's Purchase Agreement was signed and personally delivered to WC for counter-signature and payment. On October 29, 2007, approximately 48 hours prior to the closing of the McFadden sale, Pullman engaged counsel to write a letter addressed to both Ms. McFadden and Ms. Whitehead, alerting them for the very first time that in 2002 McFadden & Whitehead signed an agreement to sell their songwriter royalty interests to him. The October 29, 2007 letter did not include a copy of the 2002 Pullman Memorandum.

*17.*     On or about October 30, 2007, AREC, each Estate's authorized representative, wrote a letter to Pullman's counsel, requesting a copy of the 2002 Pullman Memorandum.  Pullman responded to that letter (erroneously dating the same October 29, 2007) and again refused to provide a copy of the 2002 Pullman Memorandum.  Accordingly, on October 31, 2007, AREC wrote another letter to Pullman again requesting a copy of the 2002 Pullman Memorandum.  No response was ever provided to AREC's October 31, 2007 letter.

**E.     The Philadelphia Litigation:**

*18.*     In light of Pullman's refusal to provide the 2002 Pullman Memorandum to anyone, Respondents were forced to engage counsel in order to determine what, if any, rights Pullman had with respect to the same.  Accordingly, on or about November 14, 2007, each Respondent filed a Petition for Declaratory Judgment ("Petition") in their respective probate proceedings in the Philadelphia Orphans Court.  The response date for each Petition was January 18, 2008. Immediately after the Petitions were filed, Respondents' Estate counsel was contacted by Pullman's Philadelphia counsel regarding his retention.  At that time, Pullman was again requested to provide a copy of the 2002 Pullman Memorandum.  Pullman again refused to provide a copy.

*19.*     On January 11, 2008, Pullman filed a Notice of Removal to remove each Estate Petition to the United States District Court located in Philadelphia.  Pullman did not attach a copy of the 2002 Pullman Memorandum to this filing.  At that time, Pullman was again requested to provide a copy of the 2002 Pullman Memorandum.  Pullman again refused to provide a copy of the 2002 Pullman Memorandum.

*20.*     The District Court set a response filing date for Pullman for January 31, 2008. Accordingly, at or around that date, Pullman filed a Notice of Motion to Dismiss/Stay for Arbitration, and finally attached to his motion a copy of the 2002 Pullman Memorandum. The Notice of Motion to Dismiss/Stay for Arbitration could have been filed in the Philadelphia Orphans Court, but Pullman elected to delay this proceeding by filing the same after each Petition was removed to the Federal Court.

*21.*     Accordingly, although requested numerous times commencing October 30, 2007, Pullman refused to provide a copy of the 2002 Pullman Memorandum until January 31, 2008 – three (3) months after he was first requested.

*22.*     Upon receipt of the 2002 Pullman Memorandum, the Respondents requested that the original of the same be examined for authenticity. Pullman once again delayed the examination of the 2002 Pullman Memorandum. Only upon application to the Federal Court was Pullman ordered to produce the original document and then he delayed the same for another month. Finally, Respondents decided in order to expeditiously have the instant matter resolved, they would agree to have this matter heard in arbitration.

**F.     Pullman's Interference With The Payment of Royalties:**

*23.*     Respondents are informed and believe, and thereon allege, that after Pullman removed the Petitions to Federal Court, he contacted both WC and Broadcast Music, Inc. ("BMI"), two companies that remit quarterly royalties to Respondents, to stop accounting to Respondents and to pay all royalties over to Pullman. Respondents are further informed and believe, and thereon allege, that both WC and BMI refused to adhere to Pullman's demand. Respondents contend that Pullman engaged in said conduct in an attempt to ensure that Respondents would be devoid

of any income with which to use to prosecute their claims against Pullman and to force them to sell their respective writer shares to him a depressed amount.

### G.  The Halt of the Sale to WC:

*24.*     As a result of Pullman's actions, on or about February 25, 2008, WC withdrew their offer to purchase from each estate their respective songwriter royalty interests.  Accordingly, no monies have been paid to Respondents and hence, they have not completed their respective "Offers and Compromise" with the various taxing authorities to satisfy the current tax liens – which grow each passing day.

**FIRST CAUSE OF ACTION**
**DECLARATORY RELIEF**

*25.*     Respondents incorporate herein by reference, to the extent applicable, each and every allegation contained hereinabove.

*26.*     An actual controversy exists among Respondents on the one hand, and Pullman on the other hand, as to any rights Pullman may have under the 2002 Pullman Memorandum to purchase from Respondents their respective songwriter royalty interests.

*27.*     Among other things, Respondents contend the 2002 Pullman Memorandum is unenforceable and/or Pullman is estopped from enforcing whatever rights he may have had under that memorandum by virtue of: (i) the doctrine of laches; (ii) the doctrine of estoppel, (iii) because Pullman irrevocably waived whatever rights he may had to enforce the 2002 Pullman Memorandum in 2002 and 2003 after McFadden & Whitehead notified Pullman that they did not desire to consummate the proposed transaction, (iv)  for failure of consideration, (v) because Pullman breached the 2002 Pullman Memorandum by, among other things, failing to complete a

9 of 11

due diligence examination, (vi) unclean hands; and (vii) Pullman's failure to comply with his other obligations under the 2002 Pullman Memorandum.

28.    Respondents have no adequate remedy at law.

29.    Accordingly, the Arbitrators are requested to make a determination that Pullman is estopped from asserting any rights he may have had under the 2002 Pullman Memorandum and/or that the 2002 Pullman Memorandum is null and void and of no force or effect.

**SECOND CAUSE OF ACTION**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

30.    Respondents incorporate herein by reference, to the extent applicable, each and every allegation contained hereinabove.

31.    At all times mentioned herein, Respondents had contractual relationships with: (i) WC – with respect to the sales of their songwriter royalty interests with WC; (ii) WC – with respect to their on-going receipt of songwriter royalties; and (iii) BMI – with respect to their on-going receipt of public performance income.

32.    At all times mentioned herein, Pullman was aware of the contractual relationships by and between Respondents on the one hand, and WC and BMI on the other hand.

33.    Pullman intentionally interfered with the contractual relationships by and between Respondents, WC and BMI by informing the latter two that: (i) WC could not purchase the songwriter royalty interests from McFadden & Whitehead because he had already contracted for the same; and (ii) that no royalties should be paid to each Respondent because Pullman allegedly owned the rights to the same.

10 of 11

*34.*     As a direct and proximate result of Pullman's intentional interference with Respondents' contractual relationships with WC and BMI, Respondents have been damaged in an amount unknown to them at this time, but at least in excess of the sum of $4,400,000.00.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Respondents demand judgment as follows:

A.     For an Order that Pullman is estopped from asserting any rights under the 2002 Pullman Memorandum and/or that the 2002 Pullman Memorandum is null and void and of no force or effect;

B.     That Respondents recover from Pullman damages for Pullman's intentional interference with contractual relations in an amount to be determined at trial but in excess of $4,400,000.00;

C.     For an award of Respondents' actual costs incurred for this action, including, but not limited to, reasonable attorneys' fees;

D.     For an award of prejudgment and post judgment interest on all sums;

E.     For such further relief as justice may require, or as this Court deems necessary.

                                        **TROUTMAN SANDERS LLP**

**Dated:**  June 2, 2008
             New York, New York

                              By:  _____
                                    Oren J. Warshavsky  (OW 9469)
                                    The Chrysler Building
                                    405 Lexington Avenue
                                    New York, New York  10174
                                    Telephone: (212) 704.6213
                                    Facsimile: (212) 704-8356
                                    e-mail: Oren.Warshavsky@troutmansanders.com

Exhibit    C

# PULLMAN ®

**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanbonds.com*
*www.pullmanbonds.com*
Securitizing the Future™

**STRUCTURED ASSET SALES GROUP**

May 2, 2002

Gene McFadden
John Whitehead
McFadden Ent., Inc.
7219 N. Bryon St.
Philadelphia, PA 19119

The Pullman Group, ® LLC ("Pullman") is interested in purchasing (the "Proposed Purchase") the musical compositions (the "Works") written in whole or in part by Gene McFadden and/or John Whitehead and/or McFadden & Whitehead ("you" or "Owner").

In exchange for good and valuable consideration, receipt of which is hereby acknowledged, including without limitation the costs incurred by Pullman as part of its "due diligence" review including but not limited to attorneys' fees and copyright search fees, Pullman and you hereby agree as follows:

1. The Rights subject to the Proposed Purchase shall include Owner's entire right, title and interest throughout the universe in perpetuity now or hereafter owned and/or controlled by Owner, in and to the Works and any revenue derived in connection therewith, including without limitation Owner's right to receive the writer's share of the music publishing royalties and artist record royalties from any and all sources pursuant to Owner's agreement with any and all record and publishing companies, including but not limited to Warner-Chappell Music; all performing rights societies, including but not limited to, BMI, and/or any other party or successors in interest thereto, all Owner's rights to use of Owner's likeness or voice for songs or voice in commercial advertisements exploiting any portion of any or all of the Works in any medium now or hereinafter invented, and all artists approval rights pertaining thereto, and Owner's right to renewal rights in the copyrights to the Works and any reversionary rights in and to said master recordings, including, upon acquisition of any interest in the Works by renewal or reversion, all rights of Owner, including both publisher's share and writer's share to income derived from uses of the Works for any and all purposes (such as synchronization licenses and "best of" albums or other sound recordings) and all artists

approval rights pertaining thereto, and audit source rights. Notwithstanding the foregoing, the Rights shall not include (a) any payments due with regard to the writer's share of publishing income for the period prior to the acquisition by Warner-Chappell Music of its ownership interest in the Works; or (b) any payments due for artist record royalties for the period prior to the closing of the Proposed Purchase.

2.  During the period commencing on the date hereof and continuing for 180 days (the "Exclusive Period") you agree to refrain from entering into discussions with any third party regarding the purchase of all or a part of the Works or any rights therein. In the event that during the Exclusive Period, you and Pullman agree upon the terms of the Proposed Purchase, the Exclusive Period shall be extended until formal purchase agreements are executed by the parties hereto. During this Exclusive Period, shall be entitled to any and all monies paid from the date of this agreement going forward from any source for subject musical compositions for any period, including back year audit periods. After execution of this agreement, Owner will turn over and/or credit to the purchase price all such monies to Pullman and will supply Pullman with all royalty and accounting statements

3.  Owner agrees to provide all due diligence material Pullman deems necessary to make the purchase, including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc. Owner will provide Pullman with signed releases so that Pullman may receive the aforementioned diligence material directly from such sources if he so chooses. Owner agrees to allow Pullman to contact, correspond and file anything it deems necessary at its sole discretion with the United States Copyright and Trademark Offices.

4.  Owner shall assign to Pullman at closing all past, present and future claims, including, without limitation, those for infringement or underpayment or non-payment of royalties with respect to any of the foregoing and the right of substitution in connection therewith.

5.  Pullman shall be entitled to all of the audit rights, as well as all claims for copyright infringements. An opinion of Owner's Counsel should be made available, reasonably satisfactory in form to Pullman, that Owner's representations and warranties are accurate.

6.  Pullman proposes to pay the following purchase price (the "Proposed Purchase Price") for the acquisition of the works:

    a.  Subject to Pullman's receipt of all necessary information and documents and our completion of due diligence, an amount equal to

the lesser of the below sub-paragraphs, at Pullman's sole discretion, to be paid in six equal installments once a year from the date of closing for a period of 6 years, with the initial payment to be made at closing:

    (i)    Six (6) times the projected writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2002; or

    (ii)    Six (6) times the writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2001; or

    (iii)    Six (6) times the average writer's share of annual royalties derived by Owner over the five (5) year period beginning January 1, 1997; or

    (iv)    Six (6) times the average annual writer's share of royalties derived by Owner over the three (3) year period beginning January 1, 1997; or

    (v)    Six (6) times the writer's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the closing of the sale transaction; or

    (vi)    Six (6) times the writer's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

    (vii)    Six (6) times the writer's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

b.    In addition to payment of the above determined Purchase Price, if, and when, Pullman acquires the copyright to a composition contained in the Works as a result of the exercise of Owner's renewal right in such composition, Pullman shall pay owner an amount equal to the lesser of the below sub-paragraphs:

    (viii)    Eight (8) times the projected net publisher's share of music publishing royalties to be derived by Owner for the then current calendar year; or

    (ix)    Eight (8) times the net publisher's share of music publishing royalties to be derived by Owner for the previous calendar year; or

    (x)    Eight (8) times the average net publisher's share of annual royalties derived by Owner over the last five (5) year period; or

(xi)   Eight (8) times the average annual net publisher's share of royalties derived by Owner over the last three (3) year period; or

(xii)   Eight (8) times the net publisher's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the renewal year; or

(xiii)   Eight (8) times the net publisher's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

(xiv)   Eight (8) times the net publisher's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

Net publisher's share is defined as the gross publisher's share of income minus all payments to writers and co-publishers and all costs of collection, but excluding "one time" items of income such as claims for infringement and audit income attributable to prior periods.  The payments due pursuant to this sub-paragraph shall be made in six equal annual installments with the first payment due upon acquisition by Pullman of the copyright in the composition.

"Projected" shall be defined as two times the last statement Owner received. The Purchase Price, as determined above, includes payment in full for the right to receive all writers and artist record royalties (except as limited by the provisions of paragraph 1 above) and all audit rights in connection with the Works and all rights purchased.

7.   First Right of Refusal:  If for any reason after due diligence is complete Pullman elects not to purchase the Works, Owner shall give Pullman written notice of any offer (a Third Party Offer) to purchase the assets received by Owner and/or any entity created by Owner.  Pullman shall have 180 (One Hundred Eighty) days to elect to exercise its first right of refusal.  Notice of such election shall be given in writing by Pullman and upon the giving of timely notice, Pullman shall be entitled to purchase the assets on the same terms and conditions as contained in the Third Party Offer.  If Pullman does not elect to exercise its right of first refusal and for any reason the assets are not sold pursuant to the Third Party Offer, Pullman's rights of first refusal shall apply to any subsequent offers received by Owner.

8.   Pullman may elect to use a special purpose vehicle ("SPV") such as an LLC to effectuate the purchase of the Works.  If Pullman so elects, you agree to fully cooperate in the formation of the SPV, the assignment to the SPV of all rights and Works being purchased, and the execution of all necessary documents,

including irrevocable letters of direction to the applicable performing rights societies, to enable the SPV to collect all income attributable to the exploitation of the Works or derived from any of the rights purchased hereunder.

9. If as a result of its due diligence Pullman elects not to proceed with the purchase of the Works, Pullman shall give written notice of its election and upon the giving of such notice, Pullman shall have no further obligations hereunder.

10. In the event that you fail to proceed with the sale of the Works, Pullman may, at its sole discretion, elect as its remedy to receive either a break-up fee in an amount equal to ten percent (10%) of the Proposed Purchase Price or specific performance of this agreement, plus any and all expenses, including reasonable attorneys fees incurred, in enforcing its right to either remedy.

11. The parties agree that any controversy or claim arising out of or relating to this agreement, its breach or any of the transactions or services contemplated herein shall be settled by arbitration before a single arbitrator (or a panel of three arbitrators if the amount at issue exceeds $250,000) in New York County, State of New York in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any Court of competent jurisdiction. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such arbitration proceeding. Any arbitration proceedings or other proceedings or other disputes hereunder shall be kept confidential by the parties and not be publicized in any manner whatsoever.

12. Prior to entering into this agreement Owner has either had this agreement reviewed by legal counsel of Owners' choice or, despite the opportunity to do so, has chosen not to have legal counsel review this agreement.

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

_____     _____     _____     _____
John Whitehead                          Date                          David Pullman,                              Date
                                                                             Founder, Chairman and CEO

_____     5-10.02
Gene McFadden                        Date

_____
McFadden & Whitehead     Date
Authorized Signature

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

John Whitehead          Date                David Pullman,                Date
                                            Founder, Chairman and CEO

Gene McFadden           Date    5-10.02

McFadden & Whitehead    Date
Authorized Signature

# Exhibit  D

# AMERICAN ARBITRATION ASSOCIATION

THE PULLMAN GROUP, LLC                                  :
Plaintiff/claimant                                       :
                                                         :
    V.                               :
                                                         :
                                                         :
ELINOR WHITEHEAD, as the Executrix                       :
of the Estate of JOHN WHITEHEAD, deceased;               :   CASE NO.: 13 148 Y 01087 08
and BARBARA MCFADDEN, as the Executrix                   :
of the Estate of GENE MCFADDEN, deceased                 :
                                                         :
Defendants/Respondents                                   :
_____                 :
ELINOR WHITEHEAD, as the Executrix                       :
of the Estate of JOHN WHITEHEAD, deceased;               :
and BARBARA MCFADDEN, as the Executrix                   :
of the Estate of GENE MCFADDEN, deceased                 :
                                                         :
Counterclaim-Plaintiffs/Claimants                        :
                                                         :
                                                         :
                                                         :
    V.                               :
                                                         :
                                                         :
THE PULLMAN GROUP, LLC and DAVID                         :
PULLMAN                                                  :
                                                         :
Counterclaim-Defendant/Respondents                       :
_____                 :

## COUNTERCLAIM-RESPONDENTS ARBITRATION MEMORANDUM

### I.  INTRODUCTION

The Estate of McFadden and Whitehead seek judgment in their favor on the

counterclaim filed by them seeking a declaratory judgment that the purported "Agreement" is null

and void.  A review of the evidence must lead the finders of fact to the inexorable conclusion that

Pullman did not perform any of his obligations as required of him in the "Agreement" and by his

conduct, or lack thereof, he abandoned it. The counterclaim also seeks a finding that David Pullman and the Pullman Group are responsible for tortious interference with a contractual relationship. Here, there are two relationships that Pullman interfered with: (1) the relationship of Gene McFadden and John Whitehead with BMI and Warner Chappell for payment of royalties and (2) the sale of the catalogue to Warner Chappell. Once again, in reviewing the evidence there can be no doubt that Pullman, by his actions, interfered with both of these relationships to the detriment of the Estates of McFadden and Whitehead.

## *II. FACTS*

Gene McFadden, (hereinafter "Gene) now deceased, was one-half of the pre-eminent song writing, production and performing duo known as McFadden and Whitehead. Teamed with his partner, John Whitehead, (hereinafter "John"), their songs were an integral part of the Philadelphia music scene in the 1970's. Gene and John wrote, produced and performed the seminal hit "Ain't No Stoppin' Us Now". The song is still heard virtually on a daily basis on radio stations, nationally and internationally. It is performed at graduations, weddings and celebratory events of all kinds. It is the unofficial theme song for many of Philadelphia's professional sports teams.

Gene and John were not one hit wonders by anyone's imagination. In addition to "Ain't No Stoppin' Us Now", Gene and John wrote, co-wrote and or produced classic tunes such as "Back Stabbers" for the O'Jays, "Bad Luck" and "Wake Up Everybody" for Harold Melvin and the Blue Notes. Most of their work was done for Gamble & Huff, who were the founders of Philadelphia International Records. Gene and John also did outside work for, among others, Melba Moore, Gloria Gaynor and Freddie Jackson.

As a result of their considerable talent, Gene and John created a significant musical catalogue

of songs they wrote and published. As part and parcel of their writing and publishing credits, they received royalties from companies such as BMI and Warner Chappel. Gene and John continued to work as a team until their respective untimely deaths: John was murdered in 2004 and Gene passed away from cancer in 2006. In due course, Barbara McFadden was appointed Executrix of Gene's Estate and Elinor was appointed Executrix of the Whitehead Estate. Elinor Whitehead was subsequently removed as the Executrix and John's son, Kenneth Whitehead, was appointed in her place. However, since the caption of the within matter has never been amended, the writer will refer to the above captioned Executrix as counterclaim plaintiff.

In 2007, the Estates were approached by Warner Chappell Music, Inc. as a result of a deal brokered by Artists Rights, to purchase the McFadden and Whitehead catalogue for a total of 4.4 million dollars to be evenly divided between the two Estates. The purchase of the catalogue would include all songwriter interests in all musical compositions then published and administered by Warner Chappell. In fact, purchase agreements were prepared. The purchase agreements were executed by representatives of the Estates of McFadden and Whitehead and forwarded to Warner Chappell for its signature to consummate the settlement on October 31, 2007. An unsigned copy of the purchase agreement is attached hereto, incorporated herein and labeled Exhibit "A". It is at that moment in time that David Pullman made his entry onto the scene and as a direct result, the closing with Warner Chappell fell through.

Without the knowledge of Barbara McFadden and Elinor Whitehead, Gene and John purportedly entered into an "Agreement" with David Pullman on behalf of the Pullman Group, giving Pullman, among other things, the right of first refusal to purchase the catalogue. This agreement was allegedly entered into in May, 2002 in New York. Gene and John were never

3

provided with a fully executed copy of the "Agreement".

Pursuant to the terms of the "Agreement" Pullman had several obligations:

(1)  Pullman had to perform a due diligence examination of the catalogue either by himself or by someone acting at his direction in 180 days from the execution of the "Agreement", i.e. May 2nd 2002;

(2)  Any sale of the catalogue would be subject to completion by Pullman of his due diligence examination;

(3)  No negotiation with any third party could occur for 180 days while the due diligence examination was being completed;

(4)  Pullman had a right of first refusal should Gene and John receive any other offers;

(5)  The right of first refusal would exist for 180 days from his notice that there was a third party offer;

(6)  Pullman could purchase the catalogue for the same terms and conditions contained in the third party offer; and

(7)  If after completion of due diligence, Pullman elected not to proceed, Pullman was required to give written notice of his election and would have no further obligations under the "Agreement".

See the "Agreement" attached hereto, incorporated herein and labeled Exhibit "B".

At no time, either prior to the eve of settlement, or, after the deal with Warner Chappell fell through, did Pullman perform his due diligence.  It was only 5 ½ years after the creation of the purported "Agreement", when 4.4 million dollars was on the table, and coincidentally, after Gene and John's death, did David Pullman surface, with his alleged "Agreement" in hand.  In fact, two days before closing, on October 29, 2007, Pullman's counsel sent a letter to Barbara McFadden and Elinor Whitehead asserting the existence of the "Agreement".  A copy of the "Agreement" was not attached to the letter.  A copy of the letter is attached hereto, incorporated herein and labeled Exhibit

4

"C".

Representatives for both Estates repeatedly requested a copy of the "Agreement". It was never produced. As indicated above, the deal with Warner Chappell was never consummated and in fact, on or about February 25, 2008, Warner Chappell withdrew its offer to purchase the catalogue. Counterclaim plaintiffs respectfully suggest that, but for the actions of David Pullman, on behalf of the Pullman Group, the sale would have been completed. Moreover, because of the on-going litigation, the McFadden Estate and the Whitehead Estate have not been able to look for another buyer for the catalogue, all to their financial detriment. In simple terms, Pullman torpedoed the deal with Warner Chappell in an effort to get McFadden and Whitehead to sell their catalogue to him for less money.

After the deal with Warner Chappell fell through, counsel for the Estates filed a civil action in the Court of Common Pleas of Philadelphia County, Orphans Court Division, seeking among other things, a copy of the "Agreement". It was not produced. Thereafter, the matter was removed to the United States District Court for the Eastern District of Pennsylvania by Pullman. He did not attach the "Agreement" to his notice of removal. Once the matter was venued in Federal Court, Pullman filed a Notice of Motion to Dismiss/Stay for Arbitration and the "Agreement" was finally made part of the record on or about January 11, 2008, some 3 ½ months after it was initially requested.

To make matters worse, Pullman engaged in a nefarious scheme to deprive the Estates of their royalty payments. After removal of the matter to Federal Court, Pullman contacted Warner Chappell and BMI in an attempt to stop them from sending royalties to each Estate and, instead, pay the royalties over to him. The companies did not accede to Pullman's demands. Notwithstanding

5

the good sense exhibited by Warner Chappell and BMI, Pullman tortuously interfered with the ongoing contractual relationship between the Estates and the royalty companies. Had Pullman succeeded in getting BMI and Warner Chappell to pay the royalties over to him, the Estates would not have had the financial wherewithal to prosecute their claims. Certainly, this would have led to fruition of Pullman's scheme, the sale of the catalogue for less value than its fair market value.

### III. LEGAL ARGUMENT

#### A.     The Purported "Agreement" Died with Gene and John

It should not be overlooked that the purported "Agreement" contains no language that states that it is binding on the heirs and successors in interest of John Whitehead and Gene McFadden. The "Agreement" if it existed at all, died when Gene and John passed away. The "Agreement" provides that the parties alone are bound. The "Agreement" states:

> The Pullman Group . . Is interested in purchasing the musical compositions
> written in whole or in part by Gene McFadden and/or John Whitehead and/or
> McFadden & Whitehead . . .

See "Agreement" attached hereto, incorporated herein and labeled Exhibit "A".

Nowhere in the "Agreement" are heirs, assigns or successors mentioned. "If the parties wished to specify that the option would be triggered by a testamentary transfer, they could have expressly provided for it." Smith v. Estate of LaTray, 161 A.D.2d 1178 (4 Dept 1990). To the extent that the terms of the purported "Agreement" are unambiguous and not amenable to alternative interpretations, at least insofar as the parties to be bound by the agreement are concerned, the construction of a plain and unambiguous contract is for the court to pass on and circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered

6

from the instrument itself. <u>West, Weir & Bartel v. Carter Paint Co.</u>, 25 N.Y.2d 535, 540; <u>Adler v.</u>

<u>Simpson</u>, 203 A.D.2d 691 (3 Dept 1994). Further, it is axiomatic that a contract must be construed

most strongly against the party who prepared it and favorably to a party who had no voice in the

selection of its language. <u>Caleb & Co. v. DuPont</u>, 624 F.Supp 747 (SD NY 1985); <u>67 Wall Street</u>

<u>Company, v. Franklin National Bank</u>, 37 N.Y.2d 245 (1975). There is no doubt that Pullman

prepared the "Agreement" without any input from John and Gene. The Estates are not parties to the

purported "Agreement" and cannot be bound by it.

Should this panel determine that the contract did not die with Gene and John, the purported

"Agreement" should still be struck down for a myriad of reasons which will be discussed infra. Not

only that, there are evidentiary prohibitions that this panel must be cognizant of when reviewing the

facts.

### B. The Dead Man's Statute Precludes Pullman From Offering Evidence of Transactions with the Decedent

CPLR 4519, informally know as: The Dead Man's Statute "precludes a party or person

interested in the underlying event from offering testimony concerning a personal transaction or

communication with the decedent. The rule is grounded in the concept that where death has sealed

the lips of one of the parties to a personal transaction, the law, for the protection of his (or her) estate

and . . .survivors, should and ought to seal the lips of anyone else making a claim against the estate."

<u>Miller v. Lu-Whitney</u>, 61 A.D.3d 1043, 1044-1045. No discovery of any sought was taken in this

action, so the Dead Man's Statute has not been waived. In this civil action, death has stilled the

voices of Gene McFadden and John Whitehead, signatories of the purported "Agreement".

Therefore, any attempt by Pullman to offer testimony or evidence before this tribunal is

objectionable. Similarly, the testimony of expert witnesses retained by Pullman for the purpose of

testimony before this panel to the extent that it is based on transactions between McFadden and Whitehead and Pullman are also objectionable and must be stricken.

**C.    The Purported "Agreement" Must Fail for Lack of Consideration**

In reviewing the purported "Agreement" in a light most favorable to the non-moving party, it is, at best, a contract that was doomed to fail at execution for lack of consideration. Every contract, pursuant to New York law contains an implied promise that neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruit of the contract. Nautilus Neuroscience, Inc. v. Fares, No 13 Civ. 1078 (S.D. NY 2013). At the root of every contract is consideration and under New York law, sufficient consideration exists as long as there is a benefit to the promisor or a detriment to the promisee. Something of real value must be exchanged in order to satisfy the requirement however, Courts will not scrutinize the adequacy of the consideration. But most importantly, "consideration is something that is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." Weiner v. McGraw-Hill, Inc., 57 NY 2d 458 (1982), citing Hamer v. Sidway 124 N.Y. 538, 545 (1891).  Notwithstanding the language of the purported "Agreement" that "in exchange for good and valuable consideration, receipt of which is hereby acknowledged . . . " no consideration, not even a "peppercorn" was exchanged between the parties.  See Exhibit "B" attached hereto. Ostensibly, Pullman promised to engage in due diligence and that is the consideration he gave to McFadden and Whitehead.  Notwithstanding the fact that Pullman's own expert states that the cost of same was "cheap", it was never produced to Gene and John or exchanged with Gene and John.

8

Pullman also promised to buy the catalogue but never stated a price term, something that is certainly material in a contract for sale of goods. At best, this was an agreement to agree, which never ripened into a contract by performance.

**D.     The Purported "Agreement" Cannot Be Enforced as Pullman's Conduct or Lack Thereof, Violates the Doctrines of Laches and Promissory Estoppel**

The doctrine of laches is an equitable bar based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party. Saratoga Chamber of Commerce v. Pataki, 100 NY2d 801, 816 (2003) cert denied 540 US 1017 (2003). The doctrine may be applied in actions where the defendant shows some prejudicial delay regardless of whether the statutory limitations periods has expired. Id. at 816. Prejudice may be demonstrated by a showing of injury, change of position, loss of evidence, or some other disadvantage resulting from the delay. White v. Priester, 78 A.D.3d 1169 (2nd Dept 2010).

In this civil action, Pullman failed to assert his rights pursuant to the purported "Agreement" for over a decade. As discussed above, Pullman had certain obligations that he needed to fulfill. He never fulfilled his obligation and never surfaced until after Gene and John died. The Estates have been severely prejudiced by Pullman's actions and/or inactions as the deal could not close with Warner Chappell nor could the Estates seek out other buyers because of the litigation. Pullman's conduct has paralyzed the Estates from moving forward.

The essence of the doctrine of promissory estoppel is well known to this panel. As Chairman Pratt wrote for the United States Court of Appeals, Second Circuit, in R.G. Group, Inc., v. The Horn & Hardart Company, 751 F.2d 69, 79 (1984) internal citations omitted, "a claim for promissory estoppel requires a clear and unambiguous promise, a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the

9

estoppel by reason of his reliance". Each element of the doctrine has clearly been met: (1) there was a purported agreement between Gene, John and Pullman; (2) McFadden and Whitehead and their subsequent Estates reasonably relied on the promises made by Pullman; and (3) the Estates were injured by relying on the promises made by Pullman to their significant financial detriment. The points need not be belabored. Equity and fairness demand that the purported "Agreement" be struck.

### E. The Right of First Refusal Contained in the Purported "Agreement" Cannot Stand As Pullman Failed to Perform Pursuant to the Terms Contained Therein.

In a case that fully describes the state of the law regarding the right of first refusal, LIN Broadcasting Corp v. Metromedia, Inc., 74 N.Y.2d 54 (1989), appellant LIN and respondent Metromedia entered into an agreement to jointly go into the cell phone business in New York and Philadelphia. They executed two agreements wherein each gave the other a right of first refusal to buy the other party's interest before the other party could sell to a third party. Sometime thereafter, Metromedia entered into a contract with a third party under which the third party agreed to purchase certain assets from Metromedia.

The sale was conditioned upon Metromedia obtaining waivers of the right of first refusal. Metromedia forwarded letters to LIN advising of the sale. The letters included the terms of the sale with the third party. LIN required an appraisal as they were concerned that the price term agreed upon by Metromedia and the third party was inflated. An appraisal was performed and it came in lower than the proposed sale price. Metromedia walked away from the deal with the third party. LIN then commenced litigation against Metromedia seeking specific performance of the deal that Metromedia would have made with the third party with the more attractive price term. The appellate division determined that the right of first refusal did not confer an irrevocable right to

10

compel a sale and that in the absence of language to the contrary, **there is nothing in the law to prohibit a partner or a shareholder in changing its mind about selling at any time prior to the invocation of the right if first refusal**. Id at 60. (Emphasis supplied.)  LIN appealed and the Supreme Court took the opportunity to address the issue and went even further discussing, whether the right of refusal, once triggered becomes a binding option.  **Simply stated, it does not.** Id at 65. (Emphasis supplied.)

The Court stated that it is well settled law that the right of first refusal is a "contractual right to preempt another".  The effect of a right of first refusal is to bind the party who desires to sell to a third party, not to sell without first giving the other party the opportunity to purchase the property at the specified price.   The subject matter of the sale is anything that the parties may make the subject of a contract. Integral to the right of first refusal is consideration or its equivalent.  It is not irrevocable and cannot last forever. (Emphasis supplied.)   Further, a right of first refusal does not include an operative offer.  In fact, the only offer involved is one to be made in the future, if and when the owner (Gene and John) reach an agreement with a third party purchaser (Warner Chappell) Id. at 61.  The language contained in the right of first refusal in the purported "Agreement" mandated that Pullman or his agent perform due diligence so that a price could be established. However, Gene and John were not bound to purchase same.  The right to accept or reject the purchase price at an appraised value are no different from those of any first refusal offeree.

The New York Court of Appeals in LIN, *supra*, held that in a situation where a first refusal offer once made, which is irrevocable for the period specified in the first refusal clause, does not comport with general principals of contract law or with the theory of first refusal rights. Id at 62. Stated another way, the right of first refusal does not exist to ensure that the seller sell only

11

to the holder of the right of first refusal. Id. at 63. (Emphasis supplied.) Thus, Gene and John were not bound in perpetuity to sell his catalogue to Pullman only, especially in light of Pullman's failure to live up to the terms of the "Agreement".

There is no doubt that the terms contained in the purported "Agreement" were clear and unambiguous. Pullman was supposed to perform his due diligence. He never did. He was supposed to present price terms to Gene and John. He never did. The right of first refusal must be supported by consideration. There was none.

F.     **Pullman Abandoned the Contract with McFadden and Whitehead**

At no time over the last twelve years, since the execution of the purported "Agreement", was Gene or Barbara McFadden, as his Executrix, or John or any representative on his behalf, ever presented with one scintilla of evidence of due diligence on the part of David Pullman. Further, no document, writing, memoranda or any tangible thing was ever been presented to Gene or John, when they were alive, or to Barbara in her capacity as Executrix, or any representative of the Whitehead Estate, that sets forth any negotiation for the purchase price of the catalogue, to say nothing of violations of the doctrine of laches and estoppel.

This panel must construe that David Pullman's conduct evidences abandonment of the purported "Agreement". A contract will be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior. That is, the refusal of one party to perform his contract amounts to abandonment of it, leaving the other party to his choice of remedies but his assent to abandonment dissolved the contract so that he can neither sue for a breach nor compel specific performance. EMF General Contracting Corp. v. Bisbee, 6 A.D.3d 475 ( 1st Dept 1994). Further, to establish abandonment of a contract by conduct,

12

it must be shown that the conduct is mutual, positive, unequivocal, and inconsistent with the intent to be bound.

Generally, a finding of abandonment will be based on clear affirmative conduct by at least one of the parties that is entirely at odds with the contract. Rosiny v. Schmidt 185 A.D.2d 727 *lv denied* 80 NY2d 762 (1992). In the instant case, Pullman's conduct or lack thereof, is inconsistent with the intent to be bound. He has done nothing one way or the other. In light of the fact that Pullman had affirmative duties pursuant to the "Agreement" that he has never carried out, it is clear that he never intended to follow through with the "Agreement".

## G. Pullman Tortuously Interfered with the Prospective Contractual Relationship Between Warner Chappell and McFadden and Whitehead

To establish a claim for tortuous interference with prospective contractual relations, movant must prove that the respondent engaged in culpable conduct which interfered with a prospective contractual relationship between the plaintiff and a third party. Lyons v. Menoudakos & Menoudakos, P.C. 63 A.D. 3d 801 (2d Dept 2009). In order to succeed on such a claim, plaintiff must prove: (a) the plaintiff had a business relationship with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship. Smith v. Meridian Technologies, Inc, 86 A.D.3d 557, 560 (2011); Thome v. Alexander & Lousia Calder Foundation, 70 A.D.3d 88, 108 (2009). As a general rule, such culpable conduct must amount to a crime or an independent tort and may include wrongful means, defined as physical violence, fraud, misrepresentation, civil suits and criminal prosecutions and some degree of economic pressure. Mere knowing persuasion would not be sufficient. See Guard-Life Corp. v. Parker Hardware Mfg. Corp. 50 NY2d 183 (1980). The conduct of Pullman fits squarely into this

13

rule of law.  There can be no doubt that a contractual relationship existed between Gene, John and

Warner Chappell.  Gene and John had already signed the agreement of sale for the catalogues.  The

agreements had been forwarded to Warner Chappell for execution and tender of payment.  Pullman

knew about the impending settlement and within two days, advised all parties that he was exercising

his supposed right of refusal.  Reasonable minds, in reviewing the conduct of Pullman at the time

of the settlement, should come to no other conclusion than he was trying to exert economic pressure

on Gene and John.  Pullman's course of conduct prevented Gene from reaping the benefit of a 4.4

million dollar deal.  Needless to say, Pullman's attempt to coerce BMI and Warner Chappel to pay

McFadden and Whitehead's royalties over to him stand as separate evidence of Pullman's tortious

interference with an actual business relationship.

*IV.  CONCLUSION*

      This panel must decide whether the purported "Agreement" is unambiguous with respect

to the question disputed by the parties as that determination is, under New York law, for the court's

determination. International Multifoods, Corp., v. Commercial Union Insurance Co., 309 F.3d 76,

83 (2d Cir. 2002).  An ambiguity exits where the terms of the contract could suggest more than one

meaning when reviewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of customs, practices, usages and

terminology as generally understood in the particular trade or business. Id.   Evidence outside the

four corners of the document as to what was really intended but unstated or misstated is generally

inadmissible to add to or vary the writing, Law Debenture Trust Co. Of New York v. Maverick

Tube Corp. et al, No. 08-5668 (USCA 2d Cir 2010) citing W.W.W. Associates v. Giancontieri, 77

N.Y.2d 157 (1990).   A plain reading of the purported "Agreement" shows that it is unambiguous.

14

No extrinsic evidence should be considered to make what is unambiguous, ambiguous.   Gene and John acted in clear fashion.  They wanted nothing to do with Pullman.  It is Pullman who has tried to obfuscate the issues in this matter and create issues where none exist.  The purported "Agreement" is void and that the Pullman Group tortuously interfered with the contract for the sale of the catalogue and with BMI and Warner Chappell for payment of royalties.  Pullman must be held accountable for his actions.

Respectfully Submitted:

DOLCHIN, SLOTKIN & TODD, P.C.

SAYDE JOY LADOV, ESQUIRE
Identification No. 37145
50 S. 16th Street, Suite 3530
Philadelphia, PA 19102
Attorney for Counterclaim Respondents

Date: 7/22/17

15

# EXHIBIT A

WARNER-TAMERLANE PUBLISHING CORP.
c/o Warner/Chappell Music, Inc.
10585 Santa Monica Boulevard
Los Angeles, CA 90025-4950

Dated: As of October 1, 2007

Barbara McFadden
Executrix of the Estate of Gene McFadden
c/o Jeffrey S. Sacharow, Esq.
Law Offices of Jeffrey S. Sacharow
11601 Wilshire Boulevard, Suite 2200
Los Angeles, CA 90025

Dear Ms. McFadden:

The following, when signed by you and by us, will constitute the terms and conditions of the purchase agreement (the "Agreement") between you and us with respect the Writer's Share of income (as defined below) derived from the Subject Compositions (as defined below):

1.  **GRANT OF RIGHTS OF WRITER SHARE**

    1.1.  Assignment to Us of Your Interest of the SCs:

        (A)  Subject to the terms and conditions contained herein, including without limitation, our payment of the Purchase Price due pursuant to paragraphs 3.1., 3.2., and 3.3. below, you hereby sell, assign, transfer and set over unto us 100% of the so-called "writer's share" of income, which shall also include the additional twenty five percent (25%) bonus payments paid to you by us (the "Additional Payments") under the separate royalty account US 100010232 000 allocated to you for such payment ("Writer's Share") in all musical compositions written, in whole or in part, by Gene McFadden ("Writer") which are currently owned and/or controlled by us or any of our affiliated companies or subsidiaries ("Subject Compositions" or "SCs"), and all other rights to collect the Writer's Share of income therein (including Writer's Share of public performance income), as well as your right to receive the Writer's Share of royalties therefrom in the SCs (and any derivative works based thereon). For the avoidance of doubt, for all purposes hereunder the Writer's Share of income shall include both the full income stream attributable to the so-called "writer's share" and the Additional Payments.

        (B)  Notwithstanding the foregoing or anything to the contrary, but subject to the next sentence, as between you and us, we shall have the right to collect and retain for our sole account the Additional Payments for the full term of US and international copyright protection in respect of the Subject Compositions and for the terms of any and all renewals or extensions thereof, specifically including the right to collect the Additional Payments during so-called "Extended Term" of United States Copyright. For the avoidance of doubt, our right to collect and retain the Additional Payments does not include any current or future copyright interest in and to the Extended Term of US Copyright as such rights are expressly retained by you and/or your designees.

ZH: Purchase/McFadden Agt vol. 5: 10/19/07         1

RE: Gene McFadden
As of October 1, 2007
Page 2

(C) Further notwithstanding the foregoing, or any other provision to the contrary contained herein, it is understood and agreed that the assignment set forth in subparagraph 1.1. (A) above shall not, and nothing herein shall be deemed to include, the so-called "publisher's share" of copyright interest in the so-called "Renewal and/or "Extended Term" of United States Copyright or any other copyright interests in the Subject Compositions or any other musical compositions which you may own as of the date hereof or which you may acquire in the future in one or more countries of the world; it being understood that all such rights shall be retained by you and/or your designees or successors and assigns. For the avoidance of doubt, you shall not be required to grant us a right of first refusal or matching right to acquire the Extended Term rights to any SC written by Writer or any other person or party in whole or in party; it being understood that the foregoing shall not be deemed to constitute a waiver of any of our rights under Section 203 of the US Copyright Act.

(D) In each instance in which we provide you with a document which is necessary to vest our rights and/or interests in and to the Writer's Share of royalties to any SC, you shall execute and return such document to us within ten (10) business days following your receipt of same. In the event that you fail to do so, in addition to any other rights and/or remedies available to us hereunder, we shall be entitled to execute such document in your name and on your behalf as your attorney-in-fact for this specific purpose (which appointment is coupled with an interest and is therefore irrevocable).

1.2. Sale of SCs; "Cut-Off Date":

1.2.1. You shall execute and deliver the attached letters of direction to us, and we shall purchase and accept the same, at the "Closing" (as defined below).

1.2.2. Cut-Off Date:

(A) It is understood and agreed that, effective as of October 1, 2007 (the "Cut-Off Date"), we shall be entitled to collect and retain (for our sole account) the Writer's Share of all income (of any nature, regardless of when earned) which would otherwise be payable to you in respect of the SCs.

(B) In the event that you and/or any person or entity on your behalf receive any monies representing the Writer's Share of income earned with respect to the SCs subsequent to the Cut-Off Date, the same shall be turned over to us by you and/or such other person or entity within 10 business days following receipt thereof.

1.3. For the avoidance of doubt, it is understood that the foregoing assigns your and the Writer's right to receive any and all Writer's Share income of any nature (including your and/or the Writer's so-called "writer's share" of public performance income payable to you from performance societies throughout the world), regardless of when earned, from any and all parties,

RE: Gene McFadden
As of October 1, 2007
Page 3

including, but not limited to, your share of any songwriter royalties otherwise payable to you by us under any songwriter, co-publisher and/or administration agreements in respect of such SCs.

        1.4.    Assignment of The "Writer's Share" of Public Performance Income:

At or prior to the Closing you shall deliver to us: (1) a BMI Royalty Assignment Verification Form, and (2) a short form assignment of BMI Royalties (the "BMI Assignment Documents"), each executed by you. If, after the Closing, BMI shall fail, for any reason, to honor the assignment of the writer's share of public performance income and royalties in respect of the SCs, then you shall cause (including promptly and irrevocably authorizing and directing) BMI to send all writer performance statements and payments to you c/o our address on your behalf in perpetuity (in the event that after the Closing you receive any statements and/or payments from BMI with respect to Writer's share of performance income with respect to the SCs despite your authorization and direction to send such statements and payments to us or because we have not submitted the BMI Assignment Documents to BMI, you shall [within 10 days following your receipt of thereof] send [via a nationally recognized courier service] said statement and/or payment to us). You hereby appoint us your attorney-in-fact (which appointment is coupled with an interest and is therefore irrevocable) to endorse and negotiate any and all writer performance royalty checks so received and to retain such amounts for our sole account. We agree that we shall not submit the BMI Assignment Documents to BMI prior to the Closing and our payment to you of the Purchase Price.

## 2.    RELEASE FROM ROYALTY OBLIGATIONS:

        2.1.    You hereby release us, our parent companies, subsidiaries and affiliated music publishing entities, as well as our officers, directors and employees (the "Released Persons"), from any and all of our obligations to account (and/or pay) you the Writer's Share of income and/or the Writer's Share of royalties in respect of any of the SCs under any and all songwriter or other royalty agreements, whether written, verbal, express or implied (the "Released Items").

        2.2.    Waiver of Statutory Provisions:

        2.2.1.   You expressly acknowledge that you are familiar with Section 1542 of the California Civil Code, which provides:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

        2.2.2.   You hereby waive any right you may have under Section 1542, as well as the provisions of all comparable, equivalent or similar statutes and principles of common law of California or of any other jurisdiction with respect to the Released Persons and/or Released Items,

ZH: Purchase/McFadden Agt vol. 5: 10/19/07      3

RE: Gene McFadden
As of October 1, 2007
Page 4

and you acknowledge and agree that the foregoing waiver is an essential and material term of this
agreement, without which the foregoing payment would not have been made.

### 3. PURCHASE PRICE:

In full consideration of the rights assigned to us hereunder and the release set forth
above, we shall pay you the following non-refundable, non-recoupable payments:

3.1.    $1,650,000 payable upon full execution of this Agreement.

3.2.    $200,000 together with interest accrued from the date of Closing (composite
"prime rate" as published in the Wall Street Journal) payable upon the closing of the John C.
Whitehead writer's share purchase agreement between Elnor Whitehead, the executrix of the Estate
of John C. Whitehead and us (the "Whitehead Agreement"); provided, however, if the Whitehead
Agreement does not close by December 31, 2008, (except to the extent that our failure to close the
Whitehead Agreement is due to the failure or neglect of ourselves or of our representatives), then
we have no obligation to pay to you the amount referenced in this paragraph 3.2.

3.3.    $350,000 will be withheld in accordance with an August 13, 2007 U.S.
Internal Revenue Service Notice of Levy in the amount of $320,956.59. issued against you on behalf
of Gene McFadden covering each tax period beginning January 1, 2001 through December 31, 2005
(the "IRS Lien"). In the event that the assessment amount is amended or released, you will send us
evidence reasonably satisfactory to us that IRS Lien has been released and or the obligation
evidenced by the IRS Lien has been discharged within ten (10) days of such amendment or release.
In the event that the IRS Lien was released for an amount less than $350,000, the difference between
the sum of $350,000 and the amount actually paid to the IRS will be paid to you within fifteen (15)
business days after our receipt of evidence indicating that the IRS Lien has been released and/or the
obligation evidenced by the IRS Lien has been discharged. In the event that the IRS Lien is released
for an amount greater than $350,000, the excess will be debited against the $200,000 payment
referenced in paragraph 3.2, if such payment is due, or you shall immediately repay us the excess
amount in full upon demand.

3.4.    We acknowledge that (1) Warner Music Group has approved the above
stated Purchase Price and (2) the Purchase Price was calculated taking into account the Additional
Payments and income received from synchronization licenses previously issued including a
synchronization fee for the use of "Aint No Stoppin Us Now" for a television commercial that
aired in 2003 and 2004 and that the Purchase Price shall not be reduced as a result of the
synchronization licenses referenced in this subparagraph.

3.5.    Subject to paragraph 3.6. below, all amounts payable to you hereunder shall
be made payable to you care of Artist's Rights Enforcement Corp., at the following address: 250
West 57th Street, Suite 701, New York, New York 10107, Attn: Chuck Rubin.

ZH: Purchase/McFadden Agt vol. 5: 10/19/07                    4

RE: Gene McFadden
As of October 1, 2007
Page 5

    3.6.    Further, we shall, on your behalf, pay directly to each payee specified in your written payment directions, which payment direction(s) shall be in a form reasonably acceptable to us, the amounts specified in any such payment direction(s). All sums paid by us on your behalf pursuant to any payment direction(s) contemplated in the first sentence of this subparagraph shall be deemed to constitute payments made by us to you in partial satisfaction of our obligation to pay you the Purchase Price specified in subparagraphs 3.1., 3.2., and 3.3. above.

## 4.    CLOSING:

    The "**Closing**" shall take place upon complete execution of this Agreement and all supporting documents, as well as our receipt of all items set forth in paragraph 8, below.

## 5.    YOUR WARRANTIES AND REPRESENTATIONS:

    5.1.    Basic Warranties and Representations/Exclusions:

    5.1.1.  You warrant and represent

    (A)    that, as of the Cut-Off Date, you have full right, power and authority to enter into this Agreement and to sell, assign, transfer and set over unto us 100% in and to the Writer's Share of income derived from the Subject Compositions (and the right to collect and receive such income in the throughout the world), free and clear of any mortgage, levy, lien, claim or other encumbrance (other than the IRS Lien referenced in subparagraph 3.3. above), and that all actions necessary to the completion of the transactions contemplated by this Agreement have taken place;

    (B)    that, as of the Cut-Off Date, you are the sole person or entity entitled to receive the Writer's Share of income derived from the Subject Compositions;

    (C)    that, except for the IRS Lien, there are no judgments, decrees, awards, orders or injunctions, actions, claims, investigations or proceedings before any court, arbitrator, governmental instrumentality or administrative agency pending against you with respect to the SCs, and that there are no restrictions which would prevent or limit your ability to assign the SCs to us or which would limit or restrict our rights to publish, administer and/or collect all income in respect of the SCs;

    5.2.    You warrant and represent that (1) neither you nor anyone authorized by you have received, or have made arrangements to receive, any advance, loan or other payments which would or might be recoupable from, or otherwise offset against, any monies which would be collectible by us on or after the Cut-Off Date; (2) you are not plaintiff in any legal action involving the Writer's Share to the SCs, and (3) as of the Closing, you will have paid or provided for payment all legal fees incurred with respect to any such actions.

RE: Gene McFadden
As of October 1, 2007
Page 6

5.3.    Each party shall be responsible for any fees or other payments which are due or may hereafter become due from such party to any agent, attorney, manager, or other third party representative(s) acting on behalf of such party by reason of this Agreement.

5.4    Notwithstanding anything to the contrary contained herein, the parties hereby acknowledge that (1) this Agreement will supersede any previous agreements, if any, (oral and/or written) previously granting to Writer any interest in the Additional Payments; (2) as between you and us, we hereby confirm the prior grant to Writer of the right to receive the Additional Payment for the duration of copyright protection throughout the world; (3) you hereby agree to sell, assign, and grant unto us the right to collect and retain for our sole account the Additional Payments for the duration of US and international copyright protection and all renewals and extensions thereof as more particularly set forth in subparagraph 1.1 (A).

6.    OUR WARRANTIES, REPRESENTATIONS AND COVENANTS:

We warrant and represent that we have full right, power and authority to enter into this Agreement and to acquire the Writer's Share of income derived from the SCs being transferred to us hereunder, that we are a corporation duly organized, validly existing and in good standing under the laws of our state of incorporation with full power to enter into and to perform this Agreement and that all corporate actions (including, but not limited to, resolutions of stockholders and/or directors) necessary to permit us to do so have been taken.

7.    SURVIVAL OF COVENANTS, WARRANTIES, AND
    REPRESENTATIONS:

7.1.    Subject to paragraph 7.2., each party's respective covenants, warranties and representations shall be true as of, and shall survive, the Closing, regardless of any "due diligence" or other investigation undertaken by either party prior to the Closing. The foregoing shall not be deemed in limitation of whatever rights we may have with respect to the SCs or any other rights which we may have against third parties.

7.2.    All warranties contained in paragraph 5.2. will terminate as of the four (4) year anniversary of the Closing.

8.    CONDITIONS TO CLOSING:

In addition to the delivery to us of the documentation referred to above, our obligation to complete the purchase contemplated by this Agreement shall be subject to our being reasonably satisfied as to:

(1)    the continuing accuracy of all representations and warranties made by you pursuant to the preceding paragraphs;

RE: Gene McFadden
As of October 1, 2007
Page 7

(2)     the validity of the copyright in each of the SCs and the agreement(s) pursuant to which such SCs were acquired (and, if acquired by a predecessor, the document(s) transferring such SCs to you);

(3)     completion of legal and financial due diligence with respect to the SCs (except to the extent that our failure to complete such due diligence is due to the failure or neglect of ourselves or of our representatives);

(4)     receipt of any third party consents necessary with respect to the assignment of the Writer's Share of income with respect to the SCs and/or agreements relating thereto; and

(5)     execution and delivery of all required ancillary documents, including letters of direction in the forms annexed hereto.

### 9.     RECIPROCAL INDEMNITIES:

9.1.    Basic Indemnity:

Each party (the **"Indemnitor"**) agrees to indemnify the other party and hold the other party harmless from and against any and all loss, damage, cost or expense (including actual and reasonable outside counsel fees and court costs) which the other party (the **"Indemnitee"**) may incur as the result of any third party claim which, if true, would constitute a breach of this Agreement on the part of the Indemnitor, but only to the extent that the third party claim shall result in a final, nonappealable adverse judgment against the Indemnitee or a settlement entered into with the prior written consent of the Indemnitor (not to be unreasonably withheld). In addition, your indemnity shall extend to the "deductible" under our errors-and-omissions policy without regard to judgment or settlement.

9.2.    In each instance, the party claiming to be the Indemnitee shall give the putative Indemnitor prompt notice of any claim, action, or proceeding in respect of which indemnity is claimed, and the Indemnitor shall defend the same at the Indemnitor's sole cost and expense. In the event that the claim, action or proceeding is of such a nature as to be covered by the Indemnitor's errors-and-omissions insurance but the carrier declines to provide coverage and/or a defense, the Indemnitee shall have the right to tender such claim, action or proceeding to its own errors-and-omissions carrier, and in such event the Indemnitor shall reimburse the Indemnitee for its deductible (or portion thereof) expended in connection with the defense thereof.

9.3.    The Indemnitee shall have the right to participate in the defense of such claim, action or proceeding by counsel of the Indemnitee's choice, at the Indemnitee's sole cost and expense.

9.4.    Breach and Cure:

RE: Gene McFadden
As of October 1, 2007
Page 8

         9.4.1. Neither party shall be deemed in breach hereunder unless the other party shall give notice thereof and the notified party shall fail to cure the same within thirty (30) days (ten (10) days, in the case of a payment of money), provided, that where such breach does not involve a payment of money and is of such a nature that it cannot be completely cured within such thirty-day period, it shall be sufficient if the notified party shall commence the curing thereof within such thirty-day period and shall proceed diligently to complete the curing of such breach within a reasonable time thereafter.

         9.4.2. However, notwithstanding the foregoing, either party shall have the right to seek injunctive relief to prevent a prospective breach of this Agreement by the other party.

## 10.    MISCELLANEOUS:

         10.1.   This Agreement contains the entire agreement of the parties with respect to the subject matter and supersedes any and all prior agreements (oral and/or written) concerning the subject matter, and may not be altered or amended except by a further written agreement signed by both parties.

         10.2.   This Agreement shall inure to the benefit of, and shall be binding upon, the parties and their respective successors and assigns.

         10.3.   Notices:

         Any notice required or permitted to be given pursuant to this Agreement shall be given to the party to be notified by registered or certified mail or any other means through which delivery may be verified, to the address set forth above (in our case, to the attention of the Executive Vice President, Legal and Business Affairs) or to such other street address as such party may designate from time to time by notice in like manner. A copy of all notices to you shall also be sent to Artist's Rights Enforcement Corp., at the address set forth in subparagraph 3.5. above, Attn: Chuck Rubin.

10.4.   Law & Forum:

10.4.1.  This Agreement has been entered into in, and is to be interpreted in accordance with the laws of, the State of California.

10.4.2.  Any action seeking the interpretation and/or enforcement of this Agreement shall be heard only in the State or Federal Courts situated in Los Angeles County, both parties hereby submitting themselves to the jurisdiction of such courts for such purpose.

10.4.3.  Service of process in any action between the parties may be made by notice in the manner prescribed in ¶10.3, above, and shall become effective 30 days following the date of delivery (unless delivery is refused, in which event service shall become effective 30 days following the date upon which delivery was refused).

Very Truly Yours,

WARNER-TAMERLANE PUBLISHING CORP.

By:_____

Edward P. Pierson
Executive Vice President
Legal and Business Affairs

Agreed and Accepted:

_____

**Barbara McFadden**
**Executrixof the Estate of Gene McFadden**

# EXHIBIT B

# PULLMAN ®

THE PULLMAN GROUP,® LLC
1370 Avenue of the Americas
New York, NY 10019
212.750.0210 tel.
212.750.0464 fax
info@pullmanbonds.com
www.pullmanbonds.com
Securitizing the Future™

STRUCTURED ASSET SALES GROUP

May 2, 2002

Gene McFadden
John Whitehead
McFadden Ent., Inc.
7219 N. Bryon St.
Philadelphia, PA 19119

    The Pullman Group, ® LLC ("Pullman") is interested in purchasing (the "Proposed Purchase") the musical compositions (the "Works") written in whole or in part by Gene McFadden and/or John Whitehead and/or McFadden & Whitehead ("you" or "Owner").

    In exchange for good and valuable consideration, receipt of which is hereby acknowledged, including without limitation the costs incurred by Pullman as part of its "due diligence" review including but not limited to attorneys' fees and copyright search fees, Pullman and you hereby agree as follows:

    1.  The Rights subject to the Proposed Purchase shall include Owner's entire right, title and interest throughout the universe in perpetuity now or hereafter owned and/or controlled by Owner, in and to the Works and any revenue derived in connection therewith, including without limitation Owner's right to receive the writer's share of the music publishing royalties and artist record royalties from any and all sources pursuant to Owner's agreement with any and all record and publishing companies, including but not limited to Warner-Chappell Music; all performing rights societies, including but not limited to, BMI, and/or any other party or successors in interest thereto, all Owner's rights to use of Owner's likeness or voice for songs or voice in commercial advertisements exploiting any portion of any or all of the Works in any medium now or hereinafter invented; and all artists approval rights pertaining thereto, and Owner's right to renewal rights in the copyrights to the Works and any reversionary rights in and to said master recordings, including, upon acquisition of any interest in the Works by renewal or reversion, all rights of Owner, including both publisher's share and writer's share to income derived from uses of the Works for any and all purposes (such as synchronization licenses and "best of" albums or other sound recordings) and all artists

approval rights pertaining thereto, and audit source rights. Notwithstanding the foregoing, the Rights shall not include (a) any payments due with regard to the writer's share of publishing income for the period prior to the acquisition by Warner-Chappell Music of its ownership interest in the Works; or (b) any payments due for artist record royalties for the period prior to the closing of the Proposed Purchase.

2. During the period commencing on the date hereof and continuing for 180 days (the "Exclusive Period") you agree to refrain from entering into discussions with any third party regarding the purchase of all or a part of the Works or any rights therein. In the event that during the Exclusive Period, you and Pullman agree upon the terms of the Proposed Purchase, the Exclusive Period shall be extended until formal purchase agreements are executed by the parties hereto. During this Exclusive Period, shall be entitled to any and all monies paid from the date of this agreement going forward from any source for subject musical compositions for any period, including back year audit periods. After execution of this agreement, Owner will turn over and/or credit to the purchase price all such monies to Pullman and will supply Pullman with all royalty and accounting statements

3. Owner agrees to provide all due diligence material Pullman deems necessary to make the purchase, including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc. Owner will provide Pullman with signed releases so that Pullman may receive the aforementioned diligence material directly from such sources if he so chooses. Owner agrees to allow Pullman to contact, correspond and file anything it deems necessary at its sole discretion with the United States Copyright and Trademark Offices.

4. Owner shall assign to Pullman at closing all past, present and future claims, including, without limitation, those for infringement or underpayment or non-payment of royalties with respect to any of the foregoing and the right of substitution in connection therewith.

5. Pullman shall be entitled to all of the audit rights, as well as all claims for copyright infringements. An opinion of Owner's Counsel should be made available, reasonably satisfactory in form to Pullman, that Owner's representations and warranties are accurate.

6. Pullman proposes to pay the following purchase price (the "Proposed Purchase Price") for the acquisition of the works:

   a. Subject to Pullman's receipt of all necessary information and documents and our completion of due diligence, an amount equal to

the lesser of the below sub-paragraphs, at Pullman's sole discretion, to be paid in six equal installments once a year from the date of closing for a period of 6 years, with the initial payment to be made at closing:

    (i)    Six (6) times the projected writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2002; or .

    (ii)    Six (6) times the writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2001; or

    (iii)    Six (6) times the average writer's share of annual royalties derived by Owner over the five (5) year period beginning January 1, 1997; or

    (iv)    Six (6) times the average annual writer's share of royalties derived by Owner over the three (3) year period beginning January 1, 1997; or.

    (v)    Six (6) times the writer's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the closing of the sale transaction; or

    (vi)    Six (6) times the writer's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

    (vii)    Six (6) times the writer's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

b.    In addition to payment of the above determined Purchase Price, if, and when, Pullman acquires the copyright to a composition contained in the Works as a result of the exercise of Owner's renewal right in such composition, Pullman shall pay owner an amount equal to the lesser of the below sub-paragraphs:

    (viii)    Eight (8) times the projected net publisher's share of music publishing royalties to be derived by Owner for the then current calendar year; or

    (ix)    Eight (8) times the net publisher's share of music publishing royalties to be derived by Owner for the previous calendar year; or

    (x)    Eight (8) times the average net publisher's share of annual royalties derived by Owner over the last five (5) year period; or

(xi)   Eight (8) times the average annual net publisher's share of royalties derived by Owner over the last three (3) year period; or

(xii)   Eight (8) times the net publisher's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the renewal year; or

(xiii)   Eight (8) times the net publisher's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

(xiv)   Eight (8) times the net publisher's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

Net publisher's share is defined as the gross publisher's share of income minus all payments to writers and co-publishers and all costs of collection, but excluding "one time" items of income such as claims for infringement and audit income attributable to prior periods. The payments due pursuant to this sub-paragraph shall be made in six equal annual installments with the first payment due upon acquisition by Pullman of the copyright in the composition.

"Projected" shall be defined as two times the last statement Owner received. The Purchase Price, as determined above, includes payment in full for the right to receive all writers and artist record royalties (except as limited by the provisions of paragraph 1 above) and all audit rights in connection with the Works and all rights purchased.

7.   First Right of Refusal: If for any reason after due diligence is complete Pullman elects not to purchase the Works, Owner shall give Pullman written notice of any offer (a Third Party Offer) to purchase the assets received by Owner and/or any entity created by Owner. Pullman shall have 180 (One Hundred Eighty) days to elect to exercise its first right of refusal. Notice of such election shall be given in writing by Pullman and upon the giving of timely notice, Pullman shall be entitled to purchase the assets on the same terms and conditions as contained in the Third Party Offer. If Pullman does not elect to exercise its right of first refusal and for any reason the assets are not sold pursuant to the Third Party Offer, Pullman's rights of first refusal shall apply to any subsequent offers received by Owner.

8.   Pullman may elect to use a special purpose vehicle ("SPV") such as an LLC to effectuate the purchase of the Works. If Pullman so elects, you agree to fully cooperate in the formation of the SPV, the assignment to the SPV of all rights and Works being purchased, and the execution of all necessary documents,

including irrevocable letters of direction to the applicable performing rights societies, to enable the SPV to collect all income attributable to the exploitation of the Works or derived from any of the rights purchased hereunder.

9.  If as a result of its due diligence Pullman elects not to proceed with the purchase of the Works, Pullman shall give written notice of its election and upon the giving of such notice, Pullman shall have no further obligations hereunder.

10. In the event that you fail to proceed with the sale of the Works, Pullman may, at its sole discretion, elect as its remedy to receive either a break-up fee in an amount equal to ten percent (10%) of the Proposed Purchase Price or specific performance of this agreement, plus any and all expenses, including reasonable attorneys fees incurred, in enforcing its right to either remedy.

11. The parties agree that any controversy or claim arising out of or relating to this agreement, its breach or any of the transactions or services contemplated herein shall be settled by arbitration before a single arbitrator (or a panel of three arbitrators if the amount at issue exceeds $250,000) in New York County, State of New York in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any Court of competent jurisdiction. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such arbitration proceeding. Any arbitration proceedings or other proceedings or other disputes hereunder shall be kept confidential by the parties and not be publicized in any manner whatsoever.

12. Prior to entering into this agreement Owner has either had this agreement reviewed by legal counsel of Owners' choice or, despite the opportunity to do so, has chosen not to have legal counsel review this agreement.

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

John Whitehead                Date

Gene McFadden                 Date    5-10-02

McFadden & Whitehead          Date
Authorized Signature

David Pullman,                Date
Founder, Chairman and CEO

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

John Whitehead          Date

David Pullman,          Date
Founder, Chairman and CEO

Gene McFadden          Date

McFadden & Whitehead          Date
Authorized Signature

# EXHIBIT C

LAW OFFICES OF
ROBERT S. BESSER
1221 SECOND STREET, THIRD FLOOR
SANTA MONICA, CALIFORNIA 90401
TELEPHONE (310) 394-6811
FACSIMILE (310) 394-6813

ROBERT S. BESSER                                                                                     RBBESSER@aol.com

October 29, 2007

Elnor Whitehead                    Elnor Whitehead                 Via Fax to:  (215) 549-0591
aka Elnor Medley                   aka Elnor medley                Barbara McFadden
1916 Dallas Street                 48 Sherin Drive                 Philadelphia, PA
Philadelphia, PA  19138            Newark, DE  19702

Via Fax to:  (215) 587-0888

Sayde J. Markowitz Ladov, Esq.                                     Elner Whitehead aka Elner Medley
Abrahams Loewenstein & Bushman, P.C.                               John Whitehead Foundation
16ᵗʰ and Cherry Streets, Suite 1300                                6817 Old Dodge Ave.
Philadelphia, PA  19102                                            Philadelphia, PA
Attorneys for Estate of John C. Whitehead
and Elner Whitehead, Personal Representative

    Re:    McFadden and Whitehead Asset Sale:  Notice of Breach

To All Parties:

        Please be advised that this office represents The Pullman Group, LLC ("Pullman").

        It is our client's understanding that you intend to sell the musical compositions, works written
and/or performed in whole or in part by Gene McFadden and/or John C. Whitehead, including but
not limited to the works listed on the attached Exhibit "A," and the assets (collectively the "Assets")
that were subject to the agreement executed in 2002 between Gene McFadden, John Whitehead and
Pullman (the "Agreement"). This information was discovered by our client within the last day and
it is our client's understanding that the transaction is set to close by October 31, 2007.

        The Agreement provides that if the holders of the Assets decide to sell the Assets, Pullman
has the sole and exclusive right to purchase the Assets upon the terms provided by the Agreement.
Thus the estates of Gene McFadden and John Whitehead (the "Estates") have no right to sell the
Assets to any entity other than Pullman and the pending transaction by which the Estates intend to
sell the Assets is a breach of the Agreement.

        By copy of this letter, we are placing all known interested parties on notice of the breach.
We demand that you furnish copies of this Notice to all persons and entities involved in the purchase
transaction. Our client will hold any person or entity liable for failure to notify all other persons or
entities involved in the proposed asset sale transaction that Pullman's rights are as set forth above.



LAW OFFICES OF ROBERT S. BESSER

October 29, 2007
Page 2

In addition, our client will hold liable all parties who proceed with the transaction after notification of Pullman's rights has been provided to the parties.

Nothing contained herein is intended as a waiver or relinquishment of any of our client's rights or remedies, all of which are hereby reserved.

Very truly yours,

LAW OFFICES OF ROBERT S. BESSER

By: _____
Robert S. Besser

RSB:sb

# Exhibit  E

1

2    -----------------------------------------X

3    IN THE MATTER OF THE ARBITRATION BETWEEN

4    THE PULLMAN GROUP, LLC,

5                    Claimant and Counterclaim Respondent,

6                    v.          Case No. 13 20 0800 1087

7    THE ESTATES OF GENE MCFADDEN AND JOHN C.
     WHITEHEAD,
8
                    Respondent and Counterclaimant.
9    -----------------------------------------X

10

11

                         Hughes Hubbard & Reed LLP
12                       One Battery Park Plaza
                         New York, New York
13
                         July 29, 2014
14                       9:11 a.m.

15

16

17

18    BEFORE:

19            GEORGE C. PRATT, CHAIRMAN

20            JAMES B. KOBAK, JR., PANEL MEMBER

21            RICHARD D. ROSENBLOOM, PANEL MEMBER

22

23

24    Reported By:

25    Nicole Cannistraci, Court Reporter

```
 1

 2      A P P E A R A N C E S:

 3           LAW OFFICE OF ANTHONY KORNARENS, ESQ.
             Attorney for Claimant and Counterclaim
 4           Respondent
                  2907 Stanford Ave
 5                Marina Del Rey, California 90292
             BY:  ANTHONY KORNARENS, ESQ.
 6
             THE PULLMAN GROUP, LLC
 7           Attorney for Claimant and Counterclaim
             Respondent
 8                3121 Chadney Drive
                  Glendale, California 91206
 9           BY:  ARMEN MANASSERIAN, ESQ. (Not present)

10
             DOLCHIN, SLOTKIN & TODD, P.C.
11           Attorneys for Respondent and
             Counterclaimant
12                Two Liberty Place
                  50 South 16th Street
13                35th Floor
                  Philadelphia, Pennsylvania 19102
14           BY:  SAYDE J. LADOV, ESQ.

15
             JAMES JACKSON, ESQ.
16           Attorney for Respondent and
             Counterclaimant
17                29 Harrison Avenue
                  Montclair, New Jersey 07042
18

19

20

21

22

23           ALSO PRESENT:

24           STEVE KUSH

25
```

```
1                     Proceedings
2          refusal does not exist in perpetuity.
3          That has been briefed extensively for
4          you and I need not go into it now.  We
5          suggest to you that the due diligence,
6          if it occurred at all, occurred in 2007
7          when Pullman got notice of the
8          Warner/Chappell deal, not 180 days after
9          2002, because no matter how you try to
10         put a square peg into a round hole,
11         Mr. Besser's receipt for monies given to
12         him by Pullman for the due diligence
13         performed was in 2007 and not 2002.
14              You will also hear that Pullman
15         disappeared for five years, as he can
16         produce no record, no record of any
17         correspondence with Gene and John.  And
18         when he learned that the estates were
19         about to sell their catalog for
20         considerably more money than what he
21         purportedly offered Gene and John, i.e.
22         The multiples of six, he had his
23         attorney write a letter to the widows
24         asserting the claims.  That action, that
25         action effectively put a kibosh,
```

```
1                    Proceedings
2          torpedoed the deal between
3          Warner/Chappell and the estates.
4               Pullman claims that he has
5          performed his due diligence to ascertain
6          the value of the catalog.  If the due
7          diligence was ever performed, if
8          Mr. Besser did what he said he did, it
9          was slipshod at best and was never
10         forwarded to Gene and John or their
11         windowed.  Obviously it couldn't be
12         forwarded to Gean and John because by
13         2007 when Besser says he completes the
14         due diligence, Gean and John were dead.
15              You will hear that no
16         consideration was exchanged between
17         Pullman and Gean and John.  And
18         Pullman's belief that under the laws of
19         New York that his due diligence
20         substitutes for consideration paid to
21         Gean and John, I suggest to you that
22         pursuant to the laws of the State of
23         New York does not fly.  This was no more
24         than an agreement to agree.
25              Panel, we appreciate that people
```

1                    Proceedings

2          can get confused and they may make

3          mistakes or simply not remember.  We can

4          try to accept that, but there are other

5          issues affecting Mr. Pullman's

6          credibility that I suggest to you are

7          not so easy to ignore.

8               You will hear that this is not

9          Mr. Pullman's first rodeo.  And by that,

10         notwithstanding the fact that

11         Mr. Pullman tells you he made a fortune

12         securitizing David's Bowie's catalog and

13         that of James Brown, he has been

14         involved in a host of litigation where

15         his credibility is directly an issue.

16         Making false accusations against

17         musicians, retired college professors,

18         developers and others; in general, using

19         the legal system as a tool.

20              As you listen to the testimony and

21         the opinions of other tribunals, ask

22         yourselves if you are able to ignore

23         these types of misstatements and

24         conduct.

25              Plaintiff would have you believe

```
 1                    Proceedings
 2          that the contract that was produced by
 3          Pullman as a result of a court order
 4          three and a half months into the
 5          litigation that originally ensued in
 6          Orphan's Court, the Philadelphia version
 7          of Surrogate's Court, after the death of
 8          the Warner/Chappell deal is the
 9          so-called Perry Mason moment, the piece
10          of evidence that seals the deal.  We do
11          not endorse the contract, but it exists
12          and we cannot walk away from it.  We
13          accept that it is there.
14              That being said, you will hear
15          from the testimony that this was nothing
16          more than an agreement to agree that did
17          not and never did ripen into a contract
18          by performance; that the agreement is
19          unenforceable for a host of reason.
20              Mr. Kornarens, respectively, and I
21          will save this in detail for summary
22          judgment, the latches argument that
23          counterclaimants is making is not a
24          latches argument vis-a-vis the statute
25          of limitations.  It is a latches
```

1                    Proceedings

2          argument that from 2002 to 2007

3          Mr. Pullman goes silent.  That is the

4          latches argument.  There is no way that

5          the estates, and to the extent Artists

6          Rights and their side deal with the

7          estates, would have engaged in all of

8          the conduct that they engaged in had

9          they believed there was an underlying

10         deal, had they believed that Pullman's

11         right of refusal lasted into perpetuity.

12         Because what Mr. Pullman would have you

13         believe that each and every time there

14         is an offer by a third party, that right

15         of refusal is triggered again and again

16         and again.  It is akin at Ground Hog

17         Day.  It happens over and over and over

18         again.  That is just not so.

19              As very often happens during the

20         course of a lifetime, we find that the

21         most important decisions are made based

22         on the simplest of facts.  The facts in

23         this case are not really very

24         complicated, but the results you reach

25         are very important, as truly it is my

47

```
 1                    Proceedings
 2           client's only day in court.  I will
 3           endeavor to enter into an understanding
 4           with you, Panel, I pledge my full effort
 5           to present the truth as fully and fairly
 6           and as succinctly given to the
 7           parameters of our time here today as it
 8           is within my power to do so.  You are
 9           well familiar with the facts and the
10           issues having had the opportunity to
11           review all of it in the very lengthy
12           motions for -- cross-motions for summary
13           judgment.  There isn't going to be very
14           much new presented to you today.  What
15           you will be able to do today that you
16           did not have the pleasure of being able
17           to do as you analyzed the cross-motions
18           is evaluate and assess the credibility
19           of the parties.  I suggest to you that
20           when you do at the close of all the
21           evidence, you will render an award in
22           favor of McFadden and Whitehead and
23           against The Pullman Group.  Thank you.
24                    THE CHAIRMAN:  Mr. Jackson?
25                    MR. JACKSON:  I'll be even
```

```
 1                     Proceedings
 2           briefer, how about that?  I've been
 3           involved with this case from the
 4           beginning and my two cents, if you will,
 5           is just this.  After looking at all the
 6           evidence, after going over it time and
 7           time again, after consulting with my
 8           client time and time again, I just can't
 9           find where we went wrong because we
10           didn't.  We did nothing wrong.  All we
11           did was be contacted by David Pullman.
12           He called us and said, hey, I would love
13           to do a deal with you.  He never even
14           mentioned, not one time, not one time,
15           that he already had an agreement.  What
16           he managed to do in his effort to gain
17           what the plaintiff seems to rely heavily
18           upon, these declarations would suck
19           information out of my client and myself
20           by asking many, many questions and write
21           declarations that he said he would use
22           to assist us in getting a better deal
23           than the Warner/Chappell deal.  Those
24           declarations, you've read them and
25           you've heard them mentioned time and
```

```
 1                    Proceedings
 2          time again.  What's clear is that if you
 3          already had a deal, you would have
 4          advised us that there was a -- a deal
 5          did exist.  You told us that there was a
 6          deal and we needed the declarations to
 7          secure more money.  So all being said,
 8          we said let's find out.
 9              So the more -- when we finally did
10          see the David Pullman deal, what we
11          recognized was that his deal was just a
12          deal to pay, meaning writers, with their
13          own money.  And that's not a deal,
14          Gentlemen.  Who does that and where do
15          they do that at was the question we
16          asked David Pullman.  Since nothing
17          changed hands, what we told him was that
18          we no longer wanted to do business with
19          him.  When he said we had no choice, he
20          said we would give it away to him for
21          free, we would walk away with nothing --
22          but he must really like us a lot is what
23          we thought because he continues to call
24          even as late as yesterday to ask us to
25          make a settlement with him, which is
```

1                    Proceedings
2          amazing but I guess not uncommon in the
3          way he does business.
4                So what I'll say is that the
5          evidence you're going to see and the
6          facts that are going to be presented
7          here are pretty clear.  We approached
8          this as shocked as everyone else was
9          that David Pullman actually had a deal
10         that locked us in and we could do
11         nothing more when he came before us
12         talking about securitizing and helping
13         the estate.  All of a sudden he said no,
14         there is no securitization, there is an
15         actual deal that I had.  We said well,
16         where is it.
17               As you will see in the
18         declarations, we said that we would want
19         to see whatever deal he had to offer
20         prior to us agreeing, because the way we
21         were told, when we finally did learn of
22         the deal from Artists Rights, is that it
23         was just merely a deal to agree to -- an
24         agreement to agree to explore a deal.
25               In fact, the first line in the David

445

```
 1
 2                      CERTIFICATE
 3    STATE OF NEW YORK    )
 4                         )    Ss.
 5    COUNTY OF NASSAU     )
 6              I, NICOLE CANNISTRACI, a Shorthand
 7    Reporter and Notary Public within and for the
 8    State of New York, do hereby certify:
 9              That I reported the proceedings in the
10    within entitled matter, and that the within
11    transcript is a true record of such proceedings.
12              I further certify that I am not
13    related to any of the parties to this action by
14    blood or marriage, and that I am in no way
15    interested in the outcome of this matter.
16              IN WITNESS WHEREOF, I have hereunto
17    set my hand this 11th day of August, 2014.
18                      _____
19                      NICOLE CANNISTRACI
20
21
22
23
24
25
```

Exhibit  F

```
 1
 2    -------------------------------------X
 3    IN THE MATTER OF THE ARBITRATION BETWEEN
 4    THE PULLMAN GROUP, LLC,
 5                 Claimant and Counterclaim Respondent,
 6                 v.           Case No. 13 20 0800 1087
 7    THE ESTATES OF GENE MCFADDEN AND JOHN C.
      WHITEHEAD,
 8
                 Respondent and Counterclaimant.
 9    -------------------------------------X
10
11
                     Hughes Hubbard & Reed LLP
12                   One Battery Park Plaza
                     New York, New York
13
                     July 29, 2014
14                   9:11 a.m.
15
16
17
18    BEFORE:
19             GEORGE C. PRATT, CHAIRMAN
20             JAMES B. KOBAK, JR., PANEL MEMBER
21             RICHARD D. ROSENBLOOM, PANEL MEMBER
22
23
24    Reported By:
25    Nicole Cannistraci, Court Reporter
```

2

```
1

2      A P P E A R A N C E S:

3           LAW OFFICE OF ANTHONY KORNARENS, ESQ.
            Attorney for Claimant and Counterclaim
4           Respondent
                 2907 Stanford Ave
5                Marina Del Rey, California 90292
            BY:  ANTHONY KORNARENS, ESQ.
6
            THE PULLMAN GROUP, LLC
7           Attorney for Claimant and Counterclaim
            Respondent
8                3121 Chadney Drive
                 Glendale, California 91206
9           BY:  ARMEN MANASSERIAN, ESQ. (Not present)

10
            DOLCHIN, SLOTKIN & TODD, P.C.
11          Attorneys for Respondent and
            Counterclaimant
12               Two Liberty Place
                 50 South 16th Street
13               35th Floor
                 Philadelphia, Pennsylvania 19102
14          BY:  SAYDE J. LADOV, ESQ.

15
            JAMES JACKSON, ESQ.
16          Attorney for Respondent and
            Counterclaimant
17               29 Harrison Avenue
                 Montclair, New Jersey 07042
18

19

20

21

22

23          ALSO PRESENT:

24          STEVE KUSH

25
```

```
 1                  McFadden - Direct
 2    person?
 3            A.    No.
 4            Q.    Did John ever discuss with you any
 5    meetings he had with David Pullman around 2002?
 6            A.    Yes.
 7            Q.    Please tell the arbitrators what
 8    your husband would tell you.
 9                  MR. KORNARENS:  Objection,
10            hearsay.
11                  THE CHAIRMAN:  We've heard a lot
12            of hearsay.
13                  MS. LADOV:  Really what is good
14            for the goose is good for the dander.
15                  (An off the record discussion took
16            place.)
17                  MS. LADOV:  Panel, you'll take it
18            for what it's worth.
19            A.    The two of them, Gene and John,
20    came into our house and said that they were
21    getting ready to make the biggest deal of a
22    lifetime, that someone named David Pullman
23    wanted to purchase their catalog for
24    $10 million.  And they were all excited about
25    it, and I guess you could say they would tell
```

1                   McFadden - Direct

2      anybody that would listen about this deal they

3      were going to make with David Pullman.

4                   As time went on, I'll say within

5      three weeks, maybe three to four weeks, Gene and

6      John no longer wanted any part of David Pullman.

7      I don't know all the exacts of what went down

8      with them, but they said -- now they were saying

9      that David Pullman was trying to steal their

10     catalog from them and that they didn't want

11     anything to do with him.  That was basically it.

12          Q.    Do you recall approximately when

13     that was?

14          A.    This was in 2002.

15          Q.    Now, did your husband show you any

16     documents that he received from The Pullman

17     Group?

18          A.    No.

19          Q.    Did your husband ever show you any

20     documents that he signed with The Pullman Group?

21          A.    No.

22          Q.    After his death did you inventory

23     his books and papers?

24          A.    Yes, I did.

25          Q.    Did Gene have any office anywhere

                    McFadden - Direct

1

2    else but in the house on Bryant?

3         A.    Not to my knowledge.

4         Q.    Did you ever find anything in all

5    of Gene's papers with regard to Pullman?

6         A.    I found a manila envelope that

7    contained a videotape that says "David Pullman

8    securitizing" -- it was a promotional videotape,

9    and a folded piece of paper that was -- that I

10   would later come to find was the so-called

11   agreement, but it was just one sheet of paper,

12   it was folded, it had no signatures or anything

13   on it.

14        Q.    Do you recall if it was on Pullman

15   Group letterhead?

16        A.    Yes, it was.

17        Q.    It was not signed, correct?

18        A.    Not signed.

19        Q.    Now, as far as you know, did Gene

20   ever visit with David Pullman in New York?

21        A.    I do believe he did.

22        Q.    Was that when he believed there

23   was going to be a $10 million deal?

24        A.    Yes.

25        Q.    Did he ever visit with him again

1                    McFadden - Direct

2    after that occasion?

3         A.    I'm not sure.  I remember hearing

4    Gene and John, they weren't talking directly to

5    me, they were speaking among each other, and I

6    remember them saying that David keeps setting up

7    meetings for them, to meet with them at this

8    place or that place, but he wouldn't show up.

9         Q.    David wouldn't show up?

10        A.    David wouldn't show up.

11              So I think the last meeting they

12   were supposed to have had was supposed to be a

13   restaurant in Philadelphia, and they waited and

14   waited for him.  He didn't show up.

15              At that point Gene told me, "If

16   David Pullman calls here, I'm not home."  So I

17   said okay.  But that particular night David

18   Pullman didn't call.  I would say within the

19   next couple of days, when I was at home, David

20   Pullman called.  Gene wasn't at home.  I told

21   him he wasn't there, that he could leave a

22   message for him.  His message was, "Just tell

23   him David Pullman called."

24        Q.    Did he ever -- withdrawn.

25              Do you remember approximately when

1                    McFadden - Direct

2    that was?

3           A.    Probably in towards the end of

4    '02.

5           Q.    Did you ever take any other calls

6    from David Pullman on behalf of Gene?

7           A.    When Gene was ill, when -- during

8    his last days, I'll say, during his last couple

9    of weeks, David Pullman called to speak with

10   Gene.

11          Q.    What year was this?  Let's put it

12   in context for the panel.

13          A.    This was towards the end of 2005.

14   Gene was in his final stages and --

15          Q.    He passed away from cancer, did he

16   not?

17          A.    Yes.

18          Q.    And the cancer had metastasized,

19   correct?

20          A.    Yes.  He had lung and liver

21   cancer.

22                David called and he asked me --

23   mind you, he hadn't called in a very, very long

24   time.  He called and asked if he could speak to

25   Gene.  I told him that he couldn't, that Gene

1                    McFadden - Direct

2    was very ill, that he was at the end stages of

3    his illness and that he could no longer speak or

4    anything.  He was just there.  So David asked me

5    if I can hold the phone up to his ear so that he

6    could speak to him.  I told him, "No, I'm not

7    doing that."  I said, "If there is anything you

8    need to know, David, it's not going to happen

9    now because Gene is no longer talking, he's no

10   longer coherent," and I said, "Is there anything

11   else?"  He said no and I hung up the phone.  I

12   didn't hear from David Pullman anymore after

13   that until '07.

14           Q.    In the two conversations that you

15   just related to the panel, did Pullman ever say

16   why he was calling, other than to talk to Gene?

17           A.    No.

18           Q.    Are you aware if Gene ever

19   received any money from David Pullman?

20           A.    No.

21           Q.    At some point in time did Gene

22   hire Artists Rights Enforcement Corporation?

23           A.    Yes, he did.

24           Q.    Do you know when that was,

25   Barbara?

```
 1                    McFadden - Direct
 2          A.     That was in '05.
 3          Q.     And what was the purpose of that
 4    engagement, if you know?
 5          A.     Yeah, I went with him.  He hired
 6    them to investigate their royalties and their
 7    copyrights, you know, through Warner/Chappell,
 8    any other entities that they received royalties
 9    from.
10          Q.     If I use the term "audit," would
11    that be familiar to you?
12          A.     Yes, yes.
13          Q.     Do you know if that was the
14    purpose of the engagement?
15          A.     Yes.
16          Q.     At some point in time after Gene
17    passed away, did you hire Artists Rights?
18          A.     I did.
19          Q.     And what was your purpose in
20    hiring Artists Rights?
21          A.     To resume what Gene started.
22          Q.     Which was the audit?
23          A.     The audit, yes.
24          Q.     Speaking of the audit, would I be
25    correct that Gene, and then you, wanted to make
```

```
1                    McFadden - Direct
2    sure that you were getting all the appropriate
3    royalties from all the appropriate sources?
4            A.    Yes.
5            Q.    Do you ever recall Gene speaking
6    about David Pullman performing an audit?
7            A.    No.
8            Q.    Do you ever recall seeing any
9    documentation whatsoever from Pullman with
10   regard to any due diligence he may have
11   performed relative to this agreement?
12           A.    No.
13           Q.    Now at some point in time did
14   Artists Rights bring a proposal to you to sell
15   Gene's interest in the catalog?
16           A.    Yes, they did.
17           Q.    Do you recall when that was?
18           A.    That was in '08, I believe.
19           Q.    2007 maybe?
20           A.    20 -- yeah 2007.  2007.
21           Q.    And did you actually reach, on
22   behalf of the estate, a deal with
23   Warner/Chappell?
24           A.    Yes, we did.
25           Q.    Do you recall the terms of that
```

```
 1                    McFadden - Direct
 2   deal?
 3            A.    They were going to buy the writer
 4   shares of the catalog for $4.4 million.
 5            Q.    And how was that 4.4 million going
 6   to be apportioned, if you know?
 7            A.    To my recollection, it would have
 8   gone 2.2 million for the estate of Whitehead and
 9   $2.2 million to the McFadden estate.
10            Q.    Let me digress for one moment.
11                  You have heard a lot of testimony
12   today about tax liens.
13            A.    Yes.
14            Q.    Prior to Gene's passing, did Gene
15   have tax issues?
16            A.    Yes, he did.
17            Q.    Was he aware of the tax issues?
18            A.    Yes, he was.
19            Q.    Was he working towards resolving
20   the tax issues?
21            A.    Not to my knowledge.
22            Q.    That came later, correct?
23            A.    Yes.
24            Q.    In fact, you were left holding the
25   bag, if you will --
```

```
 1                    McFadden - Direct

 2          A.    Yes.

 3          Q.    -- after Gene passed away?

 4          A.    I was.

 5          Q.    Now, but Gene knew that he had

 6   problems?

 7          A.    Yes.

 8          Q.    Also, just so the panel

 9   understands, because I don't know what they

10   know, so we're going to tell them, I want to

11   digress one moment and talk about Gene's

12   relationship with John.

13                How long had they been song

14   writing partners, to your knowledge?

15          A.    Since they were about, I guess,

16   20.

17                No, you know what, I'm going to

18   take it back further than that.  Because they

19   started writing songs when they were about, I

20   would say, 15 or 16 years old.

21          Q.    They were high school sweethearts

22   in essence?

23          A.    Yeah.

24          Q.    And they continued that

25   partnership until the time that both of them
```

```
 1                    McFadden - Direct
 2   passed away?
 3          A.     They did.
 4          Q.     Did you have -- in fact, you look
 5   at Kenneth as your sort of nephew, correct?
 6          A.     My baby, yeah.
 7          Q.     He calls you Aunt Barbara?
 8          A.     Yes.
 9          Q.     So you had a close personal
10   relationship with the Whitehead family?
11          A.     Yes.
12          Q.     Were you aware of John Whitehead's
13   tax problems?
14          A.     Yes.
15          Q.     And were you aware of these tax
16   problems before 2002?
17          A.     Yes.
18          Q.     Now, let's go back -- let's go
19   forward now to the time of the Warner/Chappell
20   deal.
21                 Do you remember receiving the
22   paperwork from Warner/Chappell?
23          A.     Yes.
24          Q.     Would it be correct that you
25   received that through Artists Rights?
```

```
 1                    McFadden - Direct

 2          A.    I did.

 3          Q.    Can you explain to the members of

 4   the panel who brokered, if you will, the deal

 5   between the estates and McFadden and Whitehead?

 6          A.    That would have been Jay Berger

 7   and Chuck Rubin.

 8          Q.    And that's Artists Rights,

 9   correct?

10          A.    Yes.

11          Q.    At any time did Artists Rights

12   indicate to you that Gene and John had a

13   previous deal for the sale of the catalog?

14          A.    No.

15          Q.    Were you in constant contact with

16   the representatives from Artists Rights as the

17   deal for the catalog with Warner/Chappell was

18   being negotiated?

19          A.    Yes.

20          Q.    Could you ballpark in hours, days,

21   weeks, months, whatever, however you want to do

22   it, how long it took for that deal to get

23   brokered?

24          A.    About four months.

25          Q.    Would you say that there was a lot
```

```
1                    McFadden - Direct
2     of back-and-forth between yourself, Artists
3     Rights and Warner/Chappell?
4              A.    Yes.
5              Q.    And finally the agreements are --
6              A.    And an accountant.
7              Q.    And an accountant.
8              A.    Yes.
9              Q.    An accountant was hired to do due
10    diligence, financial due diligence?
11             A.    Yes, and to do an offer in
12    compromise on Gene's behalf on his taxes.
13             Q.    With the IRS?
14             A.    Yes.
15             Q.    Do you remember executing, signing
16    the Warner/Chappell deal?
17             A.    Yes.
18             Q.    Do you recall when that was?
19             A.    The exact date, no, I don't.
20             Q.    After you signed -- by the way,
21    did Elnor Whitehead, who was then the executrix
22    of the Whitehead estate, also sign the
23    agreement?
24             A.    She did.
25                   MR. KORNARENS:   Lacks foundation.
```

<pre>
 1                   McFadden - Direct
 2          A.     To my knowledge, yes.
 3          Q.     Did you understand what the
 4   process was going to be after the estates signed
 5   off on the agreements?
 6          A.     To my understanding, after we all
 7   signed off on the agreements, Warner/Chappell --
 8   the papers went back to Warner/Chappell, and
 9   Warner/Chappell was then going to issue signed
10   contracts and a check to Artists Rights on
11   behalf of the McFadden and Whitehead estates.
12          Q.     So if I use the phrase "three-day
13   right of rescission," would that ring any bells
14   for you?
15          A.     Yes, because within that three
16   days, David Pullman appeared.
17          Q.     And did Mr. Pullman appear
18   personally or in the person of Robert Besser?
19          A.     I would say in the person of
20   Robert Besser.
21          Q.     Is that that letter that we've
22   been talking about all of today, the letter from
23   Mr. Besser asserting the rights that he believed
24   that he had on behalf of David Pullman?
25          A.     Yes.
</pre>

```
 1                     McFadden - Direct
 2          Q.    When you received that letter,
 3   what was your reaction?
 4          A.    I was stunned.
 5          Q.    Why?
 6          A.    I was stunned because David
 7   Pullman hadn't said anything about doing
 8   anything, you know, with a deal with Gene and
 9   John since the end of 2002.  So why now?  Why is
10   it all of a sudden you have a deal and you want
11   to enforce your rights to something that I felt
12   like didn't belong to you.
13          Q.    Did you believe that in 2002 there
14   was a deal between McFadden and Whitehead and
15   Pullman?
16          A.    I don't.  I don't.
17          Q.    Did you ever see a document with
18   regard to a deal?
19          A.    Not until after the letter from
20   Besser.
21          Q.    When is the first time that you
22   can recall, Barbara, that you ever saw this
23   agreement between your husband, John Whitehead
24   and The Pullman Group?
25          A.    When it was mailed to me by
```

1                    McFadden - Direct

2    Artists Rights.

3         Q.    The letter that you received from

4    Mr. Besser, did that have the agreement attached

5    to it?

6         A.    No, it just stated it in the

7    letter.

8         Q.    That it existed?

9         A.    Yes.

10        Q.    When you received a copy of the

11   agreement from Artists Rights, had the

12   litigation already commenced?

13        A.    Yes.

14        Q.    I mean the very first piece of

15   litigation in Orphans' Court in Philly.

16        A.    Yes.

17        Q.    Now, obviously the deal with

18   Warner/Chappell never went through, correct?

19        A.    Correct.

20        Q.    They never signed and tendered a

21   check, correct?

22        A.    Correct.

23        Q.    Did you ever learn from any source

24   why Warner/Chappell never countersigned the

25   agreement and tendered a check?

```
 1                  McFadden - Direct
 2         A.    Warner/Chappell said that they had
 3    to pull out of the deal because David Pullman
 4    was saying that he already had a deal and they
 5    couldn't go on, they couldn't go on further with
 6    the deal that we were supposed to be doing.
 7         Q.    Do you recall -- again, can you
 8    give us a time frame?
 9         A.    I would say 2007.
10         Q.    After October?
11         A.    After October, yes.
12         Q.    Ms. McFadden, since that time,
13    since the letter from Robert Besser of
14    October 29th, 2007 and the information that you
15    received from Warner/Chappell that they could
16    not move forward to consummate the deal, have
17    you been able to market the catalog to any third
18    party for sale?
19         A.    No.
20         Q.    Can you indicate to the panel why
21    you believe you cannot market that catalog or
22    your interest in that catalog?
23         A.    Because of David Pullman's claim
24    to ownership of the catalog.
25         Q.    And how has that -- can you
```

1                    McFadden - Direct
2    explain to the panel how that has prevented you
3    from marketing the catalog?
4          A.    With his claim nobody wants to
5    touch the catalog, so we can't get anyone to do
6    commercials for the songs or anything.  Nobody
7    wants to push any of the songs in the catalog
8    because they don't want to deal with what's
9    going on with David Pullman.
10         Q.    For the benefit of the members of
11   the panel who may not be familiar, how --
12   because you've been receiving royalties for
13   these many years since Gene passed, correct?
14         A.    Yes.
15         Q.    And prior to that you and Gene
16   collectively received the royalties, correct?
17         A.    Yes.
18         Q.    How are royalties computed?  I'm
19   not asking you for an expert opinion.  What is
20   your understanding of how royalties are
21   computed?
22         A.    My understanding is they're
23   computed -- they're computed by the sales of the
24   songs as they're played on radio and -- radio,
25   commercials, anywhere that you would hear music,

```
 1                    McFadden - Direct
 2    on the elevators, in the airplane.  All this is
 3    tallied through their -- I don't know the
 4    technical terms for these things, but this is
 5    how they compute and come up with their figures
 6    and in turn send you a check.
 7              Q.    It stands to reason that the more
 8    the songs are played or performed, the more
 9    money you are going to receive as part of the
10    royalty stream; is that correct?
11              A.    Absolutely.
12              Q.    And in the last almost seven years
13    since the deal with Warner/Chappell has not --
14    was not consummated, can you go out, either you
15    or your representative go out to different
16    companies, movie companies for product placement
17    or do anything to push the catalog?
18              A.    No, no.
19              Q.    So is it fair to say that what you
20    get now, in terms of the royalties, is what you
21    get?
22              A.    Yes.  It's considerably low
23    compared to what it was when you were able to
24    get people to promote these songs and -- but now
25    that you can't move it, you know, it just goes
```

348

1                   McFadden - Direct

2    down.

3          Q.    What do you attribute the lack of

4    promotion to?

5          A.    David Pullman, the fact that we

6    can't move forward, we can't do anything.

7          Q.    You've told us about some of the

8    interaction that you had with David Pullman,

9    those two phone calls that you mentioned.  Have

10   you had any other interaction with David Pullman

11   over, let us say, the last 12 years, I guess?

12         A.    Only when he started calling

13   demanding -- David Pullman would call late at

14   night demanding that I stop spending his money

15   and that -- in that same outraged voice that he

16   used in here today he would use on the phone

17   with me on several occasions, "Stop spending my

18   money, I'm going to sue you, I want every dime

19   of my money that you've been spending, you've

20   been spending my money since '02 and I want my

21   money, you're not going to be able to do

22   anything with this catalog, you're not going to

23   be able to do anything with anything."  I mean,

24   it was just one threat after another, after

25   another, after another.

```
 1                    McFadden - Cross
 2         Q.    Are you aware that in an answer
 3    and counterclaim filed in this proceeding by
 4    your former counsel, Orshefsky --
 5              MR. JACKSON:  Where are you?
 6              MR. KORNARENS:  Exhibit C30.
 7         Q.    -- that there is an admission at
 8    paragraph 11, this is at 005, that shortly after
 9    McFadden and Whitehead executed the 2002 Pullman
10    memorandum, Pullman abandoned whatever rights he
11    may have had under the memorandum.
12              Do you see that?
13         A.    I do.
14         Q.    And do you base that on the fact
15    that your husband didn't tell you that he had
16    signed the contract with Mr. Pullman?  Is that
17    what you base that claim on?
18         A.    Actually, I base the claim on we
19    hadn't heard from Mr. Pullman about this
20    supposed deal.  I mean, if you have a deal with
21    someone to do something, you make it your
22    business to contact them.
23              We didn't move.  We never changed
24    our phone number or anything, so that -- it just
25    felt like abandonment to me.
```

1                    McFadden - Cross

2          Q.    Okay.  So you aren't talking about

3    abandonment under the legal standard, you are

4    talking about how it felt to you?

5          A.    I'm talking about under the legal

6    standard and how it felt to me, because if he's

7    claiming that he has this agreement, why

8    wouldn't you act on it?

9          Q.    Weren't Mr. Pullman's

10   communications with your husband before he

11   passed away?

12         A.    No.  What communications?  He

13   wasn't talking to Gene anymore.  He hadn't

14   spoken with Gene since the end of 2002 or maybe

15   the beginning of 2003.  I'm not sure.

16         Q.    I apologize if I've already asked

17   this, but is it correct that you never learned

18   that Mr. Pullman had his lawyer send a letter to

19   Warner/Chappell, BMI in 2004?  No one ever told

20   you about that?

21         A.    I didn't know about that until

22   later, when all this stuff started.

23         Q.    Within the last six months you

24   first learned about it; is that what you're

25   saying?

```
 1                      McFadden - Cross

 2          A.     No.  Within the last -- I'll say

 3    within the last couple of years.  Maybe -- in

 4    '07, I learned about it in '07.

 5          Q.     And yet do you understand that

 6    you're still contending that Pullman completely

 7    disappeared from the scene between 2002 and 2007

 8    and only emerged right on the eve of the

 9    Warner/Chappell deal.  Is that still your claim

10    here?

11                 MR. JACKSON:  Objection.  She

12              already testified about the times she

13              spoke to David Pullman.  It's on the

14              record.  She said she spoke to him in

15              2002, 2005 and again in 2007.  She's

16              testified to that in direct.

17                 MR. KORNARENS:  In direct

18              conflict -- well, I don't need to

19              respond.

20          Q.     You can go ahead, please.

21                 MS. LADOV:  Read the question.

22                 MR. KORNARENS:  We'll have the

23              question read back.

24                 (The last question was read back

25              by the court reporter.)
```

1                     McFadden - Cross

2           A.    I'm going to say yes to that

3    because I didn't know anything about the 2003 --

4    these papers of his until he presented them.  I

5    do believe he presented them for Artists Rights

6    to see?  Are those the papers that you're

7    talking about?

8           Q.    I was referring to Mr. Besser's

9    testimony this morning in the letter that he

10   said he sent to Warner/Chappell and also to BMI.

11   We produced the Warner/Chappell letter and not

12   the BMI letter.

13          A.    Well, no one ever told me about

14   those letters.

15          Q.    That's fine.  And in Exhibit

16   C30 -- this is the answer and counterclaim

17   that's pending against Mr. Pullman and his

18   corporation -- it says, "Pullman irrevocably

19   waived whatever rights he may have had to

20   enforce the 2002 and" -- "the 2002 Pullman

21   memorandum in 2002 and 2003 after McFadden and

22   Whitehead notified Pullman that they did not

23   desire to consummate the proposed transaction."

24                 MR. JACKSON:  I'm sorry, where are

25          you?

```
 1                     McFadden - Cross
 2              MR. KORNARENS:  C30, 009,
 3          paragraph 27 sub Roman numeral III, near
 4          the bottom of page 9 of 11.
 5              MS. LADOV:  Question?
 6         Q.   Do you see that language now?
 7         A.   I see the language.
 8         Q.   Did your husband tell you in 2002
 9    that he had notified Pullman that he did not
10    desire to consummate the proposed transaction
11    with Pullman?
12         A.   Yes, he did.
13         Q.   And at that time he did not tell
14    you that he had signed the contract with
15    Pullman?
16         A.   He did not.
17         Q.   Do you have any understanding as
18    to why your husband didn't tell you that he had
19    actually gone ahead and signed the contract?
20         A.   I don't.
21              MR. KORNARENS:  And actually, I
22          have nothing further.
23              Thank you for your time.
24              THE WITNESS:  Thank you, sir.
25              (An off the record discussion took
```

```
 1                    McFadden - Direct

 2            place.)

 3    DIRECT EXAMINATION

 4    BY MR. JACKSON:

 5            Q.    I'll be very brief.

 6                  The deal that was presented by

 7    Warner/Chappell and the Artists Rights at this

 8    point that was initially brokered -- the deal

 9    that was brokered with Warner/Chappell that

10    Artists Rights did, it was originally brought to

11    you by whom?

12                  When you were first introduced to

13    Artists Rights, you knew that Gene had a deal

14    with them, but when you started talking about

15    doing a deal with them, who was the person who

16    brought that to your attention?

17            A.    Jay Berger.

18            Q.    So at what point in time does

19    Beverly Gay come into the picture?

20            A.    Beverly Gay was Gene and John's

21    manager.

22            Q.    Okay.

23            A.    And she is the one that initially

24    took them to Artists Rights so that they could

25    do the audit on their royalties.
```

```
1                   McFadden - Direct
2          Q.    And so your first conversation
3    with David before it got volatile, you testified
4    directly with Mr. s. Ladov that he talked to you
5    about a $10 million deal?
6          A.    Yes, he did.
7          Q.    And that slowly but surely changed
8    over time?
9          A.    Yes.
10         Q.    And is it in fact -- in 2002 you
11   didn't know what the David Pullman deal was in
12   terms of money?
13         A.    I didn't.
14         Q.    In 2005, when Gene was near death,
15   did he ever contact you in writing or on the
16   phone and tell you how much money he was
17   offering?
18         A.    No, he didn't.
19         Q.    And in 2007 when the litigation
20   started, is that not when you first learned
21   about how much the deal was for?
22         A.    The deal with David Pullman?
23         Q.    Correct.
24         A.    Yes.
25         Q.    And at the time you had a deal on
```

1                    McFadden - Redirect

2       the table that was worth more than that,

3       correct?

4              A.    Yes.

5              Q.    So is it not logical that you

6       would be looking at a better deal?

7              A.    Yes.

8                    MR. JACKSON:  I have no further

9              questions.

10                   MS. LADOV:  I have one quick

11             question on redirect.  Actually, I have

12             two questions.

13      REDIRECT EXAMINATION

14      BY MS. LADOV:

15             Q.    Barbara, first of all, did

16      anything that Mr. Kornarens ask you on

17      cross-examination change any of your opinions or

18      any of your knowledge or jog any other

19      recollections regarding this entire transaction?

20             A.    No.

21             Q.    Finally, Barbara, in terms of

22      abandonment, whether you're looking at it

23      legally or whether you're looking at it in a

24      common everyday parlance, did Pullman -- The

25      Pullman Group, David Pullman or any of his

```
 1                    McFadden - Redirect
 2    representatives, ever forward to you or Gene at
 3    your mailing address any correspondence
 4    whatsoever after 2002, prior to 2007, that
 5    indicated -- I'm going to ask you two things --
 6    one, that there was a deal, and that Pullman was
 7    ready to consummate the deal?
 8           A.    No.
 9           Q.    I'm sorry, last question.
10                 Mr. Kornarens asked you questions
11    about records, vinyl records.  Anybody buy
12    records anymore?
13           A.    Not unless you're a collector.
14           Q.    Okay.  So in today's environment
15    it's about CDs?
16           A.    Digital.
17           Q.    It's digital, it's downloads?
18           A.    Uh-huh.
19           Q.    It's not traditional vinyl; is
20    that correct?
21           A.    That's correct.
22           Q.    And the only way that catalog is
23    going to get more value is if someone on behalf
24    of the catalog tries to go to the different
25    performers and companies that manufacture CDs
```

```
1
2                         CERTIFICATE
3     STATE OF NEW YORK     )
4                           )    Ss.
5     COUNTY OF NASSAU      )
6                I, NICOLE CANNISTRACI, a Shorthand
7     Reporter and Notary Public within and for the
8     State of New York, do hereby certify:
9                That I reported the proceedings in the
10    within entitled matter, and that the within
11    transcript is a true record of such proceedings.
12               I further certify that I am not
13    related to any of the parties to this action by
14    blood or marriage, and that I am in no way
15    interested in the outcome of this matter.
16               IN WITNESS WHEREOF, I have hereunto
17    set my hand this 11th day of August, 2014.
18                        _____
19                        NICOLE CANNISTRACI
20
21
22
23
24
25
```

Exhibit  G

```
 1
 2    ------------------------------------------X
 3    IN THE MATTER OF THE ARBITRATION BETWEEN
 4    THE PULLMAN GROUP, LLC,
 5                  Claimant and Counterclaim Respondent,
 6                  v.          Case No. 13 20 0800 1087
 7    THE ESTATES OF GENE MCFADDEN AND JOHN C.
      WHITEHEAD,
 8
                  Respondent and Counterclaimant.
 9    ------------------------------------------X
10
11
                        Hughes Hubbard & Reed LLP
12                      One Battery Park Plaza
                        New York, New York
13
                        July 29, 2014
14                      9:11 a.m.
15
16
17
18     BEFORE:
19            GEORGE C. PRATT, CHAIRMAN
20            JAMES B. KOBAK, JR., PANEL MEMBER
21            RICHARD D. ROSENBLOOM, PANEL MEMBER
22
23
24    Reported By:
25    Nicole Cannistraci, Court Reporter
```

```
 1

 2        A P P E A R A N C E S:

 3           LAW OFFICE OF ANTHONY KORNARENS, ESQ.
             Attorney for Claimant and Counterclaim
 4           Respondent
                 2907 Stanford Ave
 5               Marina Del Rey, California 90292
             BY:  ANTHONY KORNARENS, ESQ.
 6
             THE PULLMAN GROUP, LLC
 7           Attorney for Claimant and Counterclaim
             Respondent
 8               3121 Chadney Drive
                 Glendale, California 91206
 9           BY:  ARMEN MANASSERIAN, ESQ. (Not present)

10
             DOLCHIN, SLOTKIN & TODD, P.C.
11           Attorneys for Respondent and
             Counterclaimant
12               Two Liberty Place
                 50 South 16th Street
13               35th Floor
                 Philadelphia, Pennsylvania 19102
14           BY:  SAYDE J. LADOV, ESQ.

15
             JAMES JACKSON, ESQ.
16           Attorney for Respondent and
             Counterclaimant
17               29 Harrison Avenue
                 Montclair, New Jersey 07042
18

19

20

21

22

23           ALSO PRESENT:

24           STEVE KUSH

25
```

```
 1                   Whitehead - Direct
 2          Q.    And can you tell the panel the
 3   circumstances surrounding the preparation and
 4   execution of that affidavit?
 5          A.    Well, after being engaged by
 6   Mr. Pullman, Mr. Pullman actually reached out
 7   to -- like I said, Mr. Jackson is in the
 8   industry, so somehow he got in touch with
 9   Mr. Jackson, who got in touch with me.
10                Mr. Jackson gave me a brief about
11   Mr. Pullman and the great things he was doing
12   for our securitization, the Bowie bonds and
13   whoever -- and some things he was dealing with.
14   Just on the surface, and we should talk to him.
15   This wasn't about his agreement.
16                So I'm on the phone, like I have
17   another -- we have someone that's interested
18   in -- that does things with catalogs and that's
19   very interested in talking to the families.
20   That was the initial -- I'm going too far, but
21   that was the initial --
22          Q.    That was the initial contact?
23          A.    Yes.
24          Q.    And at the time of that initial
25   contact, do you remember approximately when that
```

```
 1                  Whitehead - Direct
 2   was?
 3          A.    That was in the summer of '07,
 4   around June maybe.
 5          Q.    Were you made aware by Mr. Pullman
 6   or anyone else that your dad had entered into an
 7   agreement to sell the catalog to Mr. Pullman in
 8   May of 2002?
 9          A.    Not until later.  Not in our first
10   round of conversations.
11          Q.    Was it Mr. Pullman who told you
12   that there was an agreement?
13          A.    I don't -- I believe I heard about
14   Mr. Pullman's agreement through Artists Rights,
15   saying that Mr. Pullman contacted them and maybe
16   have -- got word to them that he was informed
17   that they were moving, trying to move the
18   catalog or sell it.
19          Q.    Was that after or before the
20   Warner/Chappell deal was on the table?
21          A.    I believe that -- before.  That he
22   actually knew about Artists Rights.
23          Q.    Okay.  Now, you say Pullman knew
24   about Artists Rights?
25          A.    Right.  I believe so, before the
```

```
 1                   Whitehead - Direct
 2           Q.    Now, you mentioned this first
 3   conversation that you had with David Pullman and
 4   you -- I think also said, just to bring it back
 5   around, that Mr. Pullman never mentioned a 2002
 6   deal with your dad?
 7           A.    No.
 8           Q.    Did there come a point in time
 9   when David Pullman did mention a 2002 deal with
10   your dad?
11           A.    Probably close to his stop of the
12   sale from Warner/Chappell.
13           Q.    That would be in 2007?
14           A.    Right, 2007.
15           Q.    Now, with regard to the
16   declaration, the affidavit, affidavit seems to
17   say that you want to -- the heirs want to sell
18   to David Pullman, correct?
19           A.    Right.
20           Q.    Did the heirs have the authority
21   to sell to David Pullman at that time?
22           A.    No.
23           Q.    Why did you sign that declaration?
24           A.    I was actually -- when Mr. Jackson
25   introduced me to David Pullman, he held up his
```

```
1                     Whitehead - Direct
2    are agreeing that he is a serious person.
3              Q.    Let me develop that just a little
4    bit more.
5              A.    Sure.
6              Q.    The deal that you're referring to,
7    is that the 2002 deal?
8              A.    Yes, yes.
9              Q.    Did you ever see that 2002 deal
10   until after the litigation was commenced?
11             A.    No.
12             Q.    Do you now understand that that
13   2002 -- that purported deal is a far cry from
14   $10 million, whether by from sale or
15   securitization?
16             A.    Yes, and 4 million, too.
17             Q.    So obviously -- let me ask you
18   this, because it's not obvious.  After the
19   execution of the affidavit, did you have any
20   further dealings with David Pullman, let us say
21   now 2008 to the present time?
22             A.    Well, just to backtrack a teeny
23   bit, while doing the affidavits it took me to
24   round up the heirs that I could get ahold to,
25   and he also suggested I talk to a few people
```

```
1
2                      CERTIFICATE
3    STATE OF NEW YORK      )
4                          )    Ss.
5    COUNTY OF NASSAU       )
6              I, NICOLE CANNISTRACI, a Shorthand
7    Reporter and Notary Public within and for the
8    State of New York, do hereby certify:
9              That I reported the proceedings in the
10   within entitled matter, and that the within
11   transcript is a true record of such proceedings.
12             I further certify that I am not
13   related to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16             IN WITNESS WHEREOF, I have hereunto
17   set my hand this 11th day of August, 2014.
18                        _____
19                           NICOLE CANNISTRACI
20
21
22
23
24
25
```

Exhibit  H

## Declaration of Kenneth Whitehead

I, Kenneth Whitehead, a Pennsylvania resident and son and beneficiary of my father John Cavadus Whitehead Sr. decedent's estate verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

I have not been provided with any accounting whatsoever by the personal representative of the John Cavadus Whitehead Sr. estate, the estate's attorney ever or the administrator. I have no idea how much has come in from royalties or what money have been received by the estate. I demand an accounting. I understand the estate is attempting to sell all the music assets of my father, John Cavadus Whitehead, Sr. which include all his royalties of any kind from the music he created an or performed, the music publishing, co-publishing, writer's share, copyrights and record masters and any and all reversionary interest, termination rights, renewal rights, and extension rights, therein, (the "Assets") in breach of The Pullman Group, LLC's (Pullman) agreement with my son's father which granted Pullman the exclusive right to purchase the Assets. I vehemently object to any sale without an accounting unless the music assets are sold to The Pullman Group, LLC.

I, further declare that both my father John Cavadus Whitehead Sr. and Gene McFadden told me they had entered in an agreement with The Pullman Group, LLC (Pullman) and showed me a copy of the executed agreement by David Pullman, my father John Whitehead, and Gene McFadden in the year 2002 with all their respective signatures on it ("the Agreement"). I am familiar with both my father's signature John C. Whitehead and his long time songwriting and recording partner Gene McFadden and recognized and can verify the signatures on the executed Pullman Agreement was theirs. The agreement among other things granted Pullman the exclusive right to purchase the musical assets, songs, compositions, record royalties, royalties or payments of any kind, writer's share, co-publishing, publisher's share and any reversionary interest, renewal rights, and extension rights in all the songs written in whole or part and or performed by my father John Whitehead and or Gene McFadden the (the "Assets").

The Pullman Group, LLC was also granted the first right refusal and matching rights in any economic transaction of any kind done by either my father, John Whitehead and or Gene McFadden, including but not limited to any economic transaction or sale of the Assets and royalties from Warner Chappell, Broadcast Music, Inc. (BMI), and Philadelphia International Records.

I understand that my father's musical Assets and Gene McFadden were about to be sold, as recently as this past Wednesday October 31, 2007 and such sale would be subject to the executed agreement by my father John Whitehead and Gene McFadden, and the estate rights of both John Whitehead and Gene McFadden are of course also subject to The Pullman Group, LLC agreement with the decedents. Any rights both estate's and their respective heirs have are subject to The Pullman Group, LLC's right the assets pass though the estate with those rights. Any sale would be a breach of the Pullman Group, LLC's rights, and The Pullman Group LLC's is now entitled to purchase all the Assets.

I have spoken to and met with Elnor "Whitehead" Medley executrix of the estate, she has refused to provide me with any documents whatsoever related to any sale, royalties, or tax issues. Elnor further said she would sign my name for me authorizing her purported sale of the Assets in violation of the Pullman agreement which numerous beneficiaries and members of both families, the Whitehead and McFadden families have been aware of the existence of such Pullman agreement or for years. I was not only shocked that the executrix of the Whitehead estate refused to even let me see the document she wanted me to sign related to the sale to same unknown parties, much less than give me a copy. Even more shocking is Elnor as executrix is saying she has been signing the names of the beneficiaries to documents approving deals and giving up rights among other things they are not only aware of, but have not seen.

Based on the above and as a beneficiary, the estate must be forced to honor the deal and agreement with Pullman for the sale of the Assets, have the executrix immediately give all the beneficiaries access to all her "the estates files" including but not limited to all correspondence and documentation related in any way with the IRS, and any related sale documents with any party, any contract with any party the estate has entered into and all royalty statements, any and all liens, creditors, liabilities, and or encumbrances of the estate and any and all accountings related to the estate in any way.

The estate recently gave a beneficiary a check which bounced. Clearly if Elnor cannot keep a check book and is passing bum checks she for all the above reasons such as threatening to sign beneficiaries' names if they don't go along with her and using that as leverage, Elnor "Whitehead" Medley has stated that she has already done so for other beneficiaries "signed their names". Elnor is making decisions for her sole personal benefit negatively affecting the other beneficiaries and clearly has a conflict of interest. Elnor's conduct as executrix has been egregious. As a matter of law Elnor "Whitehead" Medley must be removed as executrix immediately.

I, Kenneth Whitehead, declare and verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Executed this _18th_ day of December, 2007 at Pennsylvania.

_Kenneth Whitehead_

State of _Pennsylvania_

County of _Philadelphia_

On December _18_, 2007, before me, _Anita L. Adams_ personally appeared Kenneth Whitehead, and proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within Declaration.

_Anita L. Adams_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANITA L. ADAMS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires June 13, 2011

# DECLARATION

I, Caiya Whitehead, declare I have not been provided with any accounting whatsoever by the personal representative of the John Cadvadus Whitehead Sr. estate, the estate's attorney over or the administrator. I have no idea how much has come in from royalties or what money have been received by the estate. I demand an accounting. I understand the estate is attempting to sell all the music assets of my father, John Cadvadus Whitehead, Sr. which include all his royalties of any kind from the music he created and or performed, the music publishing, co-publishing, writer's share, copyrights and record masters and any and all reversionary interest, termination rights, renewal rights, and extension rights, therein, (the "Assets") in breach of The Pullman Group, LLC's agreement with my father which granted Pullman the exclusive right to purchase the Assets. I vehemently object to any sale without an accounting unless the music assets are sold to The Pullman Group, LLC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of December, 2007.

Caiya Whitehead

State of PENNSYLVANIA

County of PHILADELPHIA

On December 5, 2007, before me, KENNETH T. MARTIN, personally appeared Caiya Whitehead, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within Assignment and acknowledged to me that she executed the same in her capacity as a duly authorized signatory on behalf of herself and her company and that by her signature on the within Assignment she executed the within Assignment in her capacity as a duly authorized signatory.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kenneth T. Martin, Jr., Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Aug. 16, 2010
Member, Pennsylvania Association of Notaries

Declaration of Dawn Whitehead Mosley

I, Elizabeth Dawn Mosley a/k/a Dawn Whitehead Mosley, a Pennsylvania resident and daughter and beneficiary of my father John Cavadus Whitehead Sr. decedent's estate verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

I have not been provided with any accounting whatsoever by the personal representative of the John Cavadus Whitehead Sr. estate, the estate's attorney ever or the administrator. I have no idea how much has come in from royalties or what money have been received by the estate. I demand an accounting. I understand the estate is attempting to sell all the music assets of my father, John Cavadus Whitehead, Sr. which include all his royalties of any kind from the music he created an or performed, the music publishing, co-publishing, writer's share, copyrights and record masters and any and all reversionary interest, termination rights, renewal rights, and extension rights, therein, (the "Assets") in breach of The Pullman Group, LLC's (Pullman) agreement with my father which granted Pullman the exclusive right to purchase the Assets. I vehemently object to any sale without an accounting unless the music assets are sold to The Pullman Group, LLC.

I, further declare that both my father John Cavadus Whitehead Sr. and Gene McFadden told me they had entered in an agreement with The Pullman Group, LLC by David Pullman, my father John Whitehead, and Gene McFadden in the year 2002. The agreement among other things granted Pullman the exclusive right to purchase the musical assets, songs, compositions, record royalties, royalties or payments of any kind, writer's share, co-publishing, publisher's share and any reversionary interest, renewal rights, and extension rights in all the songs written in whole or part and or performed by my father John Whitehead and or Gene McFadden the (the "Assets").

The Pullman Group, LLC was also granted the first right refusal and matching rights in any economic transaction of any kind done by either, my father John Whitehead and or Gene McFadden, including but not limited to any

economic transaction or sale of the Assets and royalties from Warner Chappell, Broadcast Music, Inc. (BMI), and Philadelphia International Records.

I understand that my father's musical Assets and Gene McFadden were about to be sold, as recently as this past Wednesday October 31, 2007 and such sale would be subject to the executed agreement by my father John Whitehead and Gene McFadden, and the estate rights of both John Whitehead and Gene McFadden are of course also subject to The Pullman Group, LLC agreement with the decedents. Any rights both estate's and their respective heirs have are subject to The Pullman Group, LLC's right the assets pass though the estate with those rights. Any sale would be a breach of the Pullman Group, LLC's rights, and The Pullman Group LLC's is now entitled to purchase all the Assets.

I have spoken to and met with Elnor "Whitehead" Medley executrix of the estate, she has refused to provide me with any documents whatsoever related to any sale, royalties, or tax issues. Elnor further said she would sign my name for me authorizing her purported sale of the Assets in violation of the Pullman agreement which numerous beneficiaries and members of both families, the Whitehead and McFadden families have been aware of the existence of such Pullman agreement or for years. I was not only shocked that the executrix of the Whitehead estate refused to even let me see the document she wanted me to sign related to the sale to same unknown parties, much less than give me a copy. Even more shocking is Elnor as executrix is saying she has been signing the names of the beneficiaries to documents approving deals and giving up rights among other things they are not only aware of, but have not seen.

Based on the above and as a beneficiary, the estate must be forced to honor the deal and agreement with Pullman for the sale of the Assets, have the executrix immediately give all the beneficiaries access to all her "the estates files" including but not limited to all correspondence and documentation related in any way with the IRS, and any related sale documents with any party, any contract with any party the estate has entered into and all royalty statements, any and all liens, creditors, liabilities, and or encumbrances of the estate and any and all accountings related to the estate in any way.

The estate recently gave a beneficiary a check which bounced. Clearly if Elnor cannot keep a check book and is passing bum checks she for all the above reasons such as threatening to sign beneficiaries' names if they don't go along with her and using that as leverage. Ironically, Elnor "Whitehead" Medley has stated that she has already done so for other beneficiaries "signed their names". Elnor is making decisions for her sole personal benefit negatively affecting the other beneficiaries and clearly has a conflict of interest. Elnor's conduct as executrix has been egregious. As a matter of law Elnor "Whitehead" Medley must be removed as executrix immediately.

I, Elizabeth Dawn Mosley a/k/a Dawn Whitehead Mosley, declare and verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Executed this /8 day of December, 2007 at Pennsylvania.

Elizabeth Dawn Mosley
a/k/a Dawn Whitehead Mosley

State of _Pennsylvania_

County of _Bucks_

On December /8, 2007, before me, _Carol M. Butterworth_, personally appeared Elizabeth Dawn Mosley a/k/a Dawn Whitehead Mosley, proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within Declaration.

Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Carol M. Butterworth, Notary Public
Warrington Twp., Bucks County
My Commission Expires July 11, 2010
Member, Pennsylvania Association of Notaries

## DECLARATION

I, John C. Mosley a/k/a John C. Mosley Whitehead II, beneficiary of the John C. Whitehead estate, declare I have not been provided with any accounting whatsoever by the personal representative of the John Cadvadus Whitehead Sr. estate, the estate's attorney ever or the administrator. I have no idea how much has come in from royalties or what money have been received by the estate. I demand an accounting. I understand the estate is attempting to sell all the music assets of my father, John Cadvadus Whitehead, Sr. which include all his royalties of any kind from the music he created an or performed, the music publishing, co-publishing, writer's share, copyrights and record masters and any and all reversionary interest, termination rights, renewal rights, and extension rights, therein, (the "Assets") in breach of The Pullman Group, LLC's (Pullman) agreement with my father which granted Pullman the exclusive right to purchase the Assets. I vehemently object to any sale without an accounting unless the music assets are sold to The Pullman Group, LLC.

I, John C. Mosley a/k/a John C. Mosley Whitehead II, declare and verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Executed this _17th_ day of December, 2007 at Pennsylvania.

_John C. Mosley_
John C. Mosley
a/k/a John C. Mosley Whitehead II

State of _Pennsylvania_
County of _Philadelphia_

On December _17th_, 2007, before me, _Anita L. Adams_, personally appeared John C. Mosley a/k/a John C. Mosley Whitehead II, and proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within Assignment and acknowledged to me that he executed the same in his capacity as a duly authorized signatory on behalf of himself and his company and that by his signature on the within Assignment he executed the within Assignment in his capacity as a duly authorized signatory.

_Anita L. Adams_
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ANITA L. ADAMS, Notary Public
City of Philadelphia, Phila. County
My Commission Expires June 13, 2011

## DECLARATION

I, Leslie A. Battle, a Pennsylvania resident and mother and legal guardian of minor Jaron Cavadus Battle beneficiary and son and heir of his father John Cavadus Whitehead Sr. decedent verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief. This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities. I have not been provided with any accounting whatsoever by the personal representative of the John Cavadus Whitehead Sr. estate, the estate's attorney ever or the administrator. I have no idea how much has come in from royalties or what money have been received by the estate. I demand an accounting. I understand the estate is attempting to sell all the music assets of my son's father, John Cavadus Whitehead, Sr. which include all his royalties of any kind from the music he created an or performed, the music publishing, co-publishing, writer's share, copyrights and record masters and any and all reversionary interest, termination rights, renewal rights, and extension rights, therein, (the "Assets") in breach of The Pullman Group, LLC's (Pullman) agreement with my son's father which granted Pullman the exclusive right to purchase the Assets. I vehemently object to any sale without an accounting unless the music assets are sold to The Pullman Group, LLC.

I have spoken to and met with Elnor "Whitehead" Medley executrix of the estate, she has refused to provide me with any documents whatsoever related to any sale, royalties, or tax issues. Elnor further said she would sign my name for me authorizing her purported sale of the Assets in violation of the Pullman agreement which numerous beneficiaries and members of both families, the Whitehead and McFadden families have been aware of the existence of such Pullman agreement or for years. I was not only shocked that the executrix of the Whitehead estate refused to even let me see the document she wanted me to sign related to the sale to same unknown parties, much less than give me a copy. Even more shocking is Elnor as executrix is saying she has been signing the names of the beneficiaries to documents approving deals and giving up rights among other things they are not only aware of, but have not seen.

Based on the above an on behalf of my beneficiary son, Jaron Cavadus Battle the estate must be force to honor the deal and agreement with Pullman for the sale of the Assets, have the executrix immediately give all the beneficiaries access to all her "the estates files" including but not limited to all correspondence with the IRS, and any related sale documents to any party, any contract with any party the estate has entered into and all royalty statements, an accountings related to the estate in any way.

The estate recently gave me a check which bounced. Clearly if Elnor cannot keep a check book and is passing bum checks she for all the above reasons such as threatening to sign beneficiaries' names if they don't go along with her and using leverage. Ironically that she has already done so for the other beneficiaries "signed their names" Elnor Whitehead must be removed as executor immediately.

DEC-27-2007  18:05                                                                    P.03

I, Leslie A. Battle, verify that to the extent the facts set forth in the foregoing document are based upon my personal knowledge, they are true and correct, and to the extent based upon information provided by others, they are true and correct to the best of my knowledge, information and belief.  This Verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Executed this _29_ day of December, 2007 at Pennsylvania.

_Leslie A Battle_

State of _Texas_

County of _Montgomery_

On December _25_, 2007, before me, _John D Collins_, personally appeared _Leslie A Battle_, and proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within the Declaration and acknowledged to me that she executed the same in her capacity as a duly authorized guardian on behalf of herself and her son and that by her signature on the within Declaration she executed the within the Declaration in her capacity as a duly authorized signatory as legal guardian of her son beneficiary Jaron Cavadus Battle.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
John D. Collins, Notary Public
Springfield Twp., Montgomery County
My Commission Expires Oct. 16, 2008

I, Leslie A. Battle, would like to be inform- and recieve any documentation in regards any and all deals, and agreements made b the estate of John Whitehead, and the Pullmen or any other parties. This to continue to protect the interest of my son, Jaron Cavadus B minor, beneficiary of John C. Whitehead esta

TOTAL P.

Exhibit  I

THE PULLMAN GROUP, LLC

CLAIMANT AND COUNTERCLAIM RESPONDENT

V.

THE ESTATES OF GENE MCFADDEN AND JOHN C. WHITEHEAD

RESPONDENT AND COUNTERCLAIMANT

AMERICAN ARBITRATION ASSOCIATION
Case No. 13 20 0800 1087
(FORMERLY CASE NUMBER 13 138 Y 01087 08)

DECLARATION OF DAVID PULLMAN
IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION

LAW OFFICE OF ANTHONY KORNARENS
Anthony Kornarens (SBN119940)
2907 Stanford Avenue
Marina del Rey, CA 90292
(310) 458-6580

ARMEN MANASSERIAN, ATTORNEY AT LAW
Armen Manasserian (SBN 288199)
3121 Chadney Dr.
Glendale, CA 91206
(818) 640-6409

Co-Counsel for Claimant
The Pullman Group, LLC
and Respondent David Pullman

David Pullman, being duly sworn, states:

1.   I am president of Claimant, The Pullman Group, LLC ("Pullman" or "The Pullman Group, LLC"), and as such am familiar with the facts and circumstances hereinafter set forth. I make this affidavit in support of Pullman's motion for summary judgment.

2.   Pullman has for many years been engaged in investment banking, purchasing, acquiring, providing financing for and/or engaging in the sale of assets (in whole or in part), making principal investments in musical compositions, entertainment and other intellectual property assets, in whole or in part  (including, but not limited to royalties, contingent interests, and the proceeds of litigations involving copyright infringements and other claims involving intellectual property assets, including assets in the music and entertainment fields), and performing and providing various other services and products such as pursuing claims for reversion, rescission, recapture and enforcement of publishing, co-publishing and writers' share rights, royalty rate re-calculations, demands for accountings, royalty audits, negotiating and discounting state and federal tax claims, developing strategies for maximizing asset recovery, and litigation management.

3.   Pullman is best known worldwide for the creation and issuance of debt securities via securitization (known as "Pullman Bonds "), such as those Pullman created for David Bowie, James Brown, Holland Dozier Holland, Ashford & Simpson and The Isley Brothers, among others.

2

4.   Pullman Bonds are backed by an artist's and/or songwriter's expected royalty income, the proceeds of which securities benefit the artist.

5.   Pullman has done numerous deals backed by artists' and songwriters' catalogues, both financing acquisitions and making direct purchases of such assets and/or doing alternative investments or services. A true and correct copy of my curriculum vitae and summary of speaking engagements is attached as Exhibit A. My expertise and experience and the primary business of The Pullman Group, LLC and its related entities is in the finance and acquisition investment banking business as it relates to music, entertainment and other intellectual property assets. Approximately 18 years ago while employed as an investment banker in New York, in 1997, I created and the first ever music, entertainment and intellectual property securitization ever, a pioneering, landmark transaction and invention that has become known as the "Pullman Bonds." I developed the methodology and framework to enable the substantial projected future income from the world renowned artist David Bowie's body of works, both sound recordings and musical compositions, to be securitized and used as collateral for Fifty Five Million Dollars ($55,000,000.00)  in asset backed securities that were rated investment grade at the single A level by multiple nationally recognized rating agencies sufficiently high enough to be eligible for purchase by institutional investors such as insurance companies. The Pullman Group, LLC trademarked the first Pullman Bond™ and the Bowie Bond™, domestically and internationally. Shortly after overseeing the first successful issuance of the "Pullman Bonds" for David Bowie, The Pullman Group, LLC and its related entities

3

began to pursue the business of securitization and acquisition of the income generated from all types of intellectual property, including musical compositions and sound recordings. The Pullman Group, LLC and its related entities have successfully created securitizations for the income streams generated by intellectual property created by numerous stars, artists and songwriters including Motown hit machine Holland Dozier Holland, Ashford & Simpson, James Brown and The Isley Brothers for tens of millions of dollars each and for over a hundred million dollars in the aggregate.

6.    Respondent Estate of Gene McFadden ("McFadden Estate") is the estate of Gene McFadden ("McFadden"), who died in 2006. The executrix of the McFadden Estate is Kenneth McFadden.

7.    Respondent Estate of John C. Whitehead ("Whitehead Estate") is the estate of John C. Whitehead ("Whitehead"), who died in 2004.

8.    McFadden and Whitehead were songwriters and performers who worked and performed together -- as a partnership known as "McFadden & Whitehead" --  during the 1970's.

9.    In the years 2001-2002, I was in dialogue with Gene McFadden and John Whitehead regarding a potential sale of their royalties to The Pullman Group, LLC.

10.   In that time frame, Gene McFadden and John Whitehead provided documents regarding their catalog and rights to The Pullman Group, LLC. This was before any agreement was signed.

11.   In early 2002, I communicated to Gene McFadden and John Whitehead that The

4

Pullman Group, LLC is interested in purchasing their royalties.

12.  On April 25, 2002, I sent a draft agreement to Gene McFadden and John Whitehead for the sale of their royalties to The Pullman Group, LLC. At the request of McFadden and Whitehead, for tax planning and to avoid risks in a drop of the catalog's future royalty income and to get fixed income payments, the draft (and the final agreement) states at paragraph 6a that the purchase price would "be paid in six equal installments . . .  with the initial payment to be made at closing." A true and correct copy of this document is attached as Exhibit B.

13.  The draft agreement dated April 26, 2002 (as well as the final Contract) states that Gene McFadden and John Whitehead individually and as partners McFadden & Whitehead (herein collectively referred to as "McFadden & Whitehead") "either had this agreement reviewed by legal counsel of [their] choice or, despite the opportunity to do so, ha[ve] chosen not to have legal counsel review this agreement."

14.  Mr. McFadden and Mr. Whitehead commented on the draft contract and requested that changes be made in communications we had. Specifically, the draft agreement stated at paragraph 1 that "Pullman would receive "audit source rights." As result of McFadden and Whitehead's requests that changes be made to the draft agreement, the final version of the Agreement added language stating "Notwithstanding the foregoing, the Rights shall not include (a) any payments due with regard to the writer's share of publishing income for the period prior to the acquisition byWarner-Chappell Music of its ownership Interest in the Works; or (b) any payments due for artist

record royalties for the period prior to the closing of the Proposed Purchase." This carve-out was in anticipation of McFadden and Whitehead receiving a lump some payment for the excluded rights. Accordingly, McFadden and Whitehead told they preferred to collect the purchase price under the Contract in other tax years, since they were expecting a good deal of money from the audit that was being excluded from our Contract.

15.  This language was proposed by McFadden and Whitehead, who had in the year 2000 retained counsel (attorney Thomas S. McNamara) to pursue those rights. At the time, McFadden and Whitehead were being represented Mr. McNamara in connection with audit claims.  I knew this from McFadden and Whitehead and because I had been in dialogue with them for well over a year regarding potential deals regarding the catalog, including an earlier discussed potential securitization agreement with Pullman which was not possible for the reasons stated below. True and correct copies of documents reflecting Mr. McNamara's retention and the audit (dated March 21, 2000) that Pullman obtained as a part of its due diligence is attached as Exhibit C. Moreover, I concluded that McFadden and Whitehead could not do a Pullman Bond asset backed security offering because their earnings were too low and their public criminal record (including for tax evasion) and their poor credit history precluded it. It was after I communicated this to McFadden and Whitehead that they stated they wished to sell their rights to The Pullman Group, LLC as an alternative, excluding their pending audit claim, which they would keep.

16.  On or about May 2, 2002, I sent a revised contract to McFadden and Whitehead.

17.  On or about May 10, 2002, McFadden and Whitehead signed the Contract and

6

returned it to me. It is signed by Mr. McFadden and Mr. Whitehead personally as well as on behalf of the McFadden & Whitehead partnership. I countersigned and returned the Contract to McFadden & Whitehead. A true and correct copy of this document is attached as Exhibit D.

18.  After Mr. McFadden and Mr. Whitehead passed away, their respective representatives initially denied that McFadden and Whitehead signed the Contract. This is stated in filings in the Probate Courts, true and correct copies of which are attached as Exhibit E. Later, the representatives stipulated that McFadden and Whitehead did in fact sign the Contract. A true and correct copy of this Stipulation is attached as Exhibit F.

19.  It is therefore undisputed that on or about May 10, 2002, Pullman entered into a written contract with McFadden and Whitehead. ("Contract").

20.  As shown by Exhibit D, Gene McFadden and John Whitehead individually and the partnership of McFadden & Whitehead were each parties to the Contract.

21.  Pursuant to the Contract, Pullman received the exclusive right to purchase McFadden's and Whitehead's rights to the musical compositions written by them in whole or in part and/or performed by them in whole or in part (the "Works").  Pullman also received the exclusive right to purchase McFadden's and Whitehead's artist's and producer's rights to the recordings made by them. However, these rights were of minimal value because, as Pullman's due diligence later showed, McFadden and Whitehead were unrecouped and owed their record company money.  In return, Pullman agreed to perform, at its sole expense, all the required due diligence with respect to the Works. This

due diligence included, without limitation, verification of the extent of Respondents'
interests in the copyrights to the Works, the status of any infringement claims by or
against Respondents involving the Works, and an examination of the royalties and other
revenues received by and due to Respondents, which numbers would determine the
purchase price Pullman would pay for the Works.

22.  As of the contract date, Gene McFadden and John Whitehead did not own the
copyrights to the Works, but only an income participation therein; i.e., the right to receive
royalties pursuant to songwriter contracts McFadden & Whitehead had entered into years
before with the predecessors to the then current copyright owners. The parties rendering
accountings to Pullman were Warner Chappell and BMI. True and correct copies of
exemplary statements from Warner Chappell and BMI are attached as Exhibit G and H.

23.  Under the Contract, multiples of the historical royalty earnings of the catalog
were used to calculate the purchase price. A multiple of six (6) times was used for the
writer's share and a multiple of eight (8) times was used for the publisher's share. These
multiples are commercially reasonable and fair market multiples to determine the
purchase price. The fact that there were competing bids using multiples in the same
approximate range years later when the earnings from Catalog had gone up shows that the
contract price and terms are reasonable and fair as to McFadden and Whitehead and their
partnership.

24.  The Contract provides that Pullman Group, LLC can create a special purpose
vehicle ("SPV") such as an LLC  to purchase the works that comprise the catalogue and

8

further provides that the Sellers are to cooperate in the formation of the SPV, the assignment to the SPV of all rights and Works being purchased, and the execution of all access documents, including irrevocable letters of direction to the applicable performing rights societies, to enable the SPV to collect all income attributable to the exploitation of the Works or derived from any of the rights purchased. In relation, BMI at the time the Contract was made required that an SPV be set up to transfer writer's share. This is an additional reason why McFadden and Whitehead's cooperation was required to proceed with the transaction under the Contract.

25.   As valuable consideration for the Contract, Pullman agreed in the Contract to perform, at its sole expense, all the required due diligence with respect to the Works, including thousands of dollars of legal review and due diligence and copyright lien searches. The Pullman Group, LLC would not have undertaken the due diligence with respect to the Works – which cost The Pullman Group, LLC in excess of $10,000 – had it not received the exclusive right to purchase the Works at the price to be determined by the Contract's specific formulas, and the right of first refusal with respect to future sales of the Works; as is standard business practice by Pullman and the music industry.

26.   To enable Pullman to conduct its due diligence, Respondents agreed to "provide all due diligence material Pullman deems necessary to make the purchase … including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc."  Contract ¶ 3.  Respondents further agreed to (and did)

9

provide Pullman with releases and authorizations to enable Pullman to receive the due diligence material, and to allow Pullman to "contact, correspond and file anything it deems necessary at its sole discretion with the United States Copyright and Trademark Offices."  Contract ¶ 3.

27.  In May 2002, The Pullman Group, LLC hired attorney Robert Besser to perform due diligence.

28.  This due diligence included, without limitation, verification of the extent of Respondents' interests in the copyrights to the Works, lien searches, copyright searches, reviewing agreements, royalty agreements, artist contracts, songwriter agreements and any offer agreement and contracts related to the Works, the status of any infringement claims by or against Respondents involving the Works, tax return schedules of Respondents and an examination of the royalties and all statements showing royalties and other revenues received by and due to Respondents related to the Works.

29.  I promptly provided attorney Besser with royalty statements, artist contracts, songwriter's agreements, amendments to agreements and other related documents in his possession. True and correct copies of examples of such materials are attached to Mr. Besser's declaration as Exhibit B.

30.  McFadden and Whitehead explicitly agreed that for a period of 180 days from the date of the Contract (defined in the Contract as the "Exclusive Period"), they would "refrain from entering into discussions with any third party regarding the purchase of all or a part of the Works or any rights therein."   Contract ¶ 2.  The parties also agreed that

on completion of Pullman's due diligence review, and once the purchase price had been

calculated pursuant to the formulas set forth in the Contract, the Exclusive Period would

be extended "until formal purchase agreements" were executed.  Contract ¶ 2.  It was

intended that these "formal purchase agreements" would be a mere formality, and

ministerial in nature, and would include formal assignments to Pullman of McFadden's

and Whitehead's rights in the Works.

31.  The purchase price for the Works was to be calculated pursuant to the detailed

formulas set forth in ¶ 6 of the Contract, as a multiple of the "projected" (as defined in the

Contract at ¶ 6) "writer's share" of annual royalties, and for the "publisher's share," an

additional amount equal to a multiple of the "projected net publisher's share" (as that

term is defined at Contract ¶ 6) of royalties.

32.  As calculated pursuant to the Contract's formulas by Pullman after its due

diligence was complete, the purchase price for the writer's share of royalties was and is

$865,749, and the purchase price for the publisher's share when and if delivered by the

Sellers (and pro-rata if in part) was and is $1,098,244 --  a total of $1,963,993.   A true

and correct copy of Pullman's calculations which I personally performed is attached as

Exhibit I.

33.  In light of the uncertainties facing the music industry in 2002, when record sales

were in decline due to electronic downloading of music (both legal and illegal), and the

risks of fluctuation in foreign exchange rates, and (as it we learned) the IRS liens on the

Catalog, these prices were extremely commercially reasonable

34.  Pursuant to the Contract, only Pullman (based on the outcome of its due diligence investigation) – and not McFadden or Whitehead – had the option to walk away from the proposed sale of the Works.

35.  The Contract further specified (in ¶ 7) that in the event, based on the results of its due diligence, Pullman elected not to proceed with its purchase of the Works --  for example, if the due diligence revealed that Respondents' rights in the Works were not as previously represented, or if the price, calculated as a function of the formulas set forth in ¶ 6, was higher than anticipated by Pullman -- Pullman "shall have no further obligations" under the Contract, but would have continued to have a right of first refusal with respect to future offers received by Respondents for the Works. Pullman would not have undertaken the due diligence with respect to the Works – which cost Pullman in excess of $10,000 – had it not received the exclusive right to purchase the Works at the price to be determined by the Contract's specific formulas, and the right of first refusal with respect to future sales of the Works. Later, when Pullman learned that Respondents had tried to sell the works to other parties, Pullman asserted the right of first refusal conferred by ¶7 of the Contract. In the unlikely event that specific performance is not awarded, Pullman will in future proceedings in this arbitration show how Respondent's violation of the right of first refusal damaged Pullman at a minimum in the amount of $2,200,000. This is measured by the expected return that AREC intends to obtain from the sale of the Works to Warner Chappell.

36.  The Contract states that McFadden and Whitehead "either had this agreement

reviewed by legal counsel of [their] choice or, despite the opportunity to do so, ha[ve] chosen not to have legal counsel review this agreement." Contract ¶12.  The parties further agreed that "any controversy or claim arising out of or relating to this agreement, its breach, or any of the transactions or services contemplated herein" would be subject to arbitration, and that in the event of arbitration, the prevailing party would be entitled to recovery of its "reasonable attorney's fees and costs incurred with respect to such arbitration proceeding." Contract ¶ 11.  McFadden and Whitehead explicitly agreed to and accepted all of the terms set forth in the Contract when they signed the Contract, on its last page, under the statement  "Agreed and Accepted By."

37.  Pullman performed all of its obligations under the Contract, including the completion of a comprehensive due diligence review of the McFadden's and Whitehead's interests in the Works.  Pullman's due diligence review included, without limitation, the review of thousands of pages of Respondents' royalty statements, legal review of the artists' songwriter contracts and agreements,  reviewing Respondents' respective discographies and biographies, preparing lists of Respondents' compositions, and conducting copyright and lien searches with respect to those compositions, together with related accounting work and legal research.

38.  Pullman's due diligence activities cost Pullman in excess of $10,000.

39.  Attorney Robert Besser and his staff performed due diligence by reviewing hundreds of pages of Respondents' lengthy royalty statements, legal review of the artists and songwriter contracts and agreements, reviewing Respondents' respective

discographies and biographies, preparing lists of Respondents' compositions, and conducting copyright and lien searches with respect to those compositions, together with related accounting work and research.  This work cost Pullman $5,000. A true and correct copy of Mr. Besser's bill from May 2002 for this work is attached to the Besser declaration as Exhibit A.

40.  I also performed due diligence by reviewing Respondents' lengthy royalty statements which were thousands of pages long, legal review of the artists' songwriter contracts and agreements,  reviewing Respondents' respective discographies and biographies, preparing lists of Respondents' compositions, and conducting copyright and lien searches with respect to those compositions, together with related accounting work and research.  True and correct copies of examples of such materials are attached hereto as Exhibit J.

41.  In order to arrive at the purchase price called for in the Contract, and with Gene McFadden and John Whitehead individually and the partnership of McFadden & Whitehead's permission and participation, I also calculated average historical royalty earnings from Gene McFadden and John Whitehead individually and the partnership of McFadden & Whitehead's catalog songs. True and correct copies of some of my calculations are attached hereto as Exhibit J, and mentioned earlier in this declaration.

42.  Pullman also learned prior to closing that Gene McFadden and John Whitehead individually and the partnership of McFadden & Whitehead had outstanding tax liens that had not been paid for many years.

43.  At the time the Contract was made, there were substantial liens on the catalogue (i.e. IRS liens). I discovered these liens in May 2002 as part of Pullman's due diligence. A true and correct copy of a documents regarding an example of an IRS lien on this catalog is attached hereto as Exhibit K.  These liens would need to be paid from the proceeds of sale for the Catalog to be acquired free and clear of the liens. Although this may not reduce the money that The Pullman Group must pay under the Contract, it likely would reduce the amount that McFadden and Whitehead will net under the Contract.

44.  In May and June 2002, I brought the tax liens to the attention of McFadden and Whitehead and attempts to communicate with McFadden and Whitehead regarding questions concerning the Catalog. McFadden and Whitehead did not respond.

45.  In May and June 2002, I attempted to communicate with McFadden  and Whitehead regarding requests for further documents, information and the tax liens.

46.  I explained that the tax liens must be paid from the proceeds of the purchase, so that The Pullman Group, LLC can purchase the royalty rights without encumbrances. Although this will not reduce the money that The Pullman Group, LLC must pay under the Contract, it will reduce the amount that McFadden and Whitehead will net under the Contract. McFadden and Whitehead generally were not responsive to my concerns about the tax liens.

47.  It appeared to me that McFadden and Whitehead had decided that they did not intend to further perform under the Agreement. Each of them told me they would not go forward with the Contract. Each of them admitted to me that they had signed the Contract

15

and believed it was legally binding and enforceable, but they nonetheless would not proceed unless legally forced to do so. This may have been motivated by McFadden and Whitehead's realizing that some of the purchase price to be paid by The Pullman Group, LLC under the Contract would be taken by the IRS. Of course, this would not have reduced the price to be paid by The Pullman Group, LLC under the Contract; however, it would have reduced the monies netted by McFadden and Whitehead under the sale.

48.  To enable The Pullman Group, LLC to conduct its due diligence, McFadden & Whitehead agreed to "provide all due diligence material Pullman deems necessary to make the purchase … including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc." nor did they provide Mr Pullman with releases and authorizations to enable Pullman to receive the due diligence material, and to allow Pullman to "contact, correspond and file anything it deems necessary at its sole discretion with the United States Copyright and Trademark Offices."

49.  McFadden & Whitehead did not provide "all due diligence material Pullman deems necessary to make the purchase … including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc.

50.  I also had costly detailed copyright searches conducted to determine the recorded owner of each of the hit songs that were the contemplated subject of the agreements and that Gene McFadden and John Whitehead individually and as McFadden

16

& Whitehead Partnership had written or co-written the compositions.

51.  Shortly after their signing of the Contract on May 10, 2002, McFadden and Whitehead generally did not respond to my concerns or calls. My contacts with them became increasingly sporadic because they were not responsive to me.

52.  Not long after signing the Contract, both Mr. McFadden and Mr. Whitehead stated to me via telephone that they do not intend to further perform under the Contract. Specifically, well before year-end 2002, Gene McFadden and John Whitehead notified me that they would not proceed with the sale of the Works to Pullman. I told each of them I considered this to be a breach of the Contract and I asked them to reconsider. As discussed above, both Gene McFadden and John Whitehead told me they would not go forward with the Contract. Each of them said to me that they knew they had signed the Contract and understood it was legally binding and enforceable. Nonetheless, they said they would not proceed unless legally forced to do so.

53.  McFadden and Whitehead's respective representatives have admitted (at paragraph 27 of their Answer and Counterclaim filed in this arbitration) that McFadden and Whitehead "notified Pullman that they did not desire to consummate the proposed transaction."

54.  It is Pullman's position that this constituted an anticipatory repudiation, excusing The Pullman Group, LLC of any obligation to further perform.

55.  As of this time (from June 2002) and continuing through the present, The Pullman Group, LLC was ready, able, and willing to consummate the purchase of the

17

Works on the pre-determined, formula calculation material terms set forth in the Contract.

56.   When Mr. McFadden and Mr. Whitehead tried to back out of the deal,  by informing me of their unwillingness to proceed they prevented a condition in the contract from occurring and thus breached the Contract by stopping the sale of the works after agreeing to cooperate in writing, in the Contract.

57.   When it became clear well before year-end 2002 that McFadden and Whitehead were not going to consummate the sale of the Works to The Pullman Group, LLC, I repeatedly reminded them and, after their deaths, their representatives and heirs, that McFadden and Whitehead were in breach of the Contract and that The Pullman Group, LLC was prepared to seek to enforce its rights under the Contract at any time in litigation. At this time, The Pullman Group, LLC had completed its due diligence to the extent it could given McFadden and Whitehead's lack of cooperation and was prepared to consummate the sale.

58.   The Pullman Group, LLC also made clear that it preferred to reach an amicable resolution of its dispute with Respondents.

59.   In fact, approximately every six months until McFadden and Whitehead's respective deaths, I was calling McFadden and Whitehead separately. I stated to McFadden and Whitehead that The Pullman Group, LLC can enforce its rights, but prefers to complete the purchase cooperatively.  McFadden and Whitehead still would not cooperate in completing the transaction.

60.   I also requested Mr. Besser to notify the third persons involved in the Catalog

18

(BMI and Warner Chappell Music) of The Pullman Group, LLC's position that it had a binding contract to acquire the Catalog. Mr. Besser did so, stating "the Pullman Group, LLC acquired the right to purchase all of Gene McFadden's and John Whitehead's rights to compositions written in whole or in part by Gene McFadden and John Whitehead." True and correct copies of documents reflecting this are attached as Exhibit C to the Declaration of Robert Besser.

61.  At all relevant times, The Pullman Group, LLC was and remains ready, able, and willing to consummate the purchase of the Works on the pre-determined, material terms set forth in the Contract. I have consistently made this clear.

62.  The Contract further specified that in the event, based on the results of its due diligence, The Pullman Group, LLC elected not to proceed with its purchase of the Works -- for example, if the due diligence revealed that Respondents' rights in the Works were not as previously represented, or if the price, calculated as a function of the formulas set forth in ¶ 6, was higher than anticipated by Pullman -- Pullman "shall have no further obligations" under the Contract, but would have continued to have a right of first refusal with respect to future offers received by Respondents for the Works: "Pullman shall have 180 (One Hundred Eighty) days to elect to exercise its first right of refusal...If Pullman does not elect to exercise its right of first refusal, and for any reason the assets are not sold pursuant to the Third Party Offer, Pullman's rights of first refusal shall apply to any subsequent offers received by Owner."

63.  On information and belief, in 2005, during the Contract's extended Exclusive

Period, in further breach of the Contract, the Whitehead Estate and McFadden transferred to Artists Rights Enforcement Corp. ("AREC"), inter alia, a fifty-percent interest in McFadden's and Whitehead's rights in the Works (the "AREC Transaction") in exchange for an audit of the record royalties with respect to which Pullman had exclusive rights under the Contract.  Pullman does these services and could have done same and therefore is entitled to a 50% interest in the Catalog for these services. True and correct copies of some documents later obtained by Pullman reflecting this attempted transaction are attached hereto as Exhibit M1.

64.  Moreover, even if Pullman had, after completion of its due diligence, determined not to finalize its purchase of the Works, the Whitehead Estate and McFadden Estate committed a further breach of the Contract by not honoring Pullman's right of first refusal with respect to the AREC Transaction.

65.  Respondents breached the Contract again, in October, 2007, when they reached agreement with Warner Chappell Music, Inc. ("Warner Chappell"), pursuant to which Respondents agreed to sell to Warner Chappell McFadden's and Whitehead's share of the royalties and rights to the Works for a total purchase price of $4,400,000 (the "Warner Chappell transaction").   True and correct copies of some documents reflecting this attempted transaction are attached hereto as Exhibit M2.

66.  Under respondents' pre-existing arrangement with AREC, over 50% of the gross amount would go to AREC. Thus, under the conflicting agreement with Warner Chappell Music, AREC would receive 50% ($2,200,000) of the proposed purchase price and the McFadden and Whitehead estates would receive $2,200,000 (net of liens)

20

67.  Based on information received by me from Barbara McFadden in October, 2007, during the extended Exclusive Period of the Contract and in breach of the Contract, former executrix of the McFadden Estate, and from beneficiaries of the Whitehead Estate, after satisfaction of Respondents' federal tax liabilities, the beneficiaries of the McFadden Estate would receive a net amount of $800,000 from the Warner Chappell transaction, and the beneficiaries of the Whitehead Estate would receive a net amount of $250,000.

68.  The Whitehead Estate and McFadden committed a further breach of the Contract's First Right of Refusal provision when they negotiated the Warner Chappell transaction without extending to Pullman its First Right of Refusal with respect to that transaction.

69.  As soon as Pullman learned of the Warner Chappell transaction, Pullman through attorney Robert Besser wrote on October 29, 2007 to the executrixes of Respondents' respective estates, reminding them of Pullman's exclusive rights under the Contract. Through AREC, the Respondents acknowledged notice of Pullman's claims and Pullman responded.  A true and correct copy of these documents are collectively attached as Exhibit N. As well, as shown by Exhibits C and E of his declaration, and Exhibit O hereto, Mr. Besser had at my request written to Warner Chappell and BMI in 2004 and to AREC in 2007 notifying them of Pullman's contention that it was party to a binding contract to purchase the McFadden and Whitehead catalog.

70.  In December 2007, Pullman obtained notarized declarations from five of the Whitehead heirs (including that of Kenneth Whitehead [the current executor of the Whitehead Estate], Caiya Whitehead, Leslie Battle [mother of then minor beneficiary

Jaron Cavadus Battle], Elizabeth Dawn Mosley, a/k/a Dawn Whitehead Mosley), and John C. Mosley stating that the Contract is valid, stating the Contract was executed by Whitehead and McFadden, complaining about the actions taken by the Estate in not honoring the Contract and objecting to any sale of the assets of the Estate "unless the music assets are sold to The Pullman Group, LLC." These declarations are submitted in support of Pullman's motion for summary adjudication. True and correct copies are also collectively submitted in support of this motion.

71.   Respondents have asserted that Warner Chappell withdrew its offer with respect to the Works as a result of Pullman's notice to Respondents. However, I believe that Warner Chappell remains ready, willing, and able to consummate the Warner Chappell Transaction, subject to the outcome of the instant arbitration.

72.   I believe that Respondents are continuing to negotiate with  persons and/or entities in addition to AREC and Warner Chappell with respect to transactions involving the Works, in violation of Pullman's exclusive rights under the Contract.

73.   Alternatively, Pullman has at all relevant times been ready, willing, and able to exercise its rights of first refusal with respect to the AREC Transaction and the proposed Warner Chappell Transaction.

74.   In prior litigation commenced by Respondents (in breach of the Contract's explicit and detailed arbitration provision) in the United States District Court for the Eastern District of Pennsylvania, Respondents denied having signed the Contract. Subsequently, counsel for Respondents signed a Stipulation consenting to arbitration of this dispute, which was "So Ordered" by the court, in which Respondents expressly

agreed as follows: The parties further agree that they will not challenge the authenticity of the signatures on the Agreement [dated May 2, 2002 and executed on May 10, 2002] or the fact that the Agreement was executed in the Arbitration proceeding or any other proceeding related to the Agreement. A true and correct copy of this document is attached as Exhibit F. The Parties also stipulated that the dispute would be decided "in arbitration in New York under New York law. . . pursuant to ¶ 11 of the Agreement dated May 2, 2002 between The Pullman Group, LLC, Gene McFadden and John Whitehead." See paragraph 1 of Exhibit F.

75.  The Pullman Group, LLC never "abandoned" the Contract or waived its rights under the Contract. To the contrary, The Pullman Group, LLC consistently asserted its rights under the Contract to purchase Respondents' catalog.

76.  Respondents have produced in discovery a series of documents establishing that Respondents were aware there were tax liens that had to be dealt with as part of any sale of the McFadden and Whitehead rights; (2) the transaction was commercially reasonable, including the multiples used and the other terms (see Ex. P hereto, email From: Jeff Sacharow [mailto: jsacharow@jsacharow.com] Sent: Thursday, May 24, 2007 3:05 PM To: Chuck Rubin; Jay Berger /Subject: FW: M&W … That puts a 5.5 x multiple for the writer's share…"); (3) each transaction was predicated on the completion of due diligence (see Ex. P hereto ; and (4) other documents would need to be signed to effectuate the transfer of the rights; including additional agreements. These documents consist of communications between third parties who tried to purchase the Works and the Rights after the date of the Contract, on the one hand, and the representative of the McFadden

23

and Whitehead Estates, on the other.  True and correct copies of these documents are

attached as Exhibit P. The undisputed evidence is that the Contract is fair and

commercially reasonable. Among other ways, this is shown by comparing the terms in the

Contract with the terms of later agreements that Respondents made to sell the Works in

breach of the Contract. For example, both the Contract and the later Warner Chappell deal

provided for the use of multiples of prior annual earnings to determine the purchase price.

The R2M Music deal offer used multiples of prior annual earnings of 5.5 x.[1/] Also, each

transaction was predicated on the completion of due diligence.[2/] Likewise, both deals

provided that other documents would need to be signed to effectuate the transfer of the

rights; including additional agreements.[3/]Additionally, Ex. P (page R00027) show yet

another example to support Pullman's position that McFadden and Whitehead had

---

[1]"From: Jeff Sacharow [mailto: jsacharow@jsacharow.com] Sent: Thursday, May 24, 2007 3:05 PM  To: Chuck Rubin; Jay Berger /Subject: FW: M&W … That puts a 5.5 x multiple for the writer's share…"

[2]Ex. P (page R00026) Email From: Jeff Sacharow  Sent: Wednesday, September 05, 2007 7:35 PM  To: Hamzeh, Zeina  Cc: Rosner, Jack; Ed Pierson (ed.pierson@warnerchappell.com)  … (b) WC's completion of the diligence examination as discussed in paragraph 2 above...". Conditions to closing in Page 7 (¶8) of Warner purchase agreement with McFadden & Whitehead (3) completion of legal and financial due diligence with respect to the SCs (except to the extent that our failure to complete such due diligence is due to the failure or neglect of ourselves or of our representatives); see also R00708 Correspondence between M & W attorney and prospective Buyer R2M Music  Contract dated: August 17, 2007 … Subject to, completion of legal and financial due diligence to our satisfaction and agreement to the terms of a long term purchase/loan agreement the following outlines R2M Music's offer to acquire… from the… ('the Estate')."

[3]Ex. P Email From: Jeff Sacharow  Sent: Wednesday, September 05, 2007 7:35 PM  To: Hamzeh, Zeina  Cc: Rosner, Jack; Ed Pierson (ed.pierson@warnerchappell.com)  … 4. The following shall be the sole conditions to closing: (a) the execution of a purchase and sale agreement reasonably satisfactory to both WC and the sellers...".

24

virtually identical language in other deals they were working on and attempting to

complete. Section 8 (5) "Execution...of all...ancillary documents..." Yet another example

of this is yet another deal with McFadden and Whitehead from R2M Music which used

virtually identical language to the Pullman deal. "Subject to completion of legal and

financial due diligence to our satisfaction...long form purchase...agreement...." Ex. P

(page R00703) the R2M Music deal with McFadden and Whitehead. Further, each of the

transactions required the satisfaction of tax liens that had to be dealt with as part of any

sale of the McFadden and Whitehead rights.4/ Likewise, the transfer of rights had to

satisfy the requirements of BMI.5/ Put simply, the terms of the agreements that

---

4Pullman Decl, Ex. P (page R00026) Email From: Jeff Sacharow  Sent: Wednesday, September 05, 2007 7:35 PM  To: Hamzeh, Zeina  Cc: Rosner, Jack; Ed Pierson (ed.pierson@warnerchappell.com) … 3. Specifically with respect to Whitehead, the parties acknowledge the existence of an IRS tax lien levied against the assets. This lien shall be discharged as a condition to closing.... in the case of Whitehead (d) the discharge of the IRS Lien (the IRS Lien shall be discharged at the closing)." Conditions to closing in Page 7 (¶8) of Warner purchase agreement with McFadden & Whitehead: (6) full discharge and/or release of the IRS Liens accompanied with (1) official IRS documentation indicating such full discharge or release and (2) a copy of a written notification sent by you to BMI informing it that the IRS Liens have been fully discharged and/or released; see R00787  RE "Risks Associated with purchase" email From: Legal and Business Affairs Attoreny Harmzeh, Zeina [mailto: Zeina.Hamzeh@warnerchappell.com] Sent: Wednesday, October 10, 2007 10:28 AM To: 'Jeff Sacharow' Subject: Whitehead Lien, referencing "the most recent correspondence from the IRS on the Whitehead liens. Please note that the 2002 lien has not yet been released."

5Ex. P (R00026) Email From: Jeff Sacharow  Sent: Wednesday, September 05, 2007 7:35 PM To: Hamzeh, Zeina  Cc: Rosner, Jack; Ed Pierson (ed.pierson@warnerchappell.com) "4. The following shall be the sole conditions to closing: ... (c) written acceptance from BMI of the writer share assignment...". Conditions to closing in Page 7 (¶8) of Warner purchase agreement with McFadden & Whitehead: (4) receipt of any third party consents necessary with respect to the assignment of the Writer's Share of income with respect to the SCs and/or agreements relating thereto; and  (5) execution and delivery of all required ancillary documents including letters of direction in the forms annexed hereto; see R00040  Another example BMI agreement form for WARNER, just as Pullman would need to do, see R00644, enclosing BMI Assignment Form.

Respondents later tried to make regarding the Works only further show that the Contract here was fair, reasonable, customary and enforceable. Ex. P, R00680. 6/ More comparables showing Pullman's deal was commercially reasonable by McFadden and Whitehead's attorney and AREC who stated, "Writer Share $750,000 to $900,000 (based on average writer income of $86,632...Term & Copyright $675,000.00 (based on approx. $75,000.00 x 9 multiple)... Ex. P, R00688. 7/

77.  The Pullman Group, LLC brought its claims for breach of contract and for declaratory relief with respect to that Contract well within the six-year limitations periods applicable to those claims under N.Y. CPLR § 213.

78.  The Pullman Group, LLC did not act fraudulently, deceitfully, or has gained any unfair advantage under the Contract. Rather, The Pullman Group, LLC has expended

---

6From: Jeff Sacharow [mailto: jsacharow@jsacharow.com]  Sent: Wednesday, September 05, 2007 7:35 PM To: 'Hamzeh, Zeine Cc: Rosner, Jack; Ed Pierson (ed.pierson@warnerchappell.com) Subject: RE: Warner-Tamerlane -w- McFadden/Whitehead offers … 3. Specifically with respect to Whitehead, the parties acknowledge the existence of an IRS tax lien levied against the assets. This lien shall be discharged as a condition to closing. My client has been (and will continue to) deal directly with the IRS and therefore no amounts should be paid directly to the IRS by WC unless the IRS orders WC to do so.  4. The following shall be the sole conditions to closing: (a) the execution of a purchase and sale agreement reasonably satisfactory to both WC and the sellers, (b) WC's completion of the diligence examination as discussed in paragraph 2 above, (c) written acceptance from BMI of the writer share assignment and, in the case acknowledge that it has previously received Warner Music Group board approval to consummate this transaction for the purchase price." Ex. P (R00680)

7From: Jay Berger (jberger@artists-rights.com) To:Chuck Rubin (crubiln@artists-rights.com) Subject: Numbers from Jeff. Spoke to Jeff-here they are: Writer Share $750,000 to $900,000 (based on average writer income of $86,632...Term & Copyright $675,000.00 (based on approx. $75,000.00 x 9 multiple)...(R00688) email dated 8/30/2007

much effort and expense in perfecting and protecting pursuing its rights, without having received any tangible benefit.

79.  Pullman seeks a declaratory judgment that all of the terms of the Contract continue to be in full force and effect, and that Pullman is entitled to specific performance of the sale of the Works pursuant to ¶¶ 2 and 10 of the Contract.

80.  Pullman's remedies in the event Gene McFadden and John Whitehead individually and as partners McFadden & Whitehead failed to proceed with the sale of the Works are set forth in the Contract:  "In the event that you [McFadden and Whitehead] fail to proceed with the sale of the Works, Pullman may, at its sole discretion, elect as its remedy to receive either a break-up fee in an amount equal to ten percent (10%) of the Proposed Purchase Price or **specific performance** of this agreement, plus any and all expenses, including reasonable attorneys fees incurred, in enforcing its right to either remedy." [Emphasis added.]

81.  Although the value of the works subject to the Contract have increased since 2002, the contractual purchase price at the time was fair and reasonable and was based on a standard formula that is well-established in the music business.

82.  Pullman's Second Claim for Relief is for Respondents' breaches of the Contract, based on (a) Respondents' failure to proceed in good faith to sell the Works to Pullman, (b) Respondents' refusal to honor Pullman's right to specific performance of the Contract, including Pullman's rights to purchase the Works pursuant to the Contract and to receive "any and all monies paid from the date of the agreement going forward from

27

any source for subject musical compositions …", and (c) Respondents' having entered into the AREC Transaction, and their negotiation and attempted sale in connection with the Warner Chappell Transaction (and possibly other proposed or actual transactions presently unknown to Pullman), all in violation of Pullman's rights under the Contract, including its right of first refusal.

83.   Respondents have asserted Counterclaims for (1) a declaration that the Contract is "null and void and of no force or effect," and (2) for Pullman's alleged intentional interference with Respondents' contractual relations with Warner Chappell and the performing rights society Broadcast Music, Inc. ("BMI"), based on Pullman's notice to those parties that Pullman had already contracted to purchase the Works and that Pullman owned the rights to all royalties to the Works.

84.   At no time was I acting as an individual; all of my acts regarding this matter were done as manager of The Pullman Group, LLC.  Furthermore, all acts performed by Pullman's attorney, Robert Besser were done on behalf of The Pullman Group, not me individually. Counterclaimants' erroneous claims against me individually were based on the temporary suspension of The Pullman Group LLC's standing as a Delaware LLC based on a technicality.  This temporary suspension was immediately rectified and as of March 23, 2009, The Pullman Group LLC was (and to this day still is) in good standing, just as it was in good standing when the Contract was executed in May 2002. A true and correct copy of this document is attached as Exhibit Q.

85. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct and that this declaration was executed by me this 29 day of April, 2014 at Los Angeles, California.

By: _____
DAVID PULLMAN

# Exhibit A



# DAVID PULLMAN
## Founder, Chairman and CEO
## The Pullman Group,® LLC

David Pullman is the Founder, Chairman & CEO of The Pullman Group,® LLC founded in New York City and now based in entertainment capitol Los Angeles, CA, where he heads all debt, structured finance and asset backed securitization arenas for the firm as the head of The Pullman Group, ® LLC. David has over a decade of experience on Wall Street, starting as a mortgaged-backed securities trader and working at primary dealers. David has traded, securitized and executed asset sales with an aggregate value in the billions of dollars. Following his undergraduate work at the University of Pennsylvania, Mr. Pullman went on to the Wharton Graduate School of Finance.

In 1997 David Pullman, Founder, Chairman and CEO of The Pullman Group,® LLC inspired The Pullman Group's conception. He created the $55 million dollar deal for David Bowie, the first Pullman Bond™ deal for future music royalties for which he became known. The deal was named *Euromoney's* 1997 deal of the year and was the first ever intellectual property securitization single "A" rated private placement.

A Pullman Bond™ is a financing of music and entertainment royalties that allows the original creator or owner to maintain 100% ownership of the assets that are financed. The Pullman Group,® LLC developed these deals to empower artists and creators of intellectual property. These include the works of David Bowie, the "Motown Hit Machine" Holland-Dozier-Holand, James Brown, Ashford and Simpson, the Isley Brothers, and Marvin Gaye.

The Pullman Group's ®, LLC asset backed securitization deals include a $30 million deal with Holland Dozier Holland (Motown Hit Machine), and eight figure deal with R&B greats Ashford & Simpson, and $30 million deal with "Godfather of Soul" James Brown, and eight figure deal for the Isley Brothers and their most recent signing, the Marvin Gaye Family.

The Pullman Group,® LLC is a principal investment bank specializing in purchasing, securitizing, and financing entertainment and intellectual property assets, was the first and company to ever securitize intellectual property based on future royalty income. The Pullman Group,® LLC and its clients have ownership of or substantial contractual income derived from intellectual property assets or other entertainment assets in Record Masters, Record Royalties, Publisher and Writer Shares, Copyrights, Producer Royalties, Film, Television, Animation Libraries, Literary Estates, Software Licenses, Biotechnology Licenses, Pharmaceutical Licenses, Trademarks, Formulas, Trade Secrets and other intellectual property and contract rights. The Pullman Group, ® LLC includes well over $1 Billion in transactions through 2014. The company's website is www.pullmanbonds.com.





# SPEAKING ENGAGEMENTS
# OF DAVID PULLMAN THROUGH 2014

| Date | Location | Topic |
|---|---|---|
| March 6, 2014 | Houlihan Lokey Annual Financing Conference on Financing Illiquid Assets at the Palace Hotel in New York, NY | Keynote Speaker |
| July 19, 2004 | Intellectual Property Conference held by Strategic Research Institute at The Westin Midtown Metropolitan Hotel in New York, NY | Keynote Luncheon Speaker |
| September 17, 2003 | Intangibles IQ: Innovation and Shareholder Value Conference at the Intercontinental Hotel in San Francisco, CA (www.intangiblesiq.com) | Keynote Speaker |
| May 29, 2003 | Advancing IP Structured Finance Conference at the Crowne Plaza Hotel, New York, NY (www.worldrg.com) | Speaker, *Examining the Structure of Music, Entertainment and Copyright Securitizations* |
| May 25, 2003 | Investment Banking for Human Capital at the Harvard Business School Club of Greater New York, New York, NY (http://hbscny.org) | Keynote Speaker, *Pullman Bonds™ for Human Capital* |
| March 6, 2003 | The Billboard 2003 Music & Money Symposium at the St. Regis Hotel, New York, NY. (www.billboardevents.com) | Speaker, *Finding the Funding that Fits* |
| March 1, 2003 | The Global Entertainment and Media Summit at Le Bar Bat, New York, NY (www.globalentertainmentnetwork.com) | Speaker, *Deal Makers Panel* |
| February 8, 2003 | The IMN Fabozzi ABS West 2002 Conference in Scottsdale, AZ (http://www.imn.org) | Panel Moderator, *Entertainment and Intellectual Property Royalty Securitizations* |
| November 4, 2002 | The Penn Media Summit in New York City. (www.alumni.upenn.edu/pennmediasummit) | Speaker, *The New Media: The Road Less Traveled* |
| October 6-8, 2002 | SRI Southbeach Industry Summit 2002, Miami, FL (www.srinstitute.org) | Panel Moderator, *Entertainment and Intellectual Property Securitization: Past, Present & Future* |
| October 1-4, 2002 | IMN Fabozzi ABS East 2002 Conference at the Atlantis Hotel & Resort in Nassau, Bahamas. (www.imn.org) | Panel Moderator, *Entertainment and Intellectual Property Royalty Securitizations* |

| | | |
|---|---|---|
| September 23-25, 2002 | Licensing Executives Society Conference<br>Chicago, IL<br>(www.usa-canada.les.org) | Keynote Speaker |
| September 19-20, 2002 | Midwest IP Institute Conference, The Hyatt<br>Regency Hotel, Minneapolis, MN.<br>(www.minncle.org) | Keynote Speaker |
| June 24-26m 2002 | Perfect Pitch - The Business of Music, IRR<br>Conference, Los Angeles, CA | - |
| April 22, 2002 | CIC Canadian Institute ABS<br>Superconference, Hilton Head, SC | Keynote Speaker |
| February 6-9, 2002 | ABS Conference, Scottsdale, AZ | Moderator,<br>*Entertainment and<br>Intellectual Property<br>Royalty Securitizations* |
| Jesse Jackson Panel -<br>January 16, 2002 - 4:30 to<br>6:00 -New York Hilton<br>Hotel & Towers - 5th<br>Annual Wall Street<br>Project Conference "A<br>Time to Heal, A Time to<br>Rebuild." | 1335 Avenue of the Americas (53rd Street) | "A Time to Heal, A Time<br>to Rebuild"<br><br>"Hip Hop Goes to Wall<br>Street" |
| Billboard Music and<br>Money Symposium –<br>November 13, 2001 | New York, NY, St. Regis Hotel | Speaker,<br>*The Future of Asset<br>Securitization* |
| October 2-5, 2001 | ABS East 2001, Nassau Bahamas | - |
| July 16-17, 2001 | The Japanese Securitisation Market | - |
| June 13-17, 2001 | Licensing Executives Society Conference<br>Kananaskis, Alberta, Canada | The Future of Intellectual<br>Property and Licensing |
| February 26, 2001 | IAM Congress<br>Glasgow, Scotland | - |
| February 10, 2001 | ABS West/Fabozzi conference<br>Phoeniz, AZ | - |
| January 30, 2001 | Pollstar/CIC conference<br>Las Vegas, LV | - |
| January 17, 2001 (6:30-<br>9:00pm) | The Learning Annex<br>New York, NY | Special Guest Speaker<br>*How to Know a Good<br>Investment* |
| October 5, 2000 (9:15pm) | ABS East 2000<br>Paradise Islands, Bahamas | Moderator for session on<br>*Entertainment, Music &<br>Intellectual Property<br>Securitization* |
| June 5, 2000 | Canadian Securitization Conference<br>Vancouver, British Columbia | - |

| | | |
|---|---|---|
| **April 12, 2000** | **New York Bar Association**<br>**Entertainment Law Committee**<br>**New York, NY** | - |
| **February 15, 2000** | **Asset Securitization 2000 Symposium**<br>**Strategic Research Institute**<br>**Scottsdale, AZ** | - |
| **January 20th, 1999** | **Ernest & Young Conference**<br>**Amsterdam, Netherlands** | - |
| **December 8th, 1999** | **NYU Stern Business Club**<br>**New York, NY** | - |
| **October 15-17, 1999** | **Music Biz 2005**<br>**San Francisco, CA** | - |
| **October 15-16, 1999** | **Forum on the Entertainment & Sports Industries**<br>**American Bar Association**<br>**Swissotel Atlanta**<br>**Atlanta, GA** | **Plenary Sessions Entertainment and Sports Law at the Millennium --- Industry Experts Discuss the Past, Present and Future** |
| **October 3-6, 1999** | **Fifth Annual Investors' and Issuers' Summit on Asset Securitization**<br>**Marriott Castle Harbour Resort**<br>**Bermuda** | **Session Moderator:** *Entertainment Royalty & Intellectual Property Securitization: Evaluating Market Size, Potential Issuance & Investor Demand* |
| **June 16-17, 1999** | **3rd Annual Investors' & Issuers' Summit on Global Asset Securitization**<br>**Montreaux, Switzerland** | - |
| **May 19-20, 1999** | **Intellectual Asset Management: Identifying, Creating, Protecting, and Exploiting Your Intellectual Assets**<br>**PriceWaterHouseCoopers Learning Partnership**<br>**The Aspen Institute**<br>**Queenstown, MD** | *Structured Finance Through Intellectual Asset Leverage* |
| **May 3-5, 1999** | **Emerging & Niche ADB Conference,**<br>**Entertainment Securitization Workshop**<br>**New York City, NY** | **Keynote Address:** *The Future of Entertainment Securitization* |
| **April 26, 1999** | **Risk Conferences**<br>**LeMeridien Hotel, London, UK** | **Keynote address:** *Assessing the Optimal Structuring of Exotic Securitizations: Applications in the Eurozone* |

| Date | Event | Presentation |
|---|---|---|
| March 19, 1999 | South by Southwest Music and Media Conference (SXSW Music '99) Austen, TX | *Bowie Bonds and Beyond* |
| March 4, 1999 | Canadian Music Week Executive Conference Toronto, Canada | **Opening address Keynote address --- "The Wizard of Wall Street and his famous 'Bowie Bonds' brings his unique financial vision to CMW '99"** |
| February 23, 1999 | California Copyright Conference, Los Angeles, CA | - |
| February 19, 1999 | The Committee on Sports & Entertainment Harvard University, Boston, MA | **Keynote address** |
| February 5, 1999 | 5th Annual Investors' & Issuers' Summit on Asset Securitization, Phoenix, AZ | *Entertainment Royalty & Intellectual Property Securitization: EvaluatingMarket Size, Potential Issuance, & Investor Demand* |
| January 26, 1999 | MIDEM, Cannes, France | - |
| January 21, 1999 | Entertainment/Sports Finance Securitization Forum 1999 New York City, NY | **Keynote Address:** *Focus on Securitization in the Music Industry* |
| January 20, 1999 | Media Entertainment Roundtable New York City, NY | **Guest Speaker** |
| November 9, 1998 | Breakthrough Strategies for Success Asset Securitization Transactions Toronto, Canada | **Keynote speaker** |
| November 2, 1998 | Music and Motion Picture Revenues & Royalties Securitization London, UK | **Luncheon Presentation** |
| October 29, 1998 | Securitization of Intellectual Property Royalties and Revenues, New York City, NY | **Introductory Address ---** *The Market for Intellectual Property Securitizations: Where We've Been, Where We are and Where We're Going* |
| October 19, 1998 | Music and Motion Picture Revenues & Royalties Securitization: The Sequel Beverly Hills, CA | **Luncheon presentation** |
| September 24, 1998 | Securitization on Entertainment Assets Los Angeles, CA | *Gauging Today's Market Place - Understanding the Goals of the Investors and the Lenders* |
| September 23, 1998 | Intellectual Property Forums San Francisco, CA | *Securitization of Intellectual Property* |

| | | |
|---|---|---|
| September 14, 1998 | In the City, Manchester 1998 Annual Music Convention, Manchester, UK | Master Class: *How to Turn Your Songs into a plc* |
| June 29, 1998 | Securitization of Emerging Asset Classes New York City, NY | *What makes an Asset Class suitable for Securitization?* |
| June 10, 1998 | Penn Breakfast Series Penn Club, New York City, NY | Breakfast Presentation on *Unfinanciable Assets* |
| May 7, 1998 | Music & Motion Picture Reveneues & Royalties Securitization: Opportunities in the Emerging ABS Market for Intellectual Property New York City, NY | Luncheon Presentation |
| April 27, 1998 | Music Law and Business Conference, New Orleans, LA | *Music Copyright Securitization : Emerging Financing Tools in the Music Industry* |
| March 23-25, 1998 | Securitization '98 Hilton Head, SC | *Examining the State of Affairs in the Asset backed Market* |
| February 12 - 13, 1998 | Nuts and Bolts of Financial Products (Practising Law Institute) PLI Conference Center  New York City | *Evolving World of Capital Markets and Investment Management Products* |
| February 8 - 11, 1998 | The Fifth Annual Asset Securitization Symposium (Strategic Research Institute) Scottsdale, AZ | *Forum on Developments in the Private and Public Markets* |
| January 20 - 21, 1998 | Private Placement: Industry Conference (Institute for International Research) New York City, NY | *Dramatic Trends and Issues Affecting Today's Private Placement Market* |
| July 20 - 22, 1997 | Spotlight '97 (InfoWorld Conference & Media Group) Los Angeles, CA | *Bowie Bonds* |
| July 22 - 23, 1997 | Private ABS '97 (Institute for International Research) New York City, NY | *Strategically Assessing The Explosive Private ABS Market and Evaluating What's Behind the Growth* |
| May 14 - 15, 1997 | The Inaugural Investors' and Issuers' Summit on: Emerging Classes in Asset-Backed Securitization (Frank J. Fabozzi / Information Management Network) New York City, NY | *Ch-Ch-Ch-Changes: Strange Fascination and Other Ways to Securitize Entertainers' Royalties* |

| | | |
|---|---|---|
| April 29 - 30, 1997 | Exotic Asset-Backed Securitization: Managing & Securitizing Exotic & Emerging Market Asset Classes (Asset-Backed Securities Week, Asset-Backed Alert) New York City, NY | *Securitizing Entertainment Royalties* |
| February 6 - 7, 1997 | Nuts and Bolts of Financial Products: Understanding the Evolving World of Capital Market and Investment Products Management (Practicing Law Institute) New York City, NY | *Securitized Products* |
| December 12 - 13, 1996 | Profiting from Sub-Prime Auto Lending (Executive Enterprises) New Orleans, LA | *Case Study: The Life of Sub-Prime Auto Securitization* |
| October 31, 1996 | Biotech Into the Next Century: Financing Strategies for Life Sciences Companies (Morrison & Foerster, KPMG Peat Marwick, Yale University Office of Cooperative Research) New York City, NY | *Creative Financing for Life Science Companies* |
| October 19 - 22, 1996 | 80th Annual Meeting of the American Financial Services Association San Francisco, CA | - |
| September 29 - October 2, 1996 | Investors' & Issuers' Summit On: Asset Securitization - Examining Opportunities in the Public & Private Markets (Frank J. Fabozzi / Information Management Network, Asset Backed Securities Week, Asset Backed Alert) Bermuda | - |
| October 12 - 13, 1995 | The Third Annual Forum on Commercial Mortgage Securitization: The State of the Industry Forum on Market Evolution: Profiting From New Developments and Facing the Competition (Strategic Research Institute) New York City, NY | *Securitization of Non-Performing Real Estate Assets* |
| October 8 - 10, 1995 | Issuer & Investor Workshop For Asset-Backed Securities (Strategic Research Institute) Orlando, FL | *Evaluating the Adequacy of Disclosure and Investor Reporting* |

# Exhibit B

LAW OFFICES
INDIK & McNAMARA

2230 LAND TITLE BUILDING
100 SOUTH BROAD STREET
PHILADELPHIA, PA 19110

. Thomas S. McNamara*
Martin K. Indik
Carl Dallarda*

(215) 567-7125
FAX: (215) 563-8330

New Jersey Office:
31 Jefferson Plaza
Princeton, New Jersey 08540
Phone: (609) 252-9700
Fax: (609) 921-7543

* Member of Bar in
both Pennsylvania and
New Jersey

March 21, 2000

Mr. Gene McFadden
7219 Bryan Street
Philadelphia, PA 19119

Mr. John Whitehead
7815 Deerrun Road
Laverock, PA 19038

Re:  Agreement for Legal Representation in Connection With
Potential Claims Against Assorted Music, Inc. t/a Philadelphia
International Records and Mighty Three Music _____

Dear Gene and John:

You have asked me to represent you, individually and jointly, in connection with the
investigation, assertion, negotiation and, if necessary, the litigation, of potential claims that you
believe you have against Assorted Music, Inc. t/a Philadelphia International Records ("PIR"),
arising out of your recording agreements and production agreement with PIR, and against
Kenneth Gamble, Leon Huff and Thom Bell t/a Mighty Three Music (collectively "Mighty
Three"), arising out of your songwriters, producers and publishing agreements with Mighty
Three.

The purpose of this letter is to set forth in writing the terms and conditions on which my
law firm, Indik & McNamara, and I (the "Law Firm") would be pleased to represent you in these
matters.

Contingent Legal Fee

Our fee for legal services in this matter will be entirely contingent on the outcome of the
case, and will be based on a percentage of the amount recovered, whether by way of settlement or
judgment. The Law Firm will be entitled to receive a contingent legal fee in the amount of forty
percent (40%) of the aggregate amount of any monies, and of the fair market value of any other
consideration, recovered by you in connection with your claims, after deduction of reimbursable
costs and expenses. If you do not recover any monies, then we will not be entitled to any fee.

Mr. Gene McFadden
Mr. John Whitehead
March 21, 2000
Page 2 of 3

### Costs and Expenses

In addition to paying the Law Firm a contingent legal fee for our legal services, you will also be responsible for the contingent reimbursement of any and all costs and expenses incurred by the Law Firm in connection with our representation of you. In this case, such costs may include, but are not limited to: court filing fees; subpoena and process service fees; witness fees; court reporter fees; costs of transcripts of depositions, hearings and trial; document retrieval and certification fees; photocopy charges; overnight mail, messenger and Federal Express charges; long-distance telephone charges; Lexis and Westlaw charges; paralegal fees; travel expenses (including the costs of transportation, food and lodging in connection with any out-of-town depositions) and expert witness fees (such as the fees of the accountants we intend to retain to perform a royalty audit). In addition, the fees and costs of any out-of-state attorneys we are required to retain to act as local counsel in connection with the issuance of any out-of-state subpoenas which may be required, and any related out-of-state depositions and document productions, will be treated as out-of-pocket costs and expenses which you will be responsible for paying, separate and apart from the legal fees payable to the Law Firm.

As we have discussed, while it is difficult to accurately estimate the total costs and expenses that will be required to pursue this matter to completion, the amount of such costs and expenses will be substantial, particularly if the case proceeds to trial. The biggest initial expense will be the cost of retaining an accounting firm to review and audit the relevant books and records.

As we have discussed, the Law Firm will initially advance or assume initial responsibility for the payment of any and all costs and expenses that the Law Firm and I, in our sole discretion, determine to be necessary and appropriate for the investigation and litigation of your claims. If we recover any monies or other consideration on your behalf, you will be responsible for the reimbursement of such costs and expenses out of the monies and other consideration recovered. If we are unable to recover any monies or other consideration on your behalf, then you will have no obligation to pay or reimburse us for the costs and expenses.

### Representation in Other Matters

You have also requested me to represent you in connection with the exploration, discussion and negotiation of a potential securitization arrangement with David Pullman of The Pullman Group, or others. My fee for representing you in connection with any possible securitization or sale of your songwriter's royalty interests will be separate and distinct from the fee outlined in this letter for legal services relating to your claims against PIR and M3M, and will be the subject of a separate retainer and fee agreement.

Mr. Gene McFadden
Mr. John Whitehead
March 21, 2000
Page 3 of 3

If the terms and conditions outlined in this letter are acceptable to you, and you want to retain us to represent you on the basis outlined above, kindly indicate your approval and acceptance by signing the enclosed duplicate copy of this letter on the lines indicated below,, and returning the signed duplicate letter to me, as soon as possible.  Please understand that our representation of you in this case will not commence unless and until we receive a signed copy of this letter from each of you.

If you have any questions concerning this letter, please feel free to call me.

We look forward to working with you.

Sincerely,

Thomas S. McNamara

THIS WILL ACKNOWLEDGE (1) THAT WE HAVE READ THE FOREGOING LETTER FROM THOMAS S. McNAMARA, ESQUIRE, CONSISTING OF 3 PAGES, DATED MARCH 21, 2000, (2) THAT WE AGREE, INTENDING TO BE LEGALLY BOUND, TO RETAIN MR. McNAMARA AND THE LAW FIRM, AND DESIGNATE AND APPOINT HIM TO ACT AS OUR ATTORNEY, ON THE TERMS AND CONDITIONS SET FORTH IN THE LETTER, AND (3) THAT WE HAVE EACH RECEIVED AN ORIGINAL AND A DUPLICATE COPY OF THE LETTER FOR OUR RECORDS.

GENE McFADDEN, Individually
and t/a McFADDEN & WHITEHEAD

JOHN WHITEHEAD, Individually
and t/a McFADDEN & WHITEHEAD

Dated: 3 - 21 - 2000

Dated:_____

C 003921

Mr. Gene McFadden          Mr. John Whitehead
7219 Bryan Street          7815 Deerrun Road
Philadelphia, PA 19119     Laverock, PA 19038

                           March 21, 2000

Mr. Kenneth Gamble
Mr. Leon Huff
Mighty Three Music
Gamble-Huff Productions
Assorted Music, Inc. t/a
Philadelphia International Records
309 South Broad Street
Philadelphia, PA

        Re:    Notice of Appointment and Designation of Attorney
               In Connection With Contractual Relations Between and Among
               Gene McFadden, John Whitehead, Jointly and Severally, and
               Mighty Three Music, Gamble-Huff Productions, and Assorted Music, Inc.
               t/a Philadelphia International Records

Gentlemen:

        Please be advised that we have retained, and that we hereby designate and appoint,
Thomas S. McNamara, Esquire, of the law firm of Indik & McNamara, to act as our attorney and
to represent our interests, individually and jointly, in connection with our various contracts, as
artists, producers and songwriters, with Mighty Three Music, Gamble-Huff Productions and
Assorted Music, Inc. t/a Philadelphia International Records.

        We hereby authorize and request you to direct any and all further communications
concerning our business and contractual relations to Mr. McNamara, and further authorize and
request you to provide Mr. McNamara, and any Certified Public Accountant designated by him on
our behalf, with any and all information, and with access to all books and records pertaining to
royalties payable to us. We enclose a formal Special Power of Attorney in this regard.

                                                Sincerely,

GENE McFADDEN, Individually               JOHN WHITEHEAD, Individually
and t/a McFADDEN & WHITEHEAD              and t/a McFADDEN & WHITEHEAD

C 003922

## LIMITED POWER OF ATTORNEY

COMMONWEALTH OF PENNSYLVANIA     :
                                 :     ss:
COUNTY OF PHILADELPHIA           :

We, Gene McFadden of Philadelphia County, Pennsylvania, and John Whitehead, of Montgomery County, Pennsylvania, jointly and severally, do hereby constitute and appoint Thomas S. McNamara, Esquire, of Philadelphia county, Pennsylvania, as our true and lawful attorney-in-fact (hereinafter referred to as our "agent"), with full power of substitution, for us and in our names, jointly and severally, to do any and all of the following:

To designate and appoint, in our names and on our behalf, one or more Certified Public Accounts to have access to and inspect any and all books and records of Mighty Three Music, Gamble-Huff Productions and Assorted Music, Inc. t/a Philadelphia International Records, relating to any and all recording agreements, productions agreements, songwriter's agreements and similar agreements between us and any of them, and to convey and make, in our names and on our behalf, any and all demands, notifications and requests of Mighty Three Music, Gamble-Huff Productions and Assorted Music, Inc. t/a Philadelphia International Records for access to such books and records.

This power shall not be affected by either of our subsequent disability or incapacity. All acts done by our agent pursuant to this limited power of attorney during any period of disability or incapacity of either or both of us shall have the same effect and inure to the benefit of and bind us and our respective heirs, legal representatives and assigns as if he or we were competent and not disabled.

In witness whereof, we have signed this limited power of attorney this 21st day of March, 2000.

Witness:

_____                    _____
                                            GENE McFADDEN, Individually
                                            and t/a McFADDEN & WHITEHEAD

_____                    _____
                                            JOHN WHITEHEAD, Individually
                                            and t/a McFADDEN & WHITEHEAD

-Page 1 of 2-

C 003926

# Exhibit C

# P U L L M A N

**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*www.pullmanbonds.com*
*melaniejones@pullmanbonds.com*

## Pullman Structured Asset Sales Group

### FACSIMILE COVER SHEET

**Date:** April 25, 2002

**To:** Gene McFadden
John Whitehead
Phone:
**Fax:** (215) 242-9158

**From:** Melanie Jones
Phone: (212) 750-0190
**Fax:** (212) 750-0464

**Pages:** Including Cover Sheet

**Subject:**

**CONFIDENTIALITY NOTICE**

The documents accompanying this telecopy transmission contain information which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited, and that the documents should be returned to this office immediately. In this regard, if you have received this telecopy in error, please notify us by telephone immediately, at the following number: 212-750-0210.

*(The following content appears upside-down / inverted at the bottom of the page, representing a fax transmission journal:)*

```
*********** -4690052121            -  ***** -        NAMLLUP- ***********************************************

                -                      NAMLLUP-

                -                .M9 ,E0:E0 200S/S20        8519242S121              ₹       KO        T00
                                                                                                      
         .                 NOITARUD      SEGAP      .ON .LET/EMAN NOITATS       .ON REBA       MOC     .ON NTS

                                                                                          941 =.ON ELIF

    80:S1 S2-RPA=DNE         40:S1 S2-RPA=TRATS                  NOISSIMSNART YROMEM = EDOM

********** -.MMOC. ,LANRUOL .MMOC- ********************** DATE APR-25-2002 ***** TIME 15:08 *** P.01
```

# P U L L M A N

**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*www.pullmanbonds.com*
*melaniejones@pullmanbonds.com*

### Pullman Structured Asset Sales Group

## FACSIMILE COVER SHEET

**Date:**   **April 25, 2002**

**To:**   **Gene McFadden**
**John Whitehead**
Phone:
**Fax:   (215) 242-9158**

**From:**   **Melanie Jones**
**Phone: (212) 750-0190**
**Fax:   (212) 750-0464**

**Pages:**   **Including Cover Sheet**

**Subject:**

CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain information which is confidential and/or legally privileged.  The information is intended only for the use
of the individual or entity named on this transmission sheet.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the
taking of any action in reliance on the contents of this telecopied information is strictly prohibited, and that the documents should be returned to this office immediately.
In this regard, if you have received this telecopy in error, please notify us by telephone immediately, at the following number:  212-750-0210.



**THE PULLMAN GROUP,® LLC**
*1370 Avenue of the Americas*
*New York, NY 10019*
*212.750.0210 tel.*
*212.750.0464 fax*
*info@pullmanbonds.com*
*www.pullmanbonds.com*
Securitizing the Future™

*STRUCTURED ASSET SALES GROUP*

April 25, 2002

Gene McFadden
John Whitehead
McFadden Ent., Inc.
7219 N. Bryon St.
Philadelphia, PA 19119

The Pullman Group, ® LLC ("Pullman") is interested in purchasing (the "Proposed Purchase") the musical compositions (the "Works") written in whole or in part by Gene McFadden and/or John Whitehead and/or McFadden & Whitehead ("you" or "Owner").

In exchange for good and valuable consideration, receipt of which is hereby acknowledged, including without limitation the costs incurred by Pullman as part of its "due diligence" review including but not limited to attorneys' fees and copyright search fees, Pullman and you hereby agree as follows:

1. The Rights subject to the Proposed Purchase shall include Owner's entire right, title and interest throughout the universe in perpetuity now or hereafter owned and/or controlled by Owner, in and to the Works and any revenue derived in connection therewith, including without limitation Owner's right to receive the writer's share of the music publishing royalties and artist record royalties from any and all sources pursuant to Owner's agreement with any and all record and publishing companies, including but not limited to Warner-Chappell Music; all performing rights societies, including but not limited to, BMI, and/or any other party or successors in interest thereto, and Owner's right any reversionary rights in and to said master recordings and audit source rights.

2. During the period commencing on the date hereof and continuing for 180 days (the "Exclusive Period") you agree to refrain from entering into discussions with any third party regarding the purchase of all or a part of the Works or any rights therein. In the event that during the Exclusive Period, you and Pullman agree upon the terms of the Proposed Purchase, the Exclusive Period shall be extended until formal purchase agreements are executed by the parties hereto. During this Exclusive Period, shall be entitled to any and all monies paid from the date of this agreement going forward

from any source for subject musical compositions for any period, including back year audit periods. After execution of this agreement, Owner will turn over and/or credit to the purchase price all such monies to Pullman and will supply Pullman with all royalty and accounting statements

3. Owner agrees to provide all due diligence material Pullman deems necessary to make the purchase, including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc. Owner will provide Pullman with signed releases so that Pullman may receive the aforementioned diligence material directly from such sources if he so chooses.

4. Owner shall assign to Pullman at closing all past, present and future claims, including, without limitation, those for infringement or underpayment or non-payment of royalties with respect to any of the foregoing and the right of substitution in connection therewith.

5. Pullman shall be entitled to all of the audit rights, as well as all claims for copyright infringements. An opinion of Owner's Counsel should be made available, reasonably satisfactory in form to Pullman, that Owner's representations and warranties are accurate.

6. Pullman proposes to pay the following purchase price (the "Proposed Purchase Price") for the acquisition of the works:

   a. Subject to Pullman's receipt of all necessary information and documents and our completion of due diligence, an amount equal to the lesser of the below sub-paragraphs, at Pullman's sole discretion, to be paid in six equal installments once a year from the date of closing for a period of 5 years, with the initial payment to be made closing:

       (i)    Six (6) times the projected writer's share of royalties to be derived by Owner for the calendar year beginning January 1, 2001; or
       (ii)   Six (6) times the average writer's share of annual royalties derived by Owner over the five (5) year period beginning January 1, 1997; or
       (iii)  Six (6) times the average annual writer's share of royalties derived by Owner over the three (3) year period beginning January 1, 1997; or
       (iv)   Six (6) times the writer's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the closing of the sale transaction; or

       (v)     Six (6) times the writer's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

       (vi)    Six (6) times the writer's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

"Projected" shall be defined as two times the last statement Owner received. The Purchase Price, as determined above, includes payment in full for the right to receive all writers and artist record royalties and all audit rights in connection with the Works and all rights purchased.

7.  First Right of Refusal: If for any reason after due diligence is complete Pullman elects not to purchase the Works, Owner shall give Pullman written notice of any offer (a Third Party Offer) to purchase the assets received by Owner and/or any entity created by Owner. Pullman shall have 180 (One Hundred Eighty) days to elect to exercise its first right of refusal. Notice of such election shall be given in writing by Pullman and upon the giving of timely notice, Pullman shall be entitled to purchase the assets on the same terms and conditions as contained in the Third Party Offer. If Pullman does not elect to exercise its right of first refusal and for any reason the assets are not sold pursuant to the Third Party Offer, Pullman's rights of first refusal shall apply to any subsequent offers received by Owner.

8.  Pullman may elect to use a special purpose vehicle ("SPV") such as an LLC to effectuate the purchase of the Works. If Pullman so elects, you agree to fully cooperate in the formation of the SPV, the assignment to the SPV of all rights and Works being purchased, and the execution of all necessary documents, including irrevocable letters of direction to the applicable performing rights societies, to enable the SPV to collect all income attributable to the exploitation of the Works or derived from any of the rights purchased hereunder.

9.  If as a result of its due diligence Pullman elects not to proceed with the purchase of the Works, Pullman shall give written notice of its election and upon the giving of such notice, Pullman shall have no further obligations hereunder.

10. In the event that you fail to proceed with the sale of the Works, Pullman may, at its sole discretion, elect as its remedy to receive either a break-up fee in an amount equal to ten percent (10%) of the Proposed Purchase Price or specific performance of this agreement, plus any and all expenses, including reasonable attorneys fees incurred, in enforcing its right to either remedy.

11. The parties agree that any controversy or claim arising out of or relating to this agreement, its breach or any of the transactions or services contemplated herein shall be settled by arbitration before a single arbitrator (or a panel of three arbitrators if the

amount at issue exceeds $250,000) in New York County, State of New York in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any Court of competent jurisdiction. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such arbitration proceeding. Any arbitration proceedings or other proceedings or other disputes hereunder shall be kept confidential by the parties and not be publicized in any manner whatsoever.

12. Prior to entering into this agreement Owner has either had this agreement reviewed by legal counsel of Owners' choice or, despite the opportunity to do so, has chosen not to have legal counsel review this agreement.

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

_____  Date          _____  Date
John Whitehead                          David Pullman,
                                        Founder, Chairman and CEO

_____  Date
Gene McFadden

_____  Date
McFadden & Whitehead
Authorized Signature

# Exhibit D

# PULLMAN

## THE PULLMAN GROUP,® LLC

1370 Avenue of the Americas
New York, NY 10019
212 750 0210 tel
212 750 0169 fax
info@pullmanbonds.com
www.pullmanbonds.com
Securitizing the Future™

*STRUCTURED ASSET SALES GROUP*

May 2, 2002

Gene McFadden
John Whitehead
McFadden Ent., Inc.
7219 N. Bryon St.
Philadelphia, PA 19119

The Pullman Group, ® LLC ("Pullman") is interested in purchasing (the "Proposed Purchase") the musical compositions (the "Works") written in whole or in part by Gene McFadden and/or John Whitehead and/or McFadden & Whitehead ("you" or "Owner").

In exchange for good and valuable consideration, receipt of which is hereby acknowledged, including without limitation the costs incurred by Pullman as part of its "due diligence" review including but not limited to attorneys' fees and copyright search fees, Pullman and you hereby agree as follows:

1   The Rights subject to the Proposed Purchase shall include Owner's entire right, title and interest throughout the universe in perpetuity now or hereafter owned and/or controlled by Owner, in and to the Works and any revenue derived in connection therewith, including without limitation Owner's right to receive the writer's share of the music publishing royalties and artist record royalties from any and all sources pursuant to Owner's agreement with any and all record and publishing companies, including but not limited to Warner-Chappell Music; all performing rights societies, including but not limited to, BMI, and/or any other party or successors in interest thereto, all Owner's rights to use of Owner's likeness or voice for songs or voice in commercial advertisements exploiting any portion of any or all of the Works in any medium now or hereinafter invented, and all artists approval rights pertaining thereto, and Owner's right to renewal rights in the copyrights to the Works and any reversionary rights in and to said master recordings, including, upon acquisition of any interest in the Works by renewal or reversion, all rights of Owner, including both publisher's share and writer's share to income derived from uses of the Works for any and all purposes (such as synchronization licenses and "best of" albums or other sound recordings) and all artists

approval rights pertaining thereto, and audit source rights. Notwithstanding the foregoing, the Rights shall not include (a) any payments due with regard to the writer's share of publishing income for the period prior to the acquisition by Warner-Chappell Music of its ownership interest in the Works; or (b) any payments due for artist record royalties for the period prior to the closing of the Proposed Purchase.

2. During the period commencing on the date hereof and continuing for 180 days (the "Exclusive Period") you agree to refrain from entering into discussions with any third party regarding the purchase of all or a part of the Works or any rights therein. In the event that during the Exclusive Period, you and Pullman agree upon the terms of the Proposed Purchase, the Exclusive Period shall be extended until formal purchase agreements are executed by the parties hereto. During this Exclusive Period, shall be entitled to any and all monies paid from the date of this agreement going forward from any source for subject musical compositions for any period, including back year audit periods. After execution of this agreement, Owner will turn over and/or credit to the purchase price all such monies to Pullman and will supply Pullman with all royalty and accounting statements

3. Owner agrees to provide all due diligence material Pullman deems necessary to make the purchase, including but not limited to: royalty statements, publishing and/or artist contracts, performance society contracts and statements and songwriter agreements and any documents related to ownership or chain of title, etc. Owner will provide Pullman with signed releases so that Pullman may receive the aforementioned diligence material directly from such sources if he so chooses. Owner agrees to allow Pullman to contact, correspond and file anything it deems necessary at its sole discretion with the United States Copyright and Trademark Offices.

4. Owner shall assign to Pullman at closing all past, present and future claims, including, without limitation, those for infringement or underpayment or non-payment of royalties with respect to any of the foregoing and the right of substitution in connection therewith.

5. Pullman shall be entitled to all of the audit rights, as well as all claims for copyright infringements. An opinion of Owner's Counsel should be made available, reasonably satisfactory in form to Pullman, that Owner's representations and warranties are accurate.

6. Pullman proposes to pay the following purchase price (the "Proposed Purchase Price") for the acquisition of the works:

   a. Subject to Pullman's receipt of all necessary information and documents and our completion of due diligence, an amount equal to

the lesser of the below sub-paragraphs, at Pullman's sole discretion, to be paid in six equal installments once a year from the date of closing for a period of 6 years, with the initial payment to be made at closing:

(i) Six (6) times the projected writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2002; or

(ii) Six (6) times the writer's share of music publishing royalties to be derived by Owner for the calendar year beginning January 1, 2001; or

(iii) Six (6) times the average writer's share of annual royalties derived by Owner over the five (5) year period beginning January 1, 1997; or

(iv) Six (6) times the average annual writer's share of royalties derived by Owner over the three (3) year period beginning January 1, 1997; or

(v) Six (6) times the writer's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the closing of the sale transaction; or

(vi) Six (6) times the writer's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

(vii) Six (6) times the writer's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

b. In addition to payment of the above determined Purchase Price, if, and when, Pullman acquires the copyright to a composition contained in the Works as a result of the exercise of Owner's renewal right in such composition, Pullman shall pay owner an amount equal to the lesser of the below sub-paragraphs:

(viii) Eight (8) times the projected net publisher's share of music publishing royalties to be derived by Owner for the then current calendar year; or

(ix) Eight (8) times the net publisher's share of music publishing royalties to be derived by Owner for the previous calendar year; or

(x) Eight (8) times the average net publisher's share of annual royalties derived by Owner over the last five (5) year period; or

(xi)   Eight (8) times the average annual net publisher's share of royalties derived by Owner over the last three (3) year period; or

(xii)   Eight (8) times the net publisher's share of royalties derived by Owner over the two (2) semi-annual accounting periods immediately preceding the renewal year; or

(xiii)   Eight (8) times the net publisher's share of royalties derived by Owner over the lower of the last two royalty semi-annual periods multiplied by two;

(xiv)   Eight (8) times the net publisher's share derived by the Owner for the year based on two (2) most recently received semi-annual payments and accompanying statements and the lesser of:

Net publisher's share is defined as the gross publisher's share of income minus all payments to writers and co-publishers and all costs of collection, but excluding "one time" items of income such as claims for infringement and audit income attributable to prior periods. The payments due pursuant to this sub-paragraph shall be made in six equal annual installments with the first payment due upon acquisition by Pullman of the copyright in the composition.

"Projected" shall be defined as two times the last statement Owner received. The Purchase Price, as determined above, includes payment in full for the right to receive all writers and artist record royalties (except as limited by the provisions of paragraph 1 above) and all audit rights in connection with the Works and all rights purchased.

7.  First Right of Refusal:  If for any reason after due diligence is complete Pullman elects not to purchase the Works, Owner shall give Pullman written notice of any offer (a Third Party Offer) to purchase the assets received by Owner and/or any entity created by Owner.  Pullman shall have 180 (One Hundred Eighty) days to elect to exercise its first right of refusal.  Notice of such election shall be given in writing by Pullman and upon the giving of timely notice, Pullman shall be entitled to purchase the assets on the same terms and conditions as contained in the Third Party Offer.  If Pullman does not elect to exercise its right of first refusal and for any reason the assets are not sold pursuant to the Third Party Offer, Pullman's rights of first refusal shall apply to any subsequent offers received by Owner.

8.  Pullman may elect to use a special purpose vehicle ("SPV") such as an LLC to effectuate the purchase of the Works.  If Pullman so elects, you agree to fully cooperate in the formation of the SPV, the assignment to the SPV of all rights and Works being purchased, and the execution of all necessary documents,

including irrevocable letters of direction to the applicable performing rights societies, to enable the SPV to collect all income attributable to the exploitation of the Works or derived from any of the rights purchased hereunder.

9. If as a result of its due diligence Pullman elects not to proceed with the purchase of the Works, Pullman shall give written notice of its election and upon the giving of such notice, Pullman shall have no further obligations hereunder.

10. In the event that you fail to proceed with the sale of the Works, Pullman may, at its sole discretion, elect as its remedy to receive either a break-up fee in an amount equal to ten percent (10%) of the Proposed Purchase Price or specific performance of this agreement, plus any and all expenses, including reasonable attorneys fees incurred, in enforcing its right to either remedy.

11. The parties agree that any controversy or claim arising out of or relating to this agreement, its breach or any of the transactions or services contemplated herein shall be settled by arbitration before a single arbitrator (or a panel of three arbitrators if the amount at issue exceeds $250,000) in New York County, State of New York in accordance with the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator(s) may be entered in any Court of competent jurisdiction. The losing party shall reimburse the prevailing party for its reasonable attorney's fees and costs incurred with respect to such arbitration proceeding. Any arbitration proceedings or other proceedings or other disputes hereunder shall be kept confidential by the parties and not be publicized in any manner whatsoever.

12. Prior to entering into this agreement Owner has either had this agreement reviewed by legal counsel of Owners' choice or, despite the opportunity to do so, has chosen not to have legal counsel review this agreement.

All information contained in this letter is confidential and shall not be shared with any third party.

ACCEPTED AND AGREED BY:

John Whitehead                    Date

David Pullman,                    Date
Founder, Chairman and CEO

Gene McFadden                    Date

McFadden & Whitehead             Date
Authorized Signature

All information contained in this letter is confidential and shall not be shared with any third party

ACCEPTED AND AGREED BY

_____        _____        _____        _____
Jolin Whitehead                Date            David Pullman,                  Date
                                               Founder, Chairman and CEO

_____   5-10.02
Gene McFadden             Date

_____        _____
McFadden & Whitehead           Date
Authorized Signature

OCT 29, 2007 20:37                          2152621189                              page 6

All information contained in this letter is confidential and shall not be shared with
any third party.

ACCEPTED AND AGREED BY:

_____          _____  5/2/12
John Whitehead              Date     David Pullman,              Date
                                     Founder, Chairman and CEO

_____          _____
Gene McFadden               Date

_____          _____
McFadden & Whitehead        Date
Authorized Signature

# Exhibit E

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

NO. 1418 AP of 2004

ESTATE OF JOHN CAVADUS WHITEHEAD, SR.

**PETITION FOR DECLARATORY JUDGMENT**

Petitioner, Elnor Whitehead, Executrix of the Estate of John Cavadus Whitehead, Sr.,
respectfully submits this Petition for Declaratory Judgment to resolve a dispute which has arisen
related to a purported contract between Pullman Group, LLC and John Cavadus Whitehead, Sr.
("Decedent"), and in support thereof avers the following:

**PARTIES/JURISDICTION**

1.      Petitioner, Elnor Whitehead ("Executrix") is the Executrix of Decedent's Estate,
Letters Testamentary having been granted to her on June 25, 2004.

2.      Respondent, Pullman Group, LLC ("Pullman"), is a limited liability company
with offices located at 1370 Avenue of the Americas, New York, NY 10019.

3.      This action is brought in accordance with the Pennsylvania Declaratory
Judgments Act, 42 PA.C.S. 7531, et seq.

4.      This Court has jurisdiction over this dispute in accordance with 20 PA.C.S. §§
711 and 712, because this matter presents a dispute related to property owned by Decedent's
Estate, and the resolution of this dispute will allow for the orderly administration of the Estate to
occur.

5.      Venue is proper in this Court because the purported transaction at issue in this
matter arose in Philadelphia, Pennsylvania.

**BACKGROUND**

6.      Decedent and his partner, Gene McFadden (now deceased as well and whose
estate is filing simultaneously its own Petition for Declaratory Judgment arising out of the same

facts and circumstances as are set forth in this Petition) ("McFadden"), were childhood friends from Philadelphia who collaborated as songwriters, artists and producers.

7.    Decedent and McFadden collaborated on hundreds of musical compositions (the "Compositions").

8.    In the music Industry, a songwriter must engage a music publisher in order to market and profit from the songwriter's Compositions.

9.    The music publisher locates artists who are willing to record the Compositions, who then make the records enjoyed around the world.

10.    The music publisher issues licenses to third parties for the right to use the Compositions in records, films, commercials or any type of media.

11.    Those third parties pay royalties to the music publisher for those rights.

12.    The music publisher, through separate contract with the songwriter, shares those royalties with the songwriter.

13.    Decedent died on May 11, 2004.

14.    A baseless challenge to the authority of the Executrix followed Executrix' appointment (the "Appeal from Probate"), with the Court (Herron, J.) having dismissed the Appeal from Probate with prejudice on April 2, 2007.

15.    During the Appeal from Probate and since that time, Petitioner has exercised due diligence by investigating the market for the sale of Decedent's one-half interest in the Compositions (the other half being owned by the Estate of Gene McFadden).

16.    Petitioner must sell Decedent's one-half interest in the Compositions in order to resolve a pending significant claim (the "Tax Claim") asserted by the United States Internal Revenue Service ("IRS") against the Estate.

17.    Petitioner has identified a purchaser for the Decedent's one-half interest in the Compositions, and entered into a contract to sell that interest at a price which Petitioner believes is fair and reasonable (the "Valid Contract").

18.    The Valid Contract contemplated a closing date for the transaction of October 31, 2007.

2

19.     The Estate has commenced the negotiation process with the IRS and intends to submit an Offer of Compromise to the IRS which will resolve the Tax Claim and which will allow the administration of the Estate to proceed to a prompt resolution.

20.     The Offer of Compromise will be contingent upon the closing on the Valid Contract.

21.     The Offer of Compromise will expire within (90) days after the same is accepted by the IRS.

### THE DISPUTED CONTRACT

22.     On or about October 29, 2007, Petitioner received a letter from counsel for Pullman in which counsel asserted, among other things, that Pullman had entered previously into a contract with Decedent and McFadden while both were living (the "Disputed Contract") whereby Pullman had allegedly acquired a right of first refusal to purchase the Compositions in accordance with the terms of any contract entered into by Decedent and McFadden with a third party to sell the assets (such as the Valid Contract). A true and correct copy of a letter dated October 29, 2007 from Robert S. Besser, Esquire to Petitioner and others (the "October 29, 2007 Letter") is attached hereto as Exhibit A.

23.     Although the October 29, 2007 Letter contains an attached list of the Compositions, the Letter did not contain an attached executed copy of the Disputed Contract. *See* Exhibit A.

24.     Although Pullman's refusal to attach an executed copy of the Disputed Contract leaves Petitioner unable to state with certainty upon which document Pullman purportedly relies, upon information and belief, a true and correct un-executed copy of the Disputed Contract is attached hereto as Exhibit B.

25.     Upon information and belief, Decedent never executed the Disputed Contract.

26.     Petitioner, as Executrix of Decedent's Estate, never executed the Disputed Contract.

27.     At approximately 10:00 p.m. on October 29, 2007, David Pullman ("Mr. Pullman"), the principal of Pullman, telephoned Barbara McFadden, Executrix of the Estate of Gene McFadden, and threatened legal action over the Disputed Contract.

3

28.     By correspondence dated October 30, 2007, Petitioner, through her authorized representative, wrote to counsel for Pullman (the "Berger October 30, 2007 Correspondence"). A true and correct copy of the Berger October 30, 2007 Correspondence is attached hereto as Exhibit C.

29.     In the Berger October 30, 2007 Correspondence, Petitioner advised Pullman of Petitioner's contention that the Disputed Contract was never executed, and requested from Pullman an executed copy of the Disputed Contract. *See* Exhibit C.

30.     Counsel for Pullman responded to the October 30, 2007 Correspondence by correspondence dated October 29, 2007 (nevertheless faxed on October 30, 2007) (the "Besser October 30, 2007 Correspondence"), a true and correct copy of which is attached hereto as Exhibit D.

31.     In the Besser October 30, 2007 Correspondence, Pullman reiterated its contention that it has an enforceable contract with Decedent's Estate, but refused to provide an executed copy of the Disputed Contract before receiving "clarification" of Petitioner's agent's relationship to Decedent's Estate. *See* Exhibit D.

32.     Petitioner, through her authorized agent, responded to the Besser October 30, 2007 Correspondence by correspondence dated October 31, 2007 (the "October 31, 2007 Correspondence"), a true and correct copy of which is attached hereto as Exhibit E.

33.     In the October 31, 2007 Correspondence, Petitioner's agent confirmed the authorization of the agent to speak on behalf of Petitioner, and noted that Mr. Pullman has been aware for months of the agent's representation of Petitioner. *See* Exhibit E.

34.     In the October 31, 2007 Correspondence, Petitioner's agent again demanded that Pullman produce to Petitioner an executed copy of the Disputed Contract. *See* Exhibit E.

35.     Despite proper demand, and with full knowledge that its actions were and are interfering with the contractual rights of Decedent's Estate to close on its Valid Contract with a third party to sell the Estate's interest in the Compositions, Pullman has to this date failed and/or refused to provide to Petitioner an executed copy of the Disputed Contract.

36.     On information and belief, neither Decedent nor McFadden ever executed or entered into the Disputed Contract.

4

37.     On information and belief, Decedent received no consideration for the Disputed Contract.

38.     The Disputed Contract, if it was ever executed or entered into by Decedent and McFadden, is illusory.

39.     The Disputed Contract, if it was ever executed or entered into by Decedent and McFadden, lacks material terms.

40.     The Disputed Contract, if it was ever executed or entered into by Decedent and McFadden, is vague and unenforceable.

41.     No contract of any kind exists between Decedent's Estate and Pullman.

### COUNT I – DECLARATORY JUDGMENT

42.     Petitioner incorporates by reference herein the averments of paragraphs 1 through 41 above as though fully set forth herein at length.

43.     An actual controversy exists between Petitioner and Pullman.

44.     Pullman asserts a concrete interest in the Disputed Contract and/or in the assets of the Estate.

45.     Petitioner denies that Pullman has any interest in any contract with Petitioner and/or Decedent's Estate or any enforceable rights of any kind with Petitioner.

46.     The issuance of a declaratory judgment will serve to terminate the controversy giving rise to the proceeding.

47.     The issuance of a declaratory judgment will allow Petitioner to proceed with the orderly administration of the Estate.

48.     Unless a declaratory judgment is issued promptly, Decedent's Estate may lose the ability to resolve the Tax Claim.



5

**PARTIES IN INTEREST**

49.   The individuals who have interests in the Estate are as follows:

| | |
|---|---|
| Elnor Whitehead<br>48 Sherin Drive<br>Newark, DE 19702 | Executrix of the Estate of John Cavadus<br>Whitehead, St., Petitioner herein |
| John C. Mosley<br>1916 Dallas Street<br>Philadelphia, PA 19138 | Son/Beneficiary |
| Kenny Whitehead<br>1916 Dallas Street<br>Philadelphia, PA 19138 | Son/Beneficiary |
| Dawn E. Mosley<br>2122 Ted Jim Drive<br>Warrington, PA 18976 | Daughter/Beneficiary |
| Lakia McNichols<br>5139 Chancellor Street<br>Philadelphia, PA 19139 | Daughter/Beneficiary |
| Carol Hendriks<br>5139 Chancellor Street<br>Philadelphia, PA 19139 | Daughter/Beneficiary |
| Caiya Whitehead<br>7519 Woolston Avenue<br>Philadelphia, PA 19150 | Daughter/Beneficiary |
| Jaron Battle<br>1016 E. Willow Grove Ave<br>2nd Floor<br>Wyndmoor, PA 19038 | Son/Beneficiary |
| Nicole Williams<br>2053 Gem Circle<br>Hartville, SC 29530 | Daughter/Beneficiary (minor, d.o.b.<br>5/13/1993) |
| Shawn Young<br>1916 Dallas Street<br>Philadelphia, PA 19138 | Son/Beneficiary |

6

Aaliyah Castro                           Granddaughter/Beneficiary
48 Sherin Drive
Newark, DE 19702

Mary E. Whitehead                        Successor Executor
1000 Ivy Hill Road, Apt. D-11
Philadelphia, PA 19150

WHEREFORE, for the foregoing reasons, Petitioner Elnor Whitehead, Executrix of the

Estate of John Cavadus Whitehead, Sr., respectfully requests that this Honorable Court issue a

citation to Pullman Group, LLC requiring it to show cause why this Honorable Court should not

issue a declaratory judgment finding that the Disputed Contract is invalid and that Pullman

Group, LLC has no interest in the assets of the Estate; and that this Honorable Court enter a final

declaratory judgment decree that the Disputed Contract is invalid and that Pullman Group, LLC

has no interest in the assets of the Estate; and that this Honorable Court issue such other and

further relief as it deems appropriate.

Respectfully submitted,

Date: __11/4/07__

Martin A. Heckscher, Esquire (I.D. #04721)
Timothy J. Holman, Esquire (I.D. #63161)
Heckscher, Teillon, Terrill & Sager, P.C.
100 Four Falls, Suite 300
West Conshohocken, PA 19428
(610) 940-4170

7

## VERIFICATION

I, ELNOR WHITEHEAD, Executrix of the Estate of John Cavadus Whitehead, Sr., Deceased, verify that I am the Petitioner in the foregoing Petition for Declaratory Judgment. I verify that the statements made in the foregoing Petition are true and correct to the best of my knowledge, information and belief. I understand that this verification is subject to the penalties of 18 Pa. C.S. §4904 relative to unsworn falsification to authorities.

Dated: 11/14/07

ELNOR WHITEHEAD, Executrix of the Estate
of John Cavadus Whitehead, Sr., Deceased

COURT OF COMMON PLEAS OF PHILADELPHIA
ORPHANS' COURT DIVISION
O. C. No. 1418 DE of 2004
Estate of John C. Whitehead, Sr., Deceased
Control No. 072191

DECREE

AND NOW, this *3rd* day of *November* 2007, upon consideration of the

petition filed by Elnor Whitehead, Executrix of the Estate of John Cavadus Whitehead, Sr., for a

Declaratory Judgment as to the validity of a purported contract between John Cavadus Whitehead

Sr. and Pullman Group LLC and any other relief sought in the declaratory judgment petition, it is

hereby ORDERED that a Citation is awarded directed to Pullman Group, LLC to show cause why a

declaratory judgment should not issue in accordance with Elnor Whitehead's Petition.

Citation returnable sec leg.

Pursuant to Section 765 of the Probate, Estates and Fiduciaries Code, the Citation shall be

served in the same manner as Original Process may be served in a civil action under Pa.R.C.P. 400,

400.1 and 402. Proof of service of the citation shall be formally filed with the Clerk in the manner

prescribed by Phila. O.C. Div. Rule 3.5.B.(2).

John W. Herron, J.

COPIES SENT
PURSUANT TO Pa.R.C.P. 236(b)

DEC 0 3 2007

FIRST JUDICIAL DISTRICT OF PA
USER I.D.

DEC 4 2007 **EXIT CITATION RETURNABLE** JAN. 18, 2008

John Cavadus Whitehead Sr, Deceased



20040141805006

## COURT OF COMMON PLEAS OF PHILADELPHIA
## ORPHANS' COURT DIVISION

PHILADELPHIA COUNTY, SS                    The Commonwealth of Pennsylvania

To Pullman Group, LLC:

Sur Petition of Barbara McFadden;

### Greeting:

WE COMMAND YOU, that laying aside all business and excuses, whatsoever, you do file in the office of the Clerk of Orphans' Court Division of the Court of Common . Pleas of Philadelphia County, Room 415, City Hall, a full and complete answer, under oath, to each and every of the averments of the petition on or before        **January 18, 2008**        and show cause why a declaratory judgment should not issue in accordance with Barbara McFadden's  Petition and further abide the order of our said Court in this matter. If you fail hereof, the petition may be taken pro confesso and a decree made against you.

Witness the Honorable Joseph D. O'Keefe,  Administrative Judge of the Orphans' Court division of the Court of Common Pleas of Philadelphia County, 3rd  day of December 2007.

Assistant Clerk of Orphans' Court
Maria Matos

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

NO. _____

ESTATE OF GENE MCFADDEN

**PETITION FOR DECLARATORY JUDGMENT**

Petitioner, Barbara McFadden, Executrix of the Estate of Gene McFadden, respectfully
submits this Petition for Declaratory Judgment to resolve a dispute which has arisen related to a
purported contract between Pullman Group, LLC and Gene McFadden ("Decedent"), and in
support thereof avers the following:

**PARTIES/JURISDICTION**

1.    Petitioner, Barbara McFadden ("Executrix") is the Executrix of Decedent's
Estate, Letters Testamentary having been granted to her on June 12, 2006.

2.    Respondent, Pullman Group, LLC ("Pullman"), is a limited liability company
with offices located at 1370 Avenue of the Americas, New York, NY 10019.

3.    This action is brought in accordance with the Pennsylvania Declaratory
Judgments Act, 42 PA.C.S. 7531, et seq.

4.    This Court has jurisdiction over this dispute in accordance with 20 PA.C.S. §§
711 and 712, because this matter presents a dispute related to property owned by Decedent's
Estate, and the resolution of this dispute will allow for the orderly administration of the Estate to
occur.

5.    Venue is proper in this Court because the purported transaction at issue in this
matter arose in Philadelphia, Pennsylvania.

**BACKGROUND**

6.    Decedent and his partner, John Cavadus Whitehead, Sr., (who died May 11, 2004
and whose estate is filing simultaneously its own Petition for Declaratory Judgment arising out

of the same facts and circumstances as are set forth in this Petition) ("Whitehead"), were childhood friends from Philadelphia who collaborated as songwriters, artists and producers.

7.     Decedent and Whitehead collaborated on hundreds of musical compositions (the "Compositions").

8.     In the music industry, a songwriter must engage a music publisher in order to market and profit from the songwriter's Compositions.

9.     The music publisher locates artists who are willing to record the Compositions, who then make the records enjoyed around the world.

10.    The music publisher issues licenses to third parties for the right to use the Compositions in records, films, commercials or any type of media.

11.    Those third parties pay royalties to the music publisher for those rights.

12.    The music publisher, through separate contract with the songwriter, shares those royalties with the songwriter.

13.    Decedent died on January 27, 2006.

14.    Since qualifying as Executrix of the Estate, Petitioner has exercised due diligence by investigating the market for the sale of Decedent's one-half interest in the Compositions (the other half being owned by the Estate of John Cavadus Whitehead, Sr.).

15.    Petitioner must sell Decedent's one-half interest in the Compositions in order to resolve a pending significant claim (the "Tax Claim") asserted by the United States Internal Revenue Service ("IRS") against the Estate.

16.    Petitioner has identified a purchaser for the Decedent's one-half interest in the Compositions, and entered into a contract to sell that interest at a price which Petitioner believes is fair and reasonable (the "Valid Contract").

17.    The Valid Contract contemplated a closing date for the transaction of October 31, 2007.

18.    The Estate has commenced the negotiation process with the IRS and intends to submit an Offer of Compromise to the IRS which will resolve the Tax Claim and which will allow the administration of the Estate to proceed to a prompt resolution.

2

19.     The Offer of Compromise will be contingent upon the closing on the Valid Contract.

20.     The Offer of Compromise will expire within (90) days after the same is accepted by the IRS.

## THE DISPUTED CONTRACT

21.     On or about October 29, 2007, Petitioner received a letter from counsel for Pullman in which counsel asserted, among other things, that Pullman had entered previously into a contract with Decedent and Whitehead while both were living (the "Disputed Contract") whereby Pullman had allegedly acquired a right of first refusal to purchase the Compositions in accordance with the terms of any contract entered into by Decedent and Whitehead with a third party to sell the assets (such as the Valid Contract). A true and correct copy of a letter dated October 29, 2007 from Robert S. Besser, Esquire to Petitioner and others (the "October 29, 2007 Letter") is attached hereto as Exhibit A.

22.     Although the October 29, 2007 Letter contains an attached list of the Compositions, the Letter did not contain an attached executed copy of the Disputed Contract. *See* Exhibit A.

23.     Although Pullman's refusal to attach an executed copy of the Disputed Contract leaves Petitioner unable to state with certainty upon which document Pullman purportedly relies, upon information and belief, a true and correct un-executed copy of the Disputed Contract is attached hereto as Exhibit B.

24.     Upon information and belief, Decedent never executed the Disputed Contract.

25.     Petitioner, as Executrix of Decedent's Estate, never executed the Disputed Contract.

26.     At approximately 10:00 p.m. on October 29, 2007, David Pullman ("Mr. Pullman"), the principal of Pullman, telephoned Petitioner and threatened legal action over the Disputed Contract.

27.     By correspondence dated October 30, 2007, Petitioner, through her authorized representative, wrote to counsel for Pullman (the "Berger October 30, 2007 Correspondence").

3

A true and correct copy of the Berger October 30, 2007 Correspondence is attached hereto as Exhibit C.

28.   In the Berger October 30, 2007 Correspondence, Petitioner advised Pullman of Petitioner's contention that the Disputed Contract was never executed, and requested from Pullman an executed copy of the Disputed Contract. *See* Exhibit C.

29.   Counsel for Pullman responded to the October 30, 2007 Correspondence by correspondence dated October 29, 2007 (nevertheless faxed on October 30, 2007) (the "Besser October 30, 2007 Correspondence"), a true and correct copy of which is attached hereto as Exhibit D.

30.   In the Besser October 30, 2007 Correspondence, Pullman reiterated its contention that it has an enforceable contract with Decedent's Estate, but refused to provide an executed copy of the Disputed Contract before receiving "clarification" of Petitioner's agent's relationship to Decedent's Estate. *See* Exhibit D.

31.   Petitioner, through her authorized agent, responded to the Besser October 30, 2007 Correspondence by correspondence dated October 31, 2007 (the "October 31, 2007 Correspondence"), a true and correct copy of which is attached hereto as Exhibit E.

32.   In the October 31, 2007 Correspondence, Petitioner's agent confirmed the authorization of the agent to speak on behalf of Petitioner, and noted that Mr. Pullman has been aware for months of the agent's representation of Petitioner. *See* Exhibit E.

33.   In the October 31, 2007 Correspondence, Petitioner's agent again demanded that Pullman produce to Petitioner an executed copy of the Disputed Contract. *See* Exhibit E.

34.   Despite proper demand, and with full knowledge that its actions were and are interfering with the contractual rights of Decedent's Estate to close on its Valid Contract with a third party to sell the Estate's interest in the Compositions, Pullman has to this date failed and/or refused to provide to Petitioner an executed copy of the Disputed Contract.

35.   On information and belief, neither Decedent nor Whitehead ever executed or entered into the Disputed Contract.

36.   On information and belief, Decedent received no consideration for the Disputed Contract.

4

37. The Disputed Contract, if it was ever executed or entered into by Decedent and Whitehead, is illusory.

38. The Disputed Contract, if it was ever executed or entered into by Decedent and Whitehead, lacks material terms.

39. The Disputed Contract, if it was ever executed or entered into by Decedent and Whitehead, is vague and unenforceable.

40. No contract of any kind exists between Decedent's Estate and Pullman.

## COUNT I – DECLARATORY JUDGMENT

41. Petitioner incorporates by reference herein the averments of paragraphs 1 through 40 above as though fully set forth herein at length.

42. An actual controversy exists between Petitioner and Pullman.

43. Pullman asserts a concrete interest in the Disputed Contract and/or in the assets of the Estate.

44. Petitioner denies that Pullman has any interest in any contract with Petitioner and/or Decedent's Estate or any enforceable rights of any kind with Petitioner.

45. The issuance of a declaratory judgment will serve to terminate the controversy giving rise to the proceeding.

46. The issuance of a declaratory judgment will allow Petitioner to proceed with the orderly administration of the Estate.

47. Unless a declaratory judgment is issued promptly, Decedent's Estate may lose the ability to resolve the Tax Claim.

## PARTIES IN INTEREST

48. The individuals who have interests in the Estate are as follows:

| | |
|---|---|
| Barbara McFadden<br>7219 Bryan Street<br>Philadelphia, PA 19119 | Executrix of the Estate of Gene<br>McFadden, Petitioner herein |

5

WHEREFORE, for the foregoing reasons, Petitioner Barbara McFadden, Executrix of the Estate of Gene McFadden, respectfully requests that this Honorable Court issue a citation to Pullman Group, LLC requiring it to show cause why this Honorable Court should not issue a declaratory judgment finding that the Disputed Contract is invalid and that Pullman Group, LLC has no interest in the assets of the Estate; and that this Honorable Court enter a final declaratory judgment decree that the Disputed Contract is invalid and that Pullman Group, LLC has no interest in the assets of the Estate; and that this Honorable Court issue such other and further relief as it deems appropriate.

Respectfully submitted,

Date:  11/14/07

Martin A. Heckscher, Esquire (I.D. #04721)
Timothy J. Holman, Esquire (I.D. #63161)
Heckscher, Teillon, Terrill & Sager, P.C.
100 Four Falls, Suite 300
West Conshohocken, PA  19428
(610) 940-4170

6

COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

NO. _____

ESTATE OF GENE MCFADDEN

## PRELIMINARY DECREE

AND NOW, this _____ day of _____, 2007, in consideration of the

attached Petition, it is hereby ORDERED and DECREED that a citation issue, directed to

Pullman Group, LLC, to show cause why a declaratory judgment should not issue in accordance

with the attached Petition.

Citation is returnable before this Court on the            day of                                ,

2007 in Courtroom            , City Hall, Philadelphia, PA at            m.

_____, J.

## VERIFICATION

I, BARBARA McFADDEN, Executrix of the Estate of Gene McFadden, Deceased,

verify that I am the Petitioner in the foregoing Petition for Declaratory Judgment. I verify that

the statements made in the foregoing Petition are true and correct to the best of my knowledge,

information and belief. I understand that this verification is subject to the penalties of 18 Pa.

C.S. §4904 relative to unsworn falsification to authorities.

Dated: _11-14-07_

_Barbara McFadden_
BARBARA McFADDEN, Executrix of the
Estate of Gene McFadden, Deceased

**AREC** ARTISTS RIGHTS ENFORCEMENT CORPORATION
250 West 57ᵗʰ Street • Suite 701 • New York, NY 10107
Tel: 212-586-2600 • Fax: 212-977-3110 • www.artists-rights.com

October 30, 2007

**VIA FACSIMILE, ELECTRONIC
& U.S. MAIL**

Robert S. Besser, Esq.
Law Offices of Robert S. Besser
1221 Second Street, Third Floor
Santa Monica, CA  90401

        **Re:     McFadden & Whitehead
                    Pullman Group, LLC**

Dear Mr. Besser:

        This acknowledges receipt of your letter dated October 29, 2007 sent after the close of business in New York.  As you and your client are aware, Artists Rights Enforcement Corp. ("AREC") is the authorized business representative of The Estate of Gene McFadden and the Estate of John C. Whitehead.

        We understand from your letter that the Pullman Group, LLC ("Pullman") contends that in or about 2002 it entered into an alleged agreement with Gene McFadden and John Whitehead which provided Pullman with "the sole and exclusive right to purchase Assets" owned by them. Notwithstanding your affirmative statement, you failed to attach to your letter a copy of the alleged agreement signed by Messrs. McFadden and Whitehead.  We find that very suspicious given that after speaking with our clients, it is our understanding that the "agreement" was never executed by either Gene McFadden or John Whitehead.  Accordingly, if you do not provide us with a copy of the fully executed "agreement" by 12 noon EST tomorrow, October 31, 2007, we will assume that no such agreement exists and will proceed accordingly.

        Further, putting aside your failure to attach the "agreement", we believe that even if the same was fully executed (a fact which our clients vehemently deny), we do not believe that the agreement is enforceable against either estate.

        We are troubled by your apparent lack of due diligence and question Pullman's motive in threatening our clients with legal proceedings.  We believe that this letter is nothing more than mere harassment sent for the sole purpose of interfering with our clients' contractual and potential economic relations to extort monies to which Pullman is not entitled.  Please understand that our clients intend to take all action necessary to hold all parties fully responsible for any damages incurred by virtue of your letter and/or your client's specious claims.

C 003833

Robert S. Besser, Esq.
October 30, 2007
Page Two

I am informed that at 10:00 p.m. last evening, your client's proprietor, David Pullman, telephoned Mrs. Barbara McFadden at her home and threatened her with legal proceedings. I have been further informed that Mr. Pullman has been placing numerous telephone calls to Mrs. Elnor Whitehead. Please advise your client that pending further written notice, all communications concerning this matter shall be directed to AREC and that neither Mr. Pullman nor any other Pullman employee or representative shall have any additional direct contact with either Mrs. McFadden or Mrs. Whitehead.

Nothing contained herein shall act in any manner as a waiver or relinquishment of any of our clients' respective rights and remedies in this matter; all of which are hereby expressly reserved.

Your prompt attention to this matter is requested.

Sincerely,
Artists Rights Enforcement Corp.

Jay L. Berger

JLB:kc
cc:    Mrs. Barbara McFadden
       Mrs. Elnor Whitehead
       Mr. Chuck Rubin
       Jeffrey S. Sacharow, Esq.

C 003834